1  RAINES FELDMAN LLP
   Miles J. Feldman (Bar No. 173383)
2      mfeldman@raineslaw.com
   Laith D. Mosely (Bar No. 250832)
3      lmosely@raineslaw.com
   9720 Wilshire Boulevard, 5th Floor
4  Beverly Hills, California 90212
   Telephone:  (310) 440-4100
5  Facsimile:  (310) 691-1943

FILED
CLERK, U.S. DISTRICT COURT

OCT 2 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

6  Attorneys for Defendants and Cross-Complainants Barry Levine, Ari
   Schottenstein, Protilus Investors, LLC, Ilus Investors, LP, Ilus GP US, LLC

7

8              UNITED STATES DISTRICT COURT
9    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  BISNO DEVELOPMENT
    ENTERPRISE, a California limited          Civil Action No.
12  liability company,
                                             CV13-7961 R (PJWx)
13              Plaintiff,

14      vs.
                                             NOTICE OF REMOVAL OF
15  BARRY LEVINE, an individual; ARI          ACTION; UNDER 28 U.S.C.
    SCHOTTENSTEIN, an individual;             § 1441(a) (FEDERAL
16  PROTILUS INVESTORS, LLC, a New            QUESTION)
    Jersey limited liability company; ILUS
17  INVESTORS, LP, a California limited
    partnership; ILUS GP US, LLC, a
18  California limited liability company;
    RIDGEMOUNT INVESTMENTS INC.,
19  a Canadian Corporation; ALEX ISCOE,
    an individual; DAVID ULMER, an
20  individual, and DOES 1 through 100,
    inclusive,
21
                Defendants.
22

23

24

25

26

27

28

To the Clerk of the United States District Court for the Central District of California:

PLEASE TAKE NOTICE that defendants Barry Levine, Ari Schottenstein, Protilus Investors, LLC, Ilus Investors, LP, and Ilus GP US, LLC, (collectively, the "Removing Defendants") hereby remove to this Court the state court action described below:

## STATEMENT OF FACTS ENTITLING DEFENDANTS TO REMOVAL

1.     On October 15, 2013, a complaint was filed in the Superior Court of the State of California in and for the City of Los Angeles County of Los Angeles, entitled *Bisno Development Enterprise, LLC* ("Plaintiff"), vs. *Barry Levine et al.* ("Defendants"), as case number BC 524604 (The "Complaint"). The Complaint is attached hereto as Exhibits "A."

2.     The first date upon which Removing Defendants received a copy of the Complaint was October 16, 2013, when defendants were sent a copy of the said Complaint and a Summons from the said state court. A copy of the Summons is attached hereto as Exhibit "B." The Removing Defendants were served by execution of an acknowledgment of service executed on October 28, 2013.

3.     Removal is timely under 28 U.S.C. § 1446(b) because this Notice of Removal is filed within 30 days of service of process of the Complaint stating a claim within federal jurisdiction.

4.     This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court by the Removing Defendants pursuant to the provisions of 28 U.S.C. § 1441(a) in that it arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

5.     Because the state court action is one within the federal question jurisdiction of the federal district courts, the action is removable to federal court

under 28 U.S.C. § 1441(a) without regard to the citizenship of the parties.

6.     All of the alleged claims are directly related to the alleged RICO claims in the Complaint.  Therefore, the federal district court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a).

7.     Removal to this district court is proper under 28 U.S.C. § 1441(a) because the Superior Court of California, Los Angeles County, is geographically located within this Court's district and division.

8.     All of the Removing Defendants have been served with Summons and Complaint and join this Notice of Removal. Those defendants who have not joined in this Notice of Removal have not been served with the Complaint. On October 25, 2013, Removing Defendants spoke with representatives of defendant Ridgemount Investments Inc. ("Ridgemount"), including Alex Iscoe ("Iscoe") and David Ulmer ("Ulmer"). Ridgemount, Iscoe and Ulmer all confirmed that they had not been served with the Complaint. The docket of the state court action further confirmed that fact.

9.     On October 25, 2013, representatives of Ridgemount, Iscoe and Ulmer each stated to the Removing Defendants that they each consent to the removal of the Complaint to federal court, reserving the right to make any claims and defenses they may have to the allegations in the Complaint once they are actually served with the Complaint.

Dated:  October 28, 2013                    RAINES FELDMAN LLP


By: _____

Miles J. Feldman
Laith D. Mosely
Attorneys for Defendants Barry Levine, Ari Schottenstien, Protilus Investors, LLC, Ilus Investors, LP; Ilus GP US LLC

# EXHIBIT A

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

OCT 15 2013

John A. Clarke, Executive Officer/Clerk
By _____; Deputy
SHAUNYA WEBLEY

1  Robert H. Bisno, Esq. (State Bar No. 83284)
2  LAW OFFICES OF ROBERT H. BISNO
   9255 Sunset Boulevard, Suite 920
3  Los Angeles, California 90069
   Tel:   (310) 277-3670
4  Fax:   (310) 277-3787
   E-Mail: rhbisno@gmail.com

5  Attorney for Plaintiff, Bisno Development Enterprise, LLC
6     a California limited liability company

7        SUPERIOR COURT OF THE STATE OF CALIFORNIA
              COUNTY OF LOS ANGELES    BC 5 2 4 6 0 4

8  BISNO DEVELOPMENT                    CASE No. _____
   ENTERPRISE, LLC, a limited
9  liability company

10           Plaintiff,                 **COMPLAINT FOR DAMAGES:**

11        vs.                           1.  **FRAUD IN THE INDUCEMENT;**
   BARRY LEVINE, an individual;         2.  **FRAUD;**
12 ARI SCHOTTENSTEIN, an                3.  **FRAUDULENT**
   individual; PROTILUS                     **CONCEALMENT;**
13 INVESTORS, LLC, a New Jersey         4.  **QUANTUM MERUIT**
   limited liability company;           5.  **UNJUST ENRICHMENT**
14 ILUS INVESTORS, LP, a California      6.  **INTENTIONAL INTERFERENCE**
   limited partnership; ILUS GP US          **WITH CONTRACT;**
15 LLC, a California limited liability   7.  **NEGLIGENT INTERFERENCE**
   company, RIDGEMOUNT                       **WITH CONTRACT**
16 INVESTMENTS INC; a Canadian          8.  **RACKETEER INFLUENCED**
   Corporation; ALEX ISCOE, an              **AND CORRUPT**
17 individual; DAVID ULMER, an              **ORGANIZATION ("RICO")**
   individual and DOES 1 through 100,   9.  **CONSTRUCTIVE TRUST**
18 Inclusive,

19           Defendants.               **DEMAND FOR JURY TRIAL**

20

21

22

23     Plaintiff alleges:

24                      **PARTIES**

25     1.     Plaintiff Bisno Development Enterprise, LLC ("Plaintiff" or

26 "BDE") is a California limited liability company in good standing.  It is duly organized

27 and existing under the laws of the State of California with its principal place of

28 business located at 9255 Sunset Blvd., Suite #920, Los Angeles, CA 90069.

COMPLAINT FOR DAMAGES

2.    Plaintiff is informed and believes and based upon such information and belief alleges that Protilus Investors, LLC ( "Protilus") is a New Jersey limited liability company with its principal place of business located at 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950, and Protilus is a limited partner in Defendant Ilus Investors, LP ("Ilus Investors"). Protilus is one of the "Enterprises" or "Enterprise Defendants" described herein. The purpose of Protilus was to commit and aid in the commission of the wrongful acts described herein. Protilus acted both for itself and in concert with the other Defendants herein. The Enterprise Defendants conducted their activities such that they committed multiple acts violating 18 U.S.C. 1343-wire fraud. Their illegal activities constituted a pattern pursuant to 18 U.S.C. 1961 (5) which is still continuing, to defraud Plaintiff.

3.    Plaintiff is informed and believes and based upon such information and belief alleges that Barry L. Levine (hereafter, "Levine") is an individual residing in the State of New Jersey and is a principal of Protilus, a limited partner in Defendant Ilus Investors. Plaintiff is further informed and believes and based upon such information and belief alleges that Levine is a co-manager of Defendant Ilus GP US LLC ("Ilus GP") which is the general partner of Defendant Ilus Investors. Levine is an Individual Defendant as set forth and described herein. Levine is both a perpetrator and conspirator, as further described herein, acting both alone and together with the other Defendants, and acting for and on behalf of and in concert with, Protilus, Ilus Investors and Ilus GP to effect the unlawful schemes described herein.

4.    Plaintiff is informed and believes and based upon such information and belief alleges that Ari Schottenstein (hereafter "Schottenstein") is an individual residing in the State of New Jersey and is the other principal of Protilus, a limited partner in Defendant Ilus Investors. Schottenstein is also a perpetrator and conspirator, as further described herein, acting both alone and together with the other Defendants

-2-

and acting for and on behalf of Protilus, and in concert with, Ilus Investors and Ilus GP to effect the unlawful schemes described herein. Schottenstein is an Individual Defendant as set forth and described herein.

5.      Plaintiff is informed and believes and based upon such information and belief alleges that Defendant Ridgemount Investments, Inc. ('Ridgemount') is a Canadian corporation doing business in California. Ridgemount's purpose was to commit and aid in the commission of the wrongful acts set forth herein. On information and belief, Ridgemount is owned and controlled by Defendants Alex Iscoe ("Iscoe") an Individual Defendant and Defendant David Ulmer ("Ulmer") an Individual Defendant. Iscoe, Ulmer, Levine and Schottenstein, collectively, are also described as the "Individual Defendants" herein. The Individual Defendants have directly and indirectly conducted and participated in the conduct of the fraudulent enterprise and in the conduct of the Enterprise Defendants in violation of 18 U.S.C. 1962 (c). As a direct and proximate result of the Defendants racketeering activities in violation of 18 U.S.C. 1962(c) Plaintiff has been injured as detailed herein. Iscoe and Ulmer are both perpetrators and conspirators, as further described herein, acting both alone and together, and acting on behalf of and in concert with Ridgemount, Protilus, Ilus Investors and Ilus GP to effect the unlawful schemes described herein. As a direct and proximate result of the Defendants racketeering activities in violation of 18 U.S.C. 1962(c). Plaintiff has been injured as detailed herein.

6.      Plaintiff is informed and believes and based upon such information and belief alleges that Ilus Investors, LP ("Ilus Investors") is a California limited partnership with a registered office at 1875 Century Park East, Suite 2230, Los Angeles, California 90067 and a principal address of 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950. The general partner of Ilus Investors is Defendant Ilus GP US LLC ("Ilus GP"). Ilus Investors and Ilus GP are two Enterprise

-3-

COMPLAINT FOR DAMAGES

Defendants. The purpose of each and every one of the Enterprise Defendants was to commit the fraud and other wrongful acts set forth herein. Ilus Investors acted both by itself and in concert with the other Defendants herein. As a direct and proximate result of the Defendants racketeering activities in violation of 18 U.S.C. 1962 (c) Plaintiff has been injured as detailed herein.

7.    Plaintiff is informed and believes and based upon such information and belief alleges that Defendant Ilus GP is a California limited liability company with a registered office at 1875 Century Park East, Suite 2230, Los Angeles, California 90067 and a principal address of 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950. Ilus GP is an Enterprise Defendant. Ilus acted both by itself and in concert with the other Defendants herein. The purpose of the Enterprise Defendants was to commit the fraud and other wrongful acts set forth herein.

8.    Each of the Enterprise Defendants and each of the Individual Defendants did agree to act and conspire to act to violate 18 U.S.C. 1962 (a) (b) and (c) as set forth herein. Each Defendant did act to conspire with each of the other Defendants to perpetrate the wrongful acts set forth herein. Each Defendants acted as the agent of the other Defendants for purposes of carrying out the wrongful acts set forth herein.

9.    Plaintiff is unaware of the true names and capacities of the defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when the same have been ascertained. Plaintiff is informed and believes and thereon alleges that the defendants sued herein as DOES 1 through 100 are proximately responsible for the acts, occurrences and damages alleged in this Complaint.

-4-

## NON-PARTIES

10.     VDC at The Met, LLC ("VDCATM") is a California Limited Liability Company.

11.     Vineyards Development Incorporated ("VDI") is a California Corporation owned by Ryan Ogulnick ("Ogulnick").  VDB Santa Ana, LLC ("VDB") is a California Limited Liability owned by Ogulnick.  VDB is a Member Manager of VDCATM.  VDB received its Member Manager contractual interest by assignment from VDI.

## JURISDICTION AND VENUE

12.     The parties named as Defendants herein do business in Los Angeles and/or Orange County, California.  Many of the acts of complained herein occurred in Los Angeles, California.

## FACTS COMMON TO ALL CAUSES OF ACTION

*Corporate Structure*

13.     VDCATM is the owner of an (approximate) three acre parcel of real property located in Santa Ana, California with a street address of 200 First American Way, Santa Ana, California 92707 (the "Property" or "Project"), and is managed pursuant to the provisions of that certain Second Amended and Restated Operating Agreement (the "VDCATM Operating Agreement" or the "Second Amended And Restated Operating Agreement"), a true and correct copy of the VDCATM Operating Agreement is attached hereto as Exhibit "A" and is incorporated herein by this reference.

-5-

COMPLAINT FOR DAMAGES

14.     Ilus GP is the general partner of Ilus Investors.  Ulmer of Ridgemount and Levine of Protilus are the co-managers of Ilus GP.   True and correct copies of the Ilus Investors Limited Partnership Agreement dated June 7, 2011, and the Ilus GP Operating Agreement dated June 7, 2011 are attached hereto as Exhibits "B" and "C," respectively, and are incorporated herein by this reference.

15.     Section 4.8 of the ILUS GP Operating Agreement expressly states that the consent of *both* of its co-managers (ULMER and LEVINE) are required before any action may be taken by ILUS GP on behalf of ILUS INVESTORS.  Thus, both ULMER and LEVINE *must* agree on any given action before ILUS GP may act on behalf of ILUS INVESTORS.

16.     An organizational chart showing the relationship between the various people and entities is attached hereto as Exhibit "D" and is incorporated herein by this reference.

17.     "Entitlements" are the discretionary rights granted by a political entity having competent jurisdiction (such as the City of Santa Ana, in this case).  The Entitlements in this case resulted in the right to construct approximately 271 apartment homes on the site owned by VDCATM.

*Factual Background*

18.     In October 2010, Ogulnick took notice of the real property in Santa Ana that ultimately became the VDCATM Project.  Ogulnick, shortly thereafter, sought to enlist the assistance of Plaintiff.

19.     During the period starting in December 2010, Plaintiff analyzed

-6-

the Project to determine the highest and best use for the Property and aided in the creation of the business plan for the Property assisting in the hiring of a team of consultants to design the project.

20.     In connection therewith Plaintiff with Ogulnick executed on the business plan above described and VDCATM, hired architects, engineers, and fostered contacts with the City of Santa Ana to further VDCATM's Entitlement efforts.

21.     After VDI placed the Property under contract, December 9, 2010, and with the assistance of Plaintiff, Ogulnick, began processing Entitlements with the City of Santa Ana for the development of apartments on the Property.  Ogulnick removed contingencies on the purchase and assigned his interest in the contract to VDCATM.  VDCATM closed on the Property in March, 2011 at a purchase price of $6,100,000.  Starting shortly after Ogulnick had placed the Property under contract, Ogulnick entered into discussions with Plaintiff.  These discussions resulted in an oral understanding which thereafter led to a written agreement in July, 2011 entitled, Re: Entitlement Representation: Geneva Commons/The Met Santa Ana, LLC" (the "Entitlement Representation Agreement") which is Exhibit E hereto.  It was material to Plaintiff that Defendants perform all of the representations they were making as set forth herein,  including their representations as to Ilus Investors outstanding Capital Contribution and total Capital Contribution under what was being negotiated as the Second Amended and Restated Operating Agreement of VDCATM.   Defendants other representations as set forth herein were also material to Plaintiff.  The reason that it was material to Plaintiff that Defendant perform all of its Capital Contribution representations is because of the terms of the Entitlement Representation Agreement. Under the terms of the Entitlement Representation Agreement if Defendant Ilus Investors did not make the Capital Contributions it represented it had or would make, Ogulnick would need to contribute more capital which would reduce Plaintiff's

-7-

compensation under the Entitlement Representation Agreement. Thus Plaintiff was relying on Defendants representations as Plaintiff codified the Entitlement Representation Agreement with Ogulnick. Plaintiff has performed its obligations under Entitlement Representation Agreement.

22. On or about August 18, 2011, Plaintiff and VDCATM entered into an "Independent Contractor Agreement" ("ICA") (Exhibit F hereto). The ICA included a copy of the Entitlement Representation Agreement as Exhibit B thereto. The email confirming Ogulnick had sent the Entitlement Representation Agreement to the Defendants is the last 3 pages of Exhibit F. The ICA specifically provided that Plaintiff would be entitled to substantial compensation under the Entitlement Representation Agreement. Plaintiff has performed its obligations under the ICA and the Entitlement Representation Agreement.

23. It is the tortious and otherwise unlawful actions of all Defendants, both prior to the codification of the Entitlement Representation Agreement and thereafter, that deceived Plaintiff and fraudulently concealed material matters from Plaintiff as set forth herein and deprived Plaintiff of its rightful and earned compensation and consideration thereunder the Entitlement Representation Agreement.

24. Through the efforts of Plaintiff in successfully gaining Entitlements for the Property, the value of the Property was increased from $6,100,000, the Purchase Price in 2011 to at least $17,250,000, which is the amount for which the Property was sold on or about October 3, 2013. Plaintiff has been damaged by the acts of Defendants as to Plaintiff's rights to profits as set forth herein.

25. The members of VDCATM as of April 2, 201, by which time the

-8-

COMPLAINT FOR DAMAGES

Property was purchased by VDCATM, were Ogulnick and Ilus Investors. The First Amended and Restated Operating Agreement for VDCATM, dated as of March 28, 2011, is attached hereto as Exhibit G. Under the First Amended and Restated Operating Agreement for VDCATM Ilus Outstanding Capital Contribution exceeded $2,246,000.

26.    Between April, 2011 and August 16, 2011, Ogulnick and the Defendants were negotiating a Second Amended and Restated Operating Agreement for VDCATM ("Second Amended and Restated Operating Agreement"). During the negotiations and draft agreements of the Second Amended and Restated Operating Agreement of VDCATM, Ilus Investors outstanding Capital Contribution as of the Effective Date of such agreement was to be no less than $2,100,000. At all times during these negotiations Ogulnick kept Plaintiff fully advised as to all of the material terms of the proposed second Amended and Restated Operating Agreement and provided Plaintiff copies of the evolving draft of the same as well as copies of emails from the Defendants Expense Tracker reports and reports of the oral communications with the Defendants. During this entire period Plaintiff provided review and comments to the draft, emails, Expense Tracker reports and reported oral communications being submitted or made by Defendants. Examples of Expense Tracker reports containing fraudulent misrepresentations and concealments are attached hereto as Exhibit I.

27.    Defendants were well aware that Plaintiff was reviewing all emails and Expense Tracker reports they exchanged with or submitted to Ogulnick. Defendants were also well aware Plaintiff was also receiving reports of oral communications and reviewing all drafts of the Second Amended and Restated Operating Agreement submitted by Defendants to Ogulnick and that Plaintiff was being advised as to the matters and positions being negotiated. Ogulnick advised all Defendants of the same. Ogulnick also advised Defendants that Plaintiff was and

-9-

would rely on the Second Amended and Restated Operating Agreement when executed, as well as Defendants representations prior to said execution. As Plaintiff's compensation under the Entitlement Representation Agreement was directly related to the Second Amended and Restated Operating Agreement its content and representations related thereto were material to Plaintiff, as Defendants knew. At all relevant times between the commencement of Ogulnick and the Defendants negotiating the Second Amended and Restated Operating Agreement and July 1, 2011, Defendants represented (and the drafts of the Second Amended and Restated Operating Agreement as well as the Expense Tracker reports set forth) that Ilus Investors would have outstanding Capital Contributions of $2,100,000 in VDCATM as of the Effective Date of the Second Amended and Restated Operating Agreement. Plaintiff reasonably relied on these reports, representations and the drafts of the Second Amended and Restated Operating Agreement being provided by Defendants. Defendants were advised and knew Plaintiff was so relying as set forth above. Defendants encouraged or acquiesced to Ogulnick providing this information to Plaintiff as Defendants knew VDCATM could not get the Entitlements without Plaintiff's work. Thereafter the Effective Date of the Second Amended and Restated Operating Agreement, August 16, 2011, Defendants continued their representations, as set forth herein and Plaintiff continued to rely on the same, which Defendants knew.

*The Background of VDCATM*

28.    VDI's owner, OGULNICK, was introduced to Levine and Schottenstein on or about March 6, 2011 by a developer who had made an offer to purchase the Property. Plaintiff was introduced to the Defendants not long thereafter.

29.    On or about March 6, 2011, Ogulnick had a telephone conversation with Schottenstein and Levine, during which they asked a series of

-10-

questions regarding the Project and informed Ogulnick that they were high interest bridge or mezzanine financiers. They represented they had ongoing business that made loans and investments and the project they were discussing with Ogulnick was one of many they were considering. Ogulnick reported this to Plaintiff. As to these representations and the balance of representations the Defendants made to Ogulnick, they made them knowing Ogulnick would report them to Plaintiff and they made them specifically intending that Plaintiff rely on them and recognizing that Plaintiff would likely rely on them.

30.     On or about March 7, 2011, Levine and Schottenstein issued a term sheet (i.e., a summary of the salient loan terms, commonly known as "Term Sheet" in the lending industry) utilizing one of the many entities owned and controlled by Levine and Schottenstein named Protean Investors, LLC ("Protean"), which stated, *inter alia*, that Levine and Schottenstein would lend monies and secure an investment in the VDCATM Project with a second trust deed against the Property at a rate of interest of twenty-eight percent (28%) with 5 points. Levine and Schottenstein also indicated they wanted a fifteen percent (15%) interest in the profits of the Project.

31.     Ogulnick agreed to Levine and Schottenstein's Term Sheet, signed the Term Sheet, and the loan application was set by Ogulnick sending $20,000 to said Defendants on March 10, 2011, and an additional $10,000 on March 25, 2011. A true and correct copy of the Term Sheet is attached hereto as Exhibit "H".

32.     Ogulnick requested that Levine and Schottenstein provide proof of funds. Levine and Schottenstein advised Ogulnick that they needed to associate with others to fully fund the loan. Protean then provided Ogulnick with a letter from a Canadian bank, which indicated that a new and different company had the required funding in Canadian dollars. Protean described that they needed this Canadian group,

-11-

Ridgemount, as a partner to fulfill their term sheet funding amount obligations. The newly formed group hired legal counsel in California, who began to draft the loan documentation for the mezzanine loan financing for a scheduled March 31, 2011 closing. Plaintiff was introduced to this Canadian group in March, 2011.

33.    On or about March 28, 2011, Levine and Schottenstein represented to Ogulnick that their attorneys in California had informed them that the "loan" as structured was usurious under California law, and they were required to change the loan to a structured partnership, to satisfy California Law. Levine and Schottenstein represented the partnership which would essentially mirror the terms and conditions of the loan. Ogulnick advised Plaintiff of Levine and Schottenstein's representations. Levine and Schottenstein's representations were untruthful. They were fraudulent.

34.    Ogulnick was barred under the provisions of the Term Sheet from attempting to find new financing until thirty (30) days after the date that escrow was due to close on the purchase of the Property. This led to the creation of VDCATM as set forth in the First Amended and Restated Operating Agreement which was entered into as of March 22, 2011 to close the transaction. Thereafter the Defendants and Ogulnick negotiated toward the end of agreeing on a Second Amended and Restated Operating Agreement for VDCATM.

35.    As of August 16, 2011, the Effective Date of the VDCATM Operating Agreement and based on the false and fraudulent representations and the commission of other wrongful acts by the Defendants, as are set forth elsewhere herein, VDI agreed to enter into the VDCATM Operating Agreement. Plaintiff agreed to enter into the ICA and to continue working under the Entitlement Representation Agreement based on the same misrepresentations Defendants made to Ogulnick. As set forth herein, these representations were transmitted by Ogulnick to Plaintiff with the full and

-12-

1  complete knowledge that Ogulnick was forwarding these representations to Plaintiff.

2  Defendants knew that unless Plaintiff agreed to work under the Entitlement

3  Representation Agreement the Property would not receive the Entitlements sought by

4  Defendants and VDCATM would be an economic disaster.  Defendants knew Plaintiff

5  was critical in getting the Entitlements and sought to defraud Plaintiff so Plaintiff

6  would continue working to get the Entitlements.  But for the representations made by

7  Defendants both in the VDCATM Operating Agreement and otherwise as set forth

8  herein Plaintiff would not have continued its work thereunder the Entitlement

9  Representation Agreement and would not have signed and performed thereunder the

10  ICA.

11

12  The Fraud of Ilus Investors, Ilus GP, Protilus, Levine. Schottenstein, Ridgemount, Iscoe

13  and Ulmer

14          36.      As set forth in Section 4.1.1 of the VDCATM Operating Agreement,

15  the Defendants represented to Ogulnick and Plaintiff that Ilus Investors would and was

16  contractually obligated to have an outstanding Capital Contribution of $2,100,000 as of

17  the Effective Date of the Operating Agreement. Additionally pursuant to section 4.2.1

18  subsection (a) (i) of the Second Amended and Restated Operating Agreement of

19  VDCATM Ilus Investors was required to make additional Capital Contributions in the

20  amount of $146,957.36 for a (the "Maximum Aggregate Additional Contribution"). The

21  required total funding requirement for Ilus Investors was $2,246,957.36.

22  Notwithstanding their representations, made to Plaintiff and Ogulnick and reported by

23  Ogulnick to Plaintiff and relied upon by Plaintiff, Defendants never intended to have the

24  outstanding Capital Contributions of $2,100,000 as of the Effective Date and never

25  intended to have Capital Contributions of $2,246,000.  Ilus Investors maintained the bank

26  account and accounting books and records for the Company and created the fraudulent

27  Expense Tracker reports. Ilus Investors, also caused the tax returns for VDCATM to be

28  filed.  Defendants refused to turn over all of the bank records to Plaintiff or Ogulnick.

Thus some of the allegations herein cannot be made with more specificity as the books

and records, including the all important bank records, are not in Plaintiff's possession, custody or control but are under the control of the Defendants who refuse to provide Plaintiff or Ogulnick copies thereof.

37.   To induce Plaintiff into entering into the ICA, to induce VDI into entering into the VDCATM Operating Agreement and to induce Plaintiff in continuing to perform thereunder the Entitlement Representation Agreement, Ilus Investors, Ilus GP, Ridgemount, Iscoe, Ulmer, Protilus, Levine and Schottenstein represented and warranted to Ogulnick (who reported the representations and warranties to Plaintiff with the Defendants knowledge and approval) that Ilus Investors would faithfully perform its obligations there under the VDCATM Operating Agreement including but not limited to the specific obligation to have an outstanding Capital Contribution of $2,100,000 as of the Effective Date and thereafter provide an additional $146,957.36 in Additional Capital Contributions.  The Defendants, and each of them also represented and warranted to Plaintiff and represented to Ogulnick (who was directed to repeat the representation to Plaintiff) that Ilus Investors, Ilus GP, and each of the other Defendants were highly ethical, trustworthy, honest to Plaintiff, would deal with Ogulnick, VDI and Plaintiff fairly, and would take no action to cheat or defraud or conceal material information form VDI, Ogulnick or Plaintiff.

38.   But for Ilus GP and Ilus Investors (and Ridgemount through Iscoe and Ulmer, and Protilus through Levine and Schottenstein) representations set forth above and elsewhere herein this Complaint, Plaintiff would have never entered into the ICA and Plaintiff would not have continued to perform thereunder the Entitlement Representation Agreement without significant modification thereto.

39.   Ilus Investors (through the other Defendants, as detailed herein)

-14-

representations, set forth above and elsewhere herein this Complaint, were false and fraudulent and known by Ilus Investors and each of the other named Defendants, to be false and fraudulent at the time they were made. Jointly and severally, all of the Defendants above named knew Ilus Investors would not have, never intended to have, and did not have an outstanding Capital Contribution of $2,100,000 as of the Effective Date of the VDCATM Operating Agreement and furthermore had no intention of having an outstanding Capital Contribution of $2,100,000 as of the Effective Date of the Second Amended and Restated Operating Agreement of VDCATM. Likewise, each of the Defendants knew that each time they made such representation they had no intention in treating Plaintiff fairly and they were not ethical, honest or trustworthy. In fact, each of the Defendants knew at the time they made the above described representations they would jump at the chance to cheat Plaintiff. Each Defendant knew Ilus Investors outstanding Capital Contribution as of the Effective Date of the Operating Agreement was significantly less than $2,100,000. Based on information and belief Ilus Investors outstanding Capital Contribution as of the Effective Date was approximately $1,700,000 to $1,800,000, approximately $350,000 less than their contractually obligated (and frequently represented) outstanding Capital Contribution of $2,100,000 as of the Effective Date and over $400,000 less than the aggregate funding obligation of $2,246,000. Each of the Defendants also knew that their actions and the actions of each of the Entity Defendants were not going to be consistent, in any way, with the representations and warranties each of then had given as to being trustworthy, ethical, honest, that they would deal with Plaintiff, Ogulnick and/or VDI fairly and that they would take no action to cheat, defraud or conceal material information from Plaintiff, VDI and/or Ogulnick (who would and did, foreseeably, disclose such representations to Plaintiff). In fact, the very purpose of each of the Entity Defendants and the Individual Defendants was to cheat, defraud, conceal from and otherwise damage Plaintiff, VDI, Ogulnick and VDB.

40.     Further to the Defendants fraudulent representations, they provided

-15-

Expense Tracker reports (Exhibit I) and submitted the same to VDI on each of the occasions set forth hereinafter. VDI and Ogulnick foreseeably, forwarded these reports to Plaintiff. Defendants anticipated these reports would be forwarded to Plaintiff and intended the same as it was in Defendants interest that Plaintiff continue working on the Entitlements for the Property and these misrepresentations were calculated to induce such actions by Plaintiff. All members of Ilus Investors, the Individual Defendants and the Enterprise Defendants, continually misreported to Ogulnick (who would and did foreseeably, disclose such information to Plaintiff) that Ilus Investors had indeed met Ilus Investors total funding obligations on or before August 16, 2011 and thereafter and that VDI ( and then assignee as to contractual rights, VDB) would be responsible for any and all project costs because Ilus Investors had met its' total funding obligation of $2,246,957.36 (pursuant to sections 4.1.1 and 4.2.1 of the VDCATM Operating Agreement). After fraudulently inducing VDI to enter into the VDCATM Operating Agreement and fraudulently inducing Plaintiff to enter into the ICA and to continue to perform under the Entitlement Representation Agreement the Defendants actions went from fraudulent inducement to fraud and fraudulent concealment to hide their earlier fraudulent and other wrongful conduct.

41.    On October 3 2011, David Ulmer, Alex Iscoe, Barry Levine and Ari Schottenstein acting on their own behalf, acting in concert and acting for the Enterprise Defendants, fraudulently misrepresented to Ogulnick and VDI via email, (who would and did, foreseeably, disclose such information to Plaintiff), that Ilus Investors had reached its contractual funding obligation and fraudulently represented that VDB was now contractually required to fund all subsequent Project costs. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. These misrepresentations, as to funding obligations and actual funding contributions to date, were made by each and every Individual Defendant as well as Ilus Investors, Ilus GP, Ridgemount and Protilus. The representations were false

-16-

and known to be false and intended to conceal the Defendants earlier fraud and other wrongful conduct from BDE and VDI, on many levels.

42.    Analyzing the Defendants fraudulent inducement and thereafter fraud and fraudulent concealment, the VDCATM Operating Agreement provided as follows:

    A. Ilus Investors had two well defined funding obligations per the VDCATM Operating Agreement:

        a.  Initial Contributions" of $2,100,000.00 as of August 16, 2011 (the Effective Date). (Section 4.1.1);

        b.  "Additional Capital Contribution" of $146,957.36. (Section 4.2.1)

        c.  Total aggregate Capital Contribution of $2,246,957.36.

    B. VDI (then VDB) had two defined funding obligations per the VDCATM Operating Agreement:

        d.  VDI (then VDB) was required to have approximately $1,500,000.00 in Capital Contributions as of the Effective Date.

        e.  VDI (then VDB)funding of additional capital was only required AFTER Ilus had reached its aggregate Capital Contribution of $2,246,957.36, then VDI (then VDB) was responsible for funding any subsequent project costs.

43.    The amount of Ilus Investors funding was material to Plaintiff as the more Ilus Investors funded the less Ogulnick (VDI or VDB) was required to fund and the less Ogulnick (or his affiliates) funded, the greater compensation of Plaintiff under the Entitlement Representation Agreement.  Defendants and each of them knew the above matters well before the date VDCATM entered into the Entitlement Representation Agreement.

-17-

44.     Per the Defendants records and <u>discovered subsequent to litigation</u> <u>between VDB and Ilus Investors,</u> all Individual Defendants confirmed that despite their earlier representations to the contrary, Ilus Investors did not meet the outstanding Capital Contribution requirement of $2,100,000 as of the Effective Date.  The shortfall was huge and material.  It was hundreds of thousands of dollars.  Ilus Investors confirmed this deficiency in their verified response to a Verified Complaint in other litigation  in September, 2012 (Exhibit J hereto).

45.     Only through discovery in other litigation did Plaintiff discover that Ilus Investors *in reality* owed in excess of $400,000 towards its total outstanding Capital Contributions requirement of $2,246,957.36.

46.     In an effort to further conceal their fraud from Plaintiff and VDI, all Individual Defendants fraudulently sent out Capital Call notices to Ogulnick prior to reaching their aggregate funding obligation of $2,246,957.36, causing OGULNICK to fund approximately $500,000 more in Project costs, which were actually the responsibility of Ilus Investors. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations to Plaintiff.

47.     Ilus Investors through the actions of the Individual Defendants continued to email Expense Trackers through December 2012, which fraudulently misrepresented that Ilus Investors had met its funding obligation, when in fact that all Individual Defendants were fully aware that Ilus Investors and its members had actually only $1,800,000 or less in outstanding Capital Contributions.  Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations to Plaintiff.

-18-

48.    Ilus Investors, Ridgemount and Protilus through the Individual Defendants continued to send Expense Trackers through December 2012, which fraudulently misrepresented that Ilus Investors <u>aggregate</u> Capital Contribution requirement was $2,100,000 (rather than $2,246,957.39 required in the Operating Agreement).  Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations, to Plaintiff.

49.    Ilus Investors, Ridgemount and Protilus through the Individual Defendants falsely represented to Ogulnick in telephone conversations from September, 2011 throughout October of 2012  that Ilus Investors had made additional Capital Contributions totaling $146,000 (in excess of $2,100,000) which fulfilled their contractual obligation to fund $2,246,957.36; Ilus Investors also represented the same in telephone conversations, between March and August, 2011.  Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations.

50.    Ilus Investors, Ridgemount and Protilus through the Individual Defendants have refused to produce banking records and accounting records in efforts to conceal their fraud.

51.    Ilus Investors, Ridgemount and Protilus through the Individual Defendants, in their response to VDB's summary adjudication motion in another lawsuit admitted to their shortfall but claim there was some sort of phantom promise by Ilus Investors to pay and this promise to pay was allowed in the Second Amended and Restated Operating Agreement of VDCATM (Exhibit K).  Ilus Investors has never produced any documents to establish a promise to pay as an alternative to cash contribution because it does not exist.

-19-

52.    Ilus Investors outstanding Capital Contribution toward the purchase of the Property and permitted entitlement expenses as of the date it made the above described fraudulent material representation and as of the Effective Date of the Operating Agreement was no more than $1,800,000.

53.    Ilus Investors, Ridgemount and Protilus, through the Individual Defendants, continued patter of fraud and fraudulent concealment, in an effort to hide its wrongful conduct from Plaintiff and VDI. Specifically, on October 3, 2011 Iscoe, and Ulmer represented to Ogulnick (operating in his capacity as an officer of VDI and VDB) that Ilus Investors had reached its outstanding Capital Contribution of requirement. This representation was also made, and re-affirmed, each time Ilus, Levine, Iscoe, Schottenstein and/or Ulmer sent an Expense Tracker report to Ogulnick fraudulently showing that Ilus Investors had an outstanding Capital Contribution of $2,100,000 as of the Effective Date and fraudulently concealing the true and accurate amount of Ilus Investors outstanding Capital Contribution. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations to Plaintiff.

54.    The Expense Tracker reports that made this fraudulent concealment and misrepresentation were sent to Ogulnick by Ilus Investors, Ridgemount and Protilus through the Individual Defendants on the following dates in addition to numerous other dates; June 18, 2011, July 12, 2011, July 18, 2011, September 7, 2011, October 3, 2011, October 9, 2011, October 12, 2011, November 9, 2011, November 16, 2011, November 17, 2011, March 7, 2012, April 30, 2012, June 17, 2012, July 12, 2013. Ogulnick reported Defendants representations to Plaintiff and provided copies of the Expense Tracker reports and Defendants other misrepresentations to Plaintiff. Until Plaintiff discovered Defendants fraud Plaintiff had relied on Defendants representations. Each and every time an Expense Tracker was sent it fraudulently concealed and misrepresented Ilus Investors outstanding Capital Contribution.

-20-

55.    A purpose of Ilus Investors sending the false information contained in the Expense Tracker including the fraudulent concealment imbedded in the false information was to intentionally conceal the true facts from Plaintiff and mislead Plaintiff into believing that Ilus Investors had an outstanding Capital Contribution of $2,100,000 as of the Effective Date and thereafter.

56.    In point of fact, Ilus Investors did not have an outstanding Capital Contribution of $2,100,000 as of the Effective Date, never intended to have an outstanding Capital Contribution of $2,100,000 as of the Effective Date or any other date relevant to this litigation was fully aware of the same and intentionally misled Plaintiff and VDI, and concealed the true facts from Plaintiff and VDI through their false representations both provided verbally, in emails and through the fraudulent Expense Tracker reports each of which was sent via interstate wire, as set forth herein. When the false representations and false information was sent to Ogulnick, he, foreseeably forwarded it to Plaintiff.  Ridgemount, Ulmer, Iscoe, Protilus, Schottenstein and Levine and each of them were likewise aware of the fraud and did act for and on behalf of Ilus Investors and did aid and assist to perpetrate the fraud and concealment set forth herein.

57.    Ilus Investors, Ridgemount, Iscoe, Ulmer, Protilus, Schottenstein and Levine jointly and severally, intended Plaintiff rely on the fraudulent information it and the other Defendants named above provided, and the material information it and the other Defendants named above fraudulently concealed from Plaintiff.  Plaintiff did so reasonably rely on the fraudulent information and was duped by the concealment, resulting in damages set forth herein.  Plaintiff had reason to suspect the Defendants and each of them would purposefully, intentionally, maliciously and fraudulently deal with it.

-21-

58.    Ilus Investors, Ilus GP, Ridgemount, Iscoe, Ulmer, Protilus, Levine
and Schottenstein knew at the time they were making the above described statements,
representations, warranties and concealments that the statements, representations and
warranties were false and that the concealment of material information was fraudulent.
They knew Plaintiff would hear or read their false statements and representations and that
Plaintiff would rely on them.

59.    Ilus, Ridgemount, Iscoe and Ulmer intended that Plaintiff rely upon
these false statements, representations and warranties. Ilus Investors, Ilus GP,
Ridgemount, Protilus, Iscoe, Ulmer, Levine and Schottenstein intended Plaintiff be
misled by their fraudulent concealment and rely on the same accordingly. Plaintiff
reasonably relied upon the false statements, representations and warranties made by
and/or through all of the Defendants to its damage as set forth herein. Plaintiff
reasonably relied that the above described Defendants did not fraudulently conceal
material information from it.

60.    But for the statements, representations, warranties and concealment
of material matters by Ilus Investors and Ilus GP, Ridgemount, Iscoe, Ulmer, Protilus,
Levine and Schottenstein, inducing Plaintiff into entering into the ICA and to continue to
perform under the Entitlement Representation Agreement, without significant
modifications to Plaintiff's benefit, Plaintiff would not have entered into the ICA or
continued performing under the Entitlement Representation Agreement.

61.    The fraudulent statements, representations, warranties and
concealments made by Ilus Investors, Ilus GP, Ridgemount, Iscoe, Ulmer, Protilus,
Schottenstein and Levine materially misled Plaintiff as to the performance of Ilus
Investors thereunder the VDCATM Operating Agreement thus damaged Plaintiff which
was the intention of Ilus Investors, Ilus GP, Ridgemount, Iscoe, Ulmer, Protilus,
Schottenstein and Levine.

-22-

62.    A long, but by no means all, litany of the fraudulent Enterprise Defendants: Protilus, Ilus Investors, Ilus GP, Ridgemount and the Individual Defendants actions within the Enterprise Defendants, has been revealed in the discovery process of other litigation.

63.    Document production in other litigation is being fiercely resisted by the Defendants and at least one Motion to Compel the Production of Documents has been filed Defendants have still not been provided the entirety of banking record of any of the above Enterprise Defendants. What Plaintiff has seen more than supports the allegations set forth herein. Plaintiff reserves the right to supplement the number, time, extent and duration of the Defendant's fraudulent activities when Plaintiff is able to access documents that Defendants have, so far, not produced.

64.    Subject to the above, the following is, at least, the tip of the iceberg as to the fraudulent activities of the Enterprise Defendants, perpetrated by the Individual Defendants. The fraudulent acts, fraudulent concealment actions and other wrongful acts set forth herein were not uncovered by Plaintiff until March, 2012, at the earliest.

A.    As set forth in Section 4.1.1 of the VDCATM Second Amended and\ Restated Operating Agreement, Ilus Investors was obligated to have an outstanding Capital Contribution of $2,100,000 as of the Effective Date (August 16,2011) of the Operating Agreement. There were no changes between the Effective Date of the Operating Agreement, August 16, 2011, and August 22, 2011 which was the date on which VDB agreed to accept the assignment of VDI's contractual member interest in VDCATM, and VDB, pursuant to that assignment, agreed to accept and perform the multitude of responsibilities thereunder required in the Operating Agreement.

-23-

B.    As of June 21, 2011, <u>prior to</u> the ICA, prior to codification of the Entitlement Representation Agreement, prior to the Effective Date of the Operating Agreement, Ari Schottenstein, under the direction of, and with the consent, approval and thereafter ratified by, Barry Levine, David Ulmer and Alex Iscoe, sent an <u>email from either New York or New Jersey to Ryan Ogulnick, in California</u>, wherein Mr. Schottenstein, acting for Protilus, Ilus Investors and Ilus GP represented that Ilus Investors had contributed $1,967,682.81 and that this amount would form a part of Ilus Investors outstanding Capital Contribution as of the Effective Date of the VDCATM Operating Agreement. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations

C.    This representation was fraudulent and known to be fraudulent by Mr. Schottenstein, Messrs. Levine, Ulmer and Iscoe and through the Individual Defendants, the Enterprise Defendants, Protilus, Ridgemount, Ilus Investors, Ilus GP and VDCATM. Straight and simple, this was wire fraud, interstate wire fraud. This interstate wire fraudulent activity was one of many, in excess of 15, in a <u>continuing pattern</u> lasting not only the 29 months until this lawsuit was filed but <u>continuing to this very day</u>. That is a period of over 29 months, and continuing. This June 21, 2011 representation was made to Ryan Ogulnick acting on behalf of VDI and VDB. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. Ogulnick was the CEO of VDI and the Manager of VDB. As set forth herein Mr. Ogulnick relied on this representation and through his reliance caused VDI and VDB to rely on this misrepresentation. Ogulnick reported this representation to Plaintiff. Plaintiff also relied on this representation. Reliance was reasonable as Plaintiff had no reason to believe the Individual Defendants or Enterprise Defendants were out to defraud it. This fraudulent misrepresentation was as to a material matter. It constituted, in addition to fraud, wire fraud, and fraud in the inducement, "promissory fraud". Promissory fraud has been used to establish the predicate act of mail/wire fraud under RICO. A defendant that promises to perform an act in the future may be liable for fraud

-24-

if at the time making the promise Defendant has no intention of ever performing the future act. That is the case here as all the Defendants acts demonstrate, Defendants had no intention of performing the outstanding Capital Contribution requirements of the Second Amended Operating Agreement of VDCATM at any relevant time prior to, during or after the Effective Date of August 16, 2011. Defendants had no intention, then or thereafter, of contributing the amount of capital set forth in the fraudulent Expense Tracker reports emailed to Ogulnick. Defendants had no intention of dealing with Plaintiff or VDI ethically, fairly, honestly. Defendants had every intent, as the demonstrated of defrauding, concealing from and otherwise damaging Plaintiff.

D.    The identical pattern as set forth above and in the manner set forth and with the intention, consent, direction, approval and ratification set forth above and in the manner set forth and with the intention, consent, direction, approval and ratification set forth above was also accomplished on July 18, 2011 except that on July 18, 2011, the expense tracker misrepresented that $1,197,612.91 had been contributed to VDCATM or toward the property owned by VDCATM (Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations ) but in fact, the actual contribution, was materially less.

E.    The identical pattern as set forth above was also accomplished on July 19, 2011 in an email chain including the July 18, 2011 email wherein the expense tracker misrepresented that $1,967,612.91 had been contributed to the property owned by VDCATM (Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations ) but in fact, the actual contribution, was materially less.

F.    On September 7, 2011, there was a slight change to the Defendants/ (and all of them) fraudulent activity. By this time the Defendants, and each of them, had already completed their fraud in the inducement, promissory fraud, (some of

-25-

their) fraudulent concealment and other torts as described herein, and the Defendants spared no effort to cover their trail, obfuscate and hide their interstate wire fraud and other fraud through additional misrepresentations and concealments and thereby avoid detection and they hoped continued the performance by Plaintiff under the ICA and Entitlement Representation Agreement. On September 7, 2011, Barry Levine was the sender of the fraudulent Expense Tracker Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. The fraudulent Expense Tracker was sent under the direction and consent of Messrs. Schottenstein, Ulmer and Iscoe who approved and ratified the same. All of the Individual Defendants were operating for their respective Enterprise Defendants. Ogulnick provided Plaintiff a copy of this Expense Tracker. Plaintiff foreseeably relied on it.

G. Further to the Defendants continued scheme, on October 3, 2011, Mr. Schottenstein (at the direction and with the consent and ratification of the other Individual Defendants) sent another fraudulent email intended and calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants.

**CONTINUING THE PATTERN OF WIRE FRAUD, FURTHER TO THE SCHEME OF THE ENTERPRISE DEFENDANTS.**

65. Further to the Defendants continued scheme, on October 9, 2011, Mr. Schottenstein caused a fraudulent posting to be made on Dropbox for receipt of Ogulnick, VDI and Plaintiff, calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. This fraudulent Expense Tracker, posted on Dropbox misrepresented that Ilus Investors has funded in excess of $2,096,000 to VDCATM. This fraudulent and otherwise tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity at this stage, he fraudulent

-26-

representation intended to conceal their earlier deeds, continues the wire fraud activities of the Enterprise Defendants and the Individual Defendants.

66.    Further to the Defendants continued scheme, on October 3, 2011, Mr. Schottenstein sent another fraudulent Expense Tracker to be posted on Dropbox, for receipt by VDI, VDB and Ogulnick, intended and calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants. This fraudulent Expense Tracker misrepresented that Ilus Investors has funded in excess of $2,096,059.00 to VDCATM. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. This fraudulent and otherwise tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity.

67.    Further to the Defendants continued scheme, on October 20, 2011, Mr. Schottenstein sent a fraudulent Capital Contribution Notice to VDI, Plaintiff and Ogulnick intended and calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. This fraudulent Capital Contribution Notice misrepresented that Ilus Investors has funded in excess of $2,096,059.00 to VDCATM. This fraudulent and otherwise tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity. At this stage the fraudulent representation intended to conceal their earlier deeds, continues the wire fraud activities of the Enterprise Defendants and the Individual Defendants.

68.    Further to the Defendants continued scheme, on November 9, 2011, Mr. Schottenstein caused to be posted on Dropbox, another fraudulent communication directed to VDI, Plaintiff and Ogunick, intended and calculated to continue the fraudulent

-27-

enterprise perpetrated by the Enterprise Defendants. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. This fraudulent Expense Tracker misrepresents that Ilus Investors has funded in excess of $2,096,059.00 to VDCATM. This fraudulent and otherwise tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity. At this time the fraudulent representation intended to conceal their earlier deeds, continues the wire fraud activities of the Enterprise Defendants and the Individual Defendants.

69.    Further to the Defendants continued scheme, on November 29, 2011, Mr. Schottenstein sent another fraudulent communication to Dropbox to be read by Plaintiff Ogulnick and  VDB. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. The Fraudulent Expense Tracker was intended and calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants. This fraudulent Expense Tracker misrepresents that Ilus Investors has funded in excess of $2,096,059.25 to VDCATM. This fraudulent and otherwise tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity. At this time the fraudulent representation intended to conceal their earlier deeds, continues the wire fraud activities of the Enterprise Defendants and the Individual Defendants.

70.    Further to the Defendants continued scheme, on March 7, 2012, Mr. Schottenstein caused to be posted  another fraudulent Communication on Dropbox, directed toward  Ogulnick, VDI and VDB, intended and calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. This fraudulent Expense Tracker misrepresents that Ilus Investors has funded in excess of $2,096,056.00 to VDCATM. This fraudulent and otherwise

-28-

tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity. At this time, the fraudulent representation continues the wire fraud activities of the Enterprise Defendants and the individual Defendants.

71.    Further to the Defendants continued scheme, on May 30, 2012, well after the commencement of litigation wherein VDB sued Ilus Investors and certain of the Defendants, The Defendants are still at it. They literally don't know have any interest in stopping their fraud., Mr. Schottenstein sends a fraudulent communication directed to VDI, VDB and Ogulnick, intended and calculated to continue the fraudulent enterprise perpetrated by the Enterprise Defendants. Ogulnick reported Defendants representations to Plaintiff and provided copies of Defendants misrepresentations. This fraudulent Expense Tracker misrepresents that Ilus Investors has funded in excess of $2,096,056.00 to VDCATM. This fraudulent and otherwise tortious wire communication was sent at the direction and with the approval and ratification of Defendants Iscoe, Ulmer and Levine, each acting in both a personal and representative capacity. At this time, the fraudulent representation intended to conceal their earlier deeds, continues the wire fraud activities of the Enterprise Defendants and the Individual Defendants. The fraudulent Expense Trackers were proven to be material misrepresentation by the Defendants own hand. On August 31, 2012, Ilus Investors _verified_ an answer _admitting_ they had provided only $1,800,000 in Capital Contributions as of the Effective Date (Exhibit J, page 7, answer 36).

72.    On May 4, 2012 VDB and others initiated a lawsuit against some of the entity Defendants and some of the Individual Defendants herein. Being stuck between a rock in a hard place, the Entity Defendants and the Individual Defendants have no choice but to continue their scheme to defraud by circulating fraudulent Expense Tracker and other reports calculated to hide their earlier frauds.

73.    They continued their fraudulent wire activities on August 30, 2012

-29-

COMPLAINT FOR DAMAGES

74.   They did so on May 30, 2012

75.   They did so on June 17, 2012, December 28, 2012, July 11, 2013. Their pattern continues and continues to this day.

76.   They filed a 2011 Federal tax return (signed by Levine) for VCDATM that contained and/or omitted material information and which tax return is inconsistent with other of their representations made under penalty of perjury, specifically the 2011 tax return does not show a $1,000,000 distribution to Ilus Investors (or one of their members). The tax return represents a materially greater Capital Contribution than that which Ilus Investors provided in a Verified Answer to a Verified Complaint in other litigation. The tax return contains NO record of a contribution of "property" or any non-cash contribution as part of Ilus Investors Capital Contribution. This is in direct contravention of Mr. Levine's Declaration (Exhibit K)

77.   They continued their fraud in 2013 in their sworn testimony, in the form of Levine's Declaration in Opposition to Summary Judgment (Exhibit K hereto, page 11) in which Declaration Levine declares a "promise to pay" satisfies Ilus "Capital Contribution", in the face of the Expense Tracker's refuting such deceit, the Second Amended and Restated Operating Agreement not allowing the same and the VDCATM tax return, signed by Levine, expressly contradicting his Declaration testimony.

78.   Further to the Defendants fraudulent scheme as continued in 2013 by their pleadings in another lawsuit they represented to VDB and VDI that they had fully performed their obligations under the Second Amended and Restated Operating Agreement and further represented that Ogulnick, VDI and VDB had not performed their

-30-

obligations thereunder.   They did this through the declaration of Barry Levine described in the immediately above paragraph.

79.     Further to this series of fraudulent representations, on or about March 16, 2012, the Defendants caused $990,000 to be wired to Avalon in an effort to reduce VDB and Plaintiff's share of proceeds from a sale of the Property.  This wire was in furtherance of a fraudulent scheme set up by certain members of Ilus on or before February 9, 2012, at which time Ilus Investors caused a deficient "Notice of Default" to be sent to Ogulnick and VDI.

80.     Further to Defendants unlawful scheme they sought to intentionally interfere (or they did negligently interfere) with Plaintiff's contractual rights as provided for in the Entitlement Representation Agreement, to the damage of Plaintiff.  As part of this interference the Defendants caused VDB Santa Ana to incur hundreds of thousands of dollars of legal fees and costs to the damage of Plaintiff. All of the above actions were part and parcel of the fraudulent scheme of Defendants.  All of these actions were intended to unjustly enrich Defendants at Plaintiff's cost or loss.

81.     The fraudulent pattern by this time has long since morphed into the Entity Defendants and the Individual Defendants sending new fraudulent reports and the republishing, by wire, older fraudulent reports including but not limited to those specifically described hereinabove.  These reports however include as their recipients Court appointed officers , specifically seeking to mislead, induce and defraud Court appointed officers so as to damage both the Office of the Court and the Judicial Process. Specifically, these fraudulent post litigation wire activities directed, at least in part at Judicial Officers, occur through sending fraudulent Expense Tracker Report and other communications to one or more "drop box" sites on the following dates: December 28, 2013, July 11, and 12, 2013, May 30, 2012, June 17, 2012 and November 29, 2011. The interstate wiring of this fraudulent information was perpetrated by each of the Individual

-31-

Defendants, with the consent and ratification of each of the Individual Defendants that did not actually send the fraudulent material. The Individual Defendants were acting on behalf of the Entity Defendants and personally.

82.    The fraudulent scheme includes fraudulent interstate wire communications with <u>others</u>: Schottenstein, Levine and through them Protilus, Ilus Investors and VDCATM, spoke on the telephone on March 14, 2012 with Mr. Heffernan of Avalon. Avalon held a note secured by deed of trust on the property. On this call Schottenstein and Levine, acting for themselves and for Protilus, Ilus Investors, and purportedly VDCATM, from New York or New Jersey, provided fraudulent false information as to their authority and the actions of VDCATM and Ilus Investors to Avalon. Mr. Heffernan was in his office in California during this call. The fraudulent conduct included a wire of money from an account without authorization, both by Protilus, Levine and Schottenstein on or around March 16, 2012. Thereafter there were fraudulent misrepresentations to attorney Don McIntyre (located in California) in March-May, 2012 and the Santa Ana City attorney's offices in April-May, 2012 (located in California). The fraudulent interstate communications were with regard to the authority of the Individual Defendants. The Individual Defendants initiated the calls from New Jersey or New York.

83.    The fraudulent acts of the Defendants are continuing against Plaintiff, are a clear threat to occur against other victims. Each and every one of the Individual Defendants is presently soliciting other investors and partners into other business arrangements and there is a clear and present danger the conduct visited upon Plaintiff will be employed against others through both the Individual Defendants, the Enterprise Defendants and other entities under their control. Each and every one of the fraudulent acts and other tortious acts set forth above were committed by Defendants and each of them, with full knowledge of the fraudulent nature, scienter and intent to commit the fraudulent acts.

-32-

<u>Information Required by RICO Case Statement (also applicable to the other Causes of Action herein)</u>

1.    The Unlawful Conduct of Defendants and each of them as set forth above, constitutes, at a minimum, violation of U.S.C. 1962(a)(1)(c) and (d) because of the violation of 18 U.S.C. Section 1343.

2.    The Enterprise Defendants violated the federal wire fraud statute on each and every email they sent as specifically described hereinabove and demonstrated by Exhibit I hereto, among other evidence.  The Individual Defendants caused the Entity Defendants to violate the Federal Wire fraud statute.

3.    The alleged wrongdoers are the named Defendants herein.  There may be other wrongdoers and Plaintiff has allowed for the same naming Does 1 through 100.  Plaintiff is seeking information from the accountancy firm hired by one or all of the Individual Defendants, which accountancy firm may be involved.

4.    Plaintiff was a victim of Defendant's wire fraud (18 U.S.C. Section 1343) violations.  Plaintiff was injured in that Plaintiff relied upon the fraudulent information transmitted over the wire (email and telephone) to Plaintiff and Ogulnick and based on that reliance performed thereunder the ICA and Entitlement Representation Agreement.  Because of Defendant's wire fraud and other tortious acts Plaintiff was the victim of economic injury insofar as to a diminishment of the compensation to which Plaintiff is entitled under the Entitlement Representation Agreement.

5(a).    The predicate acts committed by Defendants are a violation of 18 U.S.C. Section 1343.

5(b).  The dates of the predicate acts are as set forth elsewhere in the Complaint, including but not limited to the emailing of an intentionally misleading draft Second Amended and Restated Operating Agreement on or about July 1, 2011 (Paragraph 9 herein of the Complaint), the emailing of the VDCATM Second Amended and Restated Operating Agreement as of August 16, 2011, the emailing of fraudulent Expense Trackers (paragraph 64), the filing of a false tax return (paragraph 72) the representations occurring over the telephone between March and August 2011 which phone calls were between each and every one of the Individual Defendants and Ogulnick (paragraph 49).  There were also fraudulent misrepresentations of October 3, 2011 (paragraph 53), June 18, 2011, July 12, 2011, July 18, 2011, September 7, 2011, October 3, 2011, October 19, 2011, October 12, 2011, November 9, 2011, November 16, 2011, November 17, 2011, March 7, 2012, April 30, 2012, July 17, 2012, July 12, 2013 (paragraph 54) June 21, 2011 (paragraphs 64 B and C.  July 18, 2011 (paragraph 64C). July 19, 2011 (paragraph 64E).  September 7, 2011 (as set forth in paragraph 60F) October 20,2011 (paragraph  67).  November 29, 2011 (paragraph 69) May 30, 2012 (paragraph 71), August 30, 2012, May 30, 2012, June 17, 2012, December 28, 2012, July 11, 2013 (paragraph 72).  Each of these dates of these predicate acts include a description of the facts surrounding the predicate acts as set forth in the paragraphs hereinabove referenced.


5(c).  The circumstances constituting the fraud are stated with particularity as set forth in the above referenced paragraphs.  The time, place and contents of the wire fraud and the identity of the person to whom and by whom made are also set forth as referenced in the paragraphs of this Complaint.  The specificity of each statement alleged to be misleading and the reasons why the statement is misleading are pled herein as have the facts on which that belief is formed (paragraph 71, Exhibit J, page 7, Answer 36).

-34-

5(d).   The common plan is set forth in paragraphs 1 through 8, 11 and 24. It is the acts of the Defendants seeking to defraud Plaintiff, VDI, VDB and Ogulnick which drives their fraud and unites them as part of the common plan.

5(e).   The Defendants fraudulent activity against Plaintiff, and the separate and distinct entities VDI and VDB, as well as Ogulnick is now in its third year, commencing in 2011 and continuing, without cessation, to the date of the filing of this Complaint.   Throughout this period Defendants have fraudulently represented to Defendants, and others, including the Court and Court Officer's the above described representations as well as the representations they have made on the VDCATM tax return, that the Defendants outstanding Capital Contribution as of the Effective Date was (materially close to) $2,100,000.   Defendants are actively engaged in other businesses soliciting other investors and partners into business arrangements and there is a clear and present danger the conduct visited upon Plaintiff will be employed against others (paragraph 78).

6(a).   The Entities are Ilus Investors, limited partnership, Ilus GP US, LLC, Protilus Investors, LLC, Ridgemount Investments Inc.   The Individuals controlling these organizations are Barry Levine (as to Protilus, Ilus GP and Ilus Investors), Ari Schottenstein as to Protilus) David Ulmer (as to Ilus Investors LP, Ilus GP and Ridgemount) and Alex Iscoe (as to Ridgemount).

6(b).   The Enterprise Defendant Ilus Investors was the parent.   Fraud and other tortious acts committed by the other Enterprise Defendants flowed upstream to Ilus Investors.   The actions of the subsidiary Enterprises, Protilus and Ridgemount, flowed into Ilus GP and Ilus Investors.   The Individual Defendants committed their tortious acts by directing the Enterprise Defendants.

6(c)   The Individual Defendants are officers, directors, partners or

-35-

members of the Entity Defendants, as set forth herein paragraphs 1 through 7.

6(d).   All of the Defendants are associated with each other as set forth herein.  They are associated with the Enterprise Defendants as set forth in paragraphs 2 through 7 and elsewhere.

6(e).   Each of the Individual Defendants participated in the direction of the affairs of the Enterprise Entity Defendants (paragraphs 2 through 7).  Additional information on the Defendants participation is set forth in paragraphs 35, 37, 38 through 41, 46 through 49, 53, 54, 64, 65 through 72, 74 (this is a partial list).  Each of the Defendants participated through joint direction of their respective Enterprises which ultimately controlled Ilus Investors.

6(f).   The Defendants are individuals and they are legally separate and distinct from the Entity Defendants.  The Entity Defendants are the enterprise.

7.   The racketeering pattern and enterprise are as set forth above.

8.   The racketeering activities are fully intertwined with the other activities of the Enterprise Defendants.

9.   The Entity Defendants and through them, the Individual Defendants, schemed to steal and cheat to get  receive many millions of dollars to which they were not entitled.  That is the reason for their unlawful acts.

10.   The utilization of interstate wires to facilitate criminal or otherwise fraudulent activities depresses the value and credibility of interstate commerce and serves to weaken our legal system.

-36-

11.(a). Levine and Ulmer control Ilus GP. Protilus (Levine and Schottenstein own Protilus), Ilus Investors and through Protilus and Ridgemount (Ulmer and Iscoe control Ridgemount) are the parties Defendants who will receive the income to be derived from the pattern of racketeering. An organization chart is Exhibit D hereto. There may be other Defendants currently named as Does 1-100.

11(b). The use of such income derived from racketeering activities will allow the Defendants to continue to perpetrate and further their fraudulent activities on other victims and for more extended periods of time.

12(a). The Individual Defendants acting both for themselves and in conspiracy with each other, acquired the Entity Defendants as set forth herein paragraphs 1 through 8.

12(b). The Entity Defendants are Separate from the Individual Defendants under Section 1962(c). Each are liable.

13(a) Levine and Schottenstein are associated with and control Protilus, Ulmer and Iscoe or associated with or control Ridgemount. Levine and Ulmer control Ilus GP. Protilus, Ridgemount, Ulmer and Levine (through Ilus GO) control Ilus Investors.

13(b) The entities; Protilus, Ridgemount, Ilus GP and Ilus, are the liable entities. The liable persons under 18 U.S.C. 1962(c) are the Individual Defendants.

14. This section is addressed by 11, 12 and 13 above.

15. The injury is to Plaintiff's business and his property as Defendants

-37-

seek to defraud Plaintiff out of substantial monies.

16.     The fraud perpetrated by the Defendants was practiced, in large part, through the use of internet and telephone, both which are governed by 18 U.S.C. Section 1343 as set forth above.

## FIRST CAUSE OF ACTION

*(Fraudulent Inducement/Fraudulent Concealment in the Inducement: Against All Defendants)*

80.     Plaintiff repeats, re-alleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 79, inclusive, of this Complaint as though fully set forth at this place.

81.     As set forth hereinabove, Defendants, and each of them, defrauded Plaintiff and thereby fraudulently induced Plaintiff into entering the ICA and in continuing to perform pursuant to the Entitlement Representation Agreement by, and in the manner set forth above.

82.     Defendants and each of them knew that Plaintiff was relying on the fraudulent statements and fraudulent concealments made by Defendants to Plaintiff and also knew that Plaintiff was relying on the fraudulent statements and fraudulent concealments that Defendants were providing to and practicing upon Ogulnick, VDI and VDB. Defendants intended that Plaintiff rely on their fraudulent actions inducing Plaintiff (both directly and, as set forth herein indirectly, through Ogulnick, VDI and VDB) and their fraudulent lack of disclosure (concealment) of material matters and intended Plaintiff rely on their fraudulent inducement and concealment in such a manner that Plaintiff entered into the ICA, and continued to perform pursuant to the Entitlement Representation Agreement.

-38-

83.     Plaintiff reasonably relied upon the fraudulent misrepresentations and concealments (lack of disclosure of known materials facts) of or by Defendants, and each of them. As a result of such reasonable reliance Plaintiff entered into the ICA and continued to perform pursuant to the Entitlement Representation Agreement. Plaintiff had no reason to understand that the Defendants and each of them were intentionally misleading it, defrauding it, cheating it and seeking to cheat it or otherwise failing to disclose material facts.

84.     The method of the Defendants fraud and fraudulent concealment are described herein, including but not limited to Defendants intentionally fraudulent acts of providing verbal and written representations as set forth herein, both to Plaintiff and to Ogulnick, VDI and VDB.

85.     But for the actions of Defendants and each of them in fraudulently inducing Plaintiff and in intentionally concealing material information from Plaintiff as set forth herein, Plaintiff would not have entered into the ICA and would not have continued to perform pursuant to the Entitlement Representation Agreement without significant amendments to the Entitlement Representation Agreement for the benefit of Plaintiff.

86.     As a proximate cause of Defendants fraud in the inducement and fraudulent concealment Plaintiff has suffered damages according to proof and Plaintiff is entitled to general and compensatory damages as a result thereof.

87.     The acts and omissions of the Defendants and each of them as alleged herein were willful, wanton and malicious, and taken with the knowledge that they would cause damage to Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages from Defendants and each of them as a result thereof.

-39-

## SECOND CAUSE OF ACTION

### *(Fraud: Against All Defendants)*

88.     Plaintiff repeats, re-alleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 87, inclusive, of this Complaint as though fully set forth at this place.

89.     As set forth hereinabove, Defendants, and each of them, after having defrauded Plaintiff into entering into the ICA and to continue to perform pursuant to the Entitlement Representation Agreement, the Defendants and each of them continued to defraud Plaintiff.  Defendants continued fraud was intended to damage Plaintiff and was intended to conceal their earlier fraud from Plaintiff.  The purpose of Defendants fraud was to seek to continue that Plaintiff performed under the ICA and continue to perform under Entitlement Representation Agreement.

90.     The method of Defendants fraud and fraudulent concealment are described herein.

91.     Defendants intended that Plaintiff rely on their fraudulent statements and representations and intended Plaintiff rely on their fraudulent statements and representations and concealments in such a manner that Plaintiff would not uncover Defendants fraud and other wrongful acts.

92.     The fraudulent representations and concealments were of material matters that Defendants knew were material and important to Plaintiff.

93.     Plaintiff reasonably relied upon the fraudulent misrepresentations

-40-

and concealment of Plaintiff intended to conceal their earlier deeds defrauding Plaintiff, cheating Plaintiff and otherwise failing to disclose material facts.

94.    As a proximate cause of Defendants fraud and concealment, Plaintiff has suffered damages according to proof and Plaintiff is entitled to general and compensatory damages as a result thereof.

95.    The acts and omissions of the Defendants as alleged herein were willful, wanton and malicious, and taken with the knowledge that they would cause damage to Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages from Defendants as a result thereof.

## THIRD CAUSE OF ACTION

*(Fraudulent Concealment: Against All Defendants)*

96.    Plaintiff repeats, re-alleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 95, inclusive, of this Complaint as though fully set forth at this place.

97.    As set forth hereinabove, Defendants, and each of them, through fraudulent concealment Defendants induced Plaintiff into entering into the ICA and continuing to perform under the Entitlement Representation Agreement and thereafter each of the Defendants continued to fraudulently conceal material information from Plaintiff.

98.    Defendants intended that Plaintiff be misled by their fraudulent concealment. The fraudulent concealment was of material information known by Defendants to be important to Plaintiff.

-41-

99.    Plaintiffs reasonably relied upon the lack of disclosure of material facts and performed its obligations under the ICA and Entitlement Representation Agreement.  Plaintiff had no reason to understand that the Defendants were intentionally concealing from it and seeking to cheat it or otherwise failing to disclose material facts.

100.    But for the actions of Defendants in fraudulently concealing the true outstanding Capital Contribution of ILUS, Plaintiff would not have continued its performance of the ICA nor would it have continued to perform under the Entitlement Representation Agreement without significantly modifying said agreement to Plaintiff's benefit.

101.    As a proximate cause of Defendants concealment, Plaintiff has suffered damages according to proof and Plaintiff is entitled to general and compensatory damages as a result thereof.

102.    The acts and omissions of the Defendants as alleged herein were willful, wanton, oppressive and malicious, and taken with the knowledge that they would cause damage to Plaintiff.  Plaintiff is therefore entitled to an award of exemplary and punitive damages from Defendants as a result thereof.

## FOURTH CAUSE OF ACTION
*(Quantum Meruit)*

103.    Plaintiff repeats, realleges and incorporates herein by this reference each and every allegation set forth in Paragraphs 1 through 102 inclusive, of this Complaint as though fully set forth at this place.

104.    On or about July 1, 2011 Plaintiff entered into the Entitlement

-42-

Representation Agreement. The actions of Plaintiff have resulted in more than a $10,000,000 increase in the value of the Property which has resulted in an increase in the value is Ilus Investors, Ridgemount and Protilus. The increased value of the Property is of both direct and indirect benefit to Defendant's and each of them. But for the actions of Plaintiff the value of the Property owned by VDCATM (thus the value of Ilus Investors and entities related thereto) would have been no more than its purchase price, $6,100,000 rather than $17,250,000 for which the Property was sold on or about October 3, 2013. The law implies the existence of a contract based on one parties having performed serviced under circumstances in which the parties must have understood and intended compensation to be paid. The Defendants not only acquiesced to the provision of services by Plaintiff, they solicited the services Plaintiff provided. The Defendants were aware that the provider, Plaintiff, expected to be compensated and as a result Plaintiff should be compensated as set forth in the Entitlement Representation Agreement, which was approved by Defendants and attached as Exhibit B to the ICA. It would be inequitable for Plaintiff not to be so compensated.

105.   Plaintiff has performed all of its obligations under the terms of the Entitlement Representation Agreement and has performed all of its duties under the ICA and as otherwise agreed to between the parties. Plaintiff is in equity and/or in law entitled to the fair value of its services as set forth herein.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment)

106.   Plaintiff repeats, re-alleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 105 inclusive, of this Complaint as though fully set forth at this place.

-43-

107.   Unjust Enrichment is an obligation imposed by law to do justice and to prevent injustice of a party retaining a benefit for which no sufficient payment has been made to the provider.

The following elements must be proven:

1)   Lack of adequate remedy at law:

2)   A benefit conferred upon the Defendants by Plaintiff coupled with the Defendant's appreciation of that benefit (i.e., and "enrichment")

3)   Acceptance and retention of the benefit under circumstances that make it inequitable for him, her or it to do so without paying the value (i.e. an "injustice"). Each of these elements are set forth hereinabove. It would be inequitable for the Court to allow Defendants to be enriched by the acts of Plaintiff and to not pay for Plaintiff's actions.

105.   Plaintiff performed its obligations under the Entitlement Representation Agreement. The actions of Plaintiff have resulted in more than a $10,000,000 increase in the value of the Property which has resulted in an increase in the value is Ilus Investors, Ridgemount and Protilus. The increased value of the Property is of both direct and indirect benefit to Defendant's and each of them. Defendants happily accepted this benefit. But for the actions of Plaintiff the value of the Property owned by VDCATM would have been no more than its purchase price, $6,100,000 rather than $17,250,000 for which the Property was sold on or about October 3, 2013. But for the work and success of Plaintiff in receiving the Entitlements for the Property there would be no net value to Ilus Investors thus no net value to any of the other Defendants. Defendants were aware that Plaintiff expected to be compensated for its services. Defendants refuse to pay Plaintiff for their share of this increase in the value of the Property which Plaintiff created. It would be violative of the principals of equity that Defendants be able to benefit from the actions of Plaintiff, which acts were taken by

-44-

Plaintiff with Defendants full knowledge and support, without providing full and complete compensation to Plaintiff. Defendants have unjustly received the benefit and unjust retention of value and worth at the expense of Plaintiff.

## SIXTH CAUSE OF ACTION

*(Intentional Interference with Contract; Against All Defendants)*

106.    Plaintiff repeats, realleges and incorporates herein by this reference each and every allegation set forth in Paragraphs 1 through 105 inclusive, of this Complaint as though fully set forth at this place.

107.    On or about July 1, 2011, Plaintiff entered into the Entitlement Representation Agreement.

108.    Plaintiff has performed all of its obligations under the terms of the Entitlement Representation Agreement.

109.    Defendants and each of them, jointly and severally, each Defendant acting for themselves and in concert with each other Defendant have, intentionally and with full knowledge of Plaintiff's contractual rights, interfered with and violated said contractual rights.

110.    As a direct and proximate result of the acts of Defendants as set forth herein, and each of them, Plaintiff has been damaged in an amount according to proof at the time of trial herein, which Plaintiff is informed and believes and upon such information and belief alleges is in excess of the jurisdictional limits of this Court.

-45-

COMPLAINT FOR DAMAGES

## SEVENTH CAUSE OF ACTION

*(Negligent Interference with Contract; Against All Defendants)*

111.   Plaintiff repeats, realleges and incorporates herein by this reference each and every allegation set forth in Paragraphs 1 through 110 inclusive, of this Complaint as though fully set forth at this place.

112.   Defendant was aware of and benefited from the Entitlement Representation Agreement.

113.   Plaintiff has performed all of its obligations under the terms of the Entitlement Representation Agreement.

114.   Defendants and each of them, jointly and severally, each Defendant acting for themselves and in concert with each other Defendant have, negligently and with full knowledge of Plaintiff's contractual rights, interfered with and violated said contractual rights.

115.   As a direct and proximate result of the acts of Defendants as set forth herein, and each of them, Plaintiff has been damaged in an amount according to proof at the time of trial herein, which Plaintiff is informed and believes and upon such information and belief alleges is in excess of the jurisdictional limits of this Court. Plaintiff also seeks prejudgment interest pursuant to Civil Code Section 3291, or as otherwise provided by law.

## EIGHT CAUSE OF ACTION

*(Racketeer Influenced and Corrupt Organization ("RICO"): Against All Defendants)*

116.   Plaintiff repeats, re-alleges and incorporates herein by this reference

-46-

each and every allegation set forth in paragraphs 1 through 115, inclusive, of this Third
Amended Complaint as though fully set forth at this place.

117.    The federal mail and wire fraud statutes outlaw schemes to defraud
that involve the use of mail or wire communications.  Both condemn fraudulent conduct
that may also come within the reach of other federal criminal statutes.  Both may serve as
racketeering and money laundering predicate offenses.  The wire fraud and mail fraud
statutes may serve as a basis for a civil RICO claim.

## Elements

118.    The mail and wire fraud statutes are essential the same, except for
the medium associated with the offense-the mail in the case of mail fraud and wire
communication in the case of wire fraud.  The individual elements are:

1.    The use of either mail or wire communications in the foreseeable
furtherance,

      The Defendants, regularly, routinely and for a period
including 3 calendar years and continuing have used the
internet and telephone wire to send fraudulent representations
from New York, New Jersey and Canada to Plaintiff in
California.

2.    Of a scheme to defraud,

      The Defendants actions were purposeful and directed at
defrauding Plaintiff.  The fraudulent representations sent over
the internet and via phone lines were an integral part of
Defendants scheme to cheat and defraud Plaintiff

3.    Involving a material deception,

      The Defendants actions defrauded Plaintiff of hundreds of
thousands of dollars of value to the interests of Plaintiff, the

-47-

amount being the additional monies required to be contributed by Ogulnick plus 20% thereon and the additional monies claimed due by Defendants even though Defendants did not fulfill the representations as to the amount of their Capital Contribution in VDCATM.

4. With the intent to deprive another of,

Defendants actions were specifically calculated to defraud both Plaintiff, Ogulnick, VDI and VDB.

5. Either property or honest services,

Defendants actions were specifically calculated to cheat and defraud Plaintiff of the services Plaintiff performed under the Entitlement Representation Agreement.

As set forth herein, each and every one of these elements has been established.

119. Use of mail or wire communications: The wire fraud statute applies to anyone who transmits or causes to be transmitted by wire, radio or television communication in interstate or foreign commerce any writings…for the purpose executing a… scheme or artifice. The mail fraud statute is similarly worded and applies to anyone who…for the purpose of executing a…scheme or artifice…places in any post office…or causes to be delivered by mail…any…matter. Electronic medium including telephone, including cell phone, and use of the internet including but not limited to email or texting is included as a transmission covered by the wire fraud statute. The Defendants fraudulent actions were regularly perpetrated using interstate wire both internet and telephone.

120. The statutes require that a mailing or wire communication be in furtherance of a scheme to defraud. It need not be an essential element of the scheme, as

-48-

long as it "is incident to an essential element of the scheme". A qualifying mailing or communication, standing alone, may be routine, innocent or even self-defeating, because The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive. The element may also be satisfied by mailings or communications designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect. The Defendants use of interstate wires to perpetrate their wire fraud were blatant, intentional and frequent over a period of years and continuing.

121.    A defendant need not personally have mailed or wired a communication; it is enough that he caused a mailing or transmission of a wire communication in the sense that the mailing or transmission was the reasonable foreseeable consequence of his intended scheme. The Defendants fraudulent actions when not directly expressly to Plaintiff were directed to Ogulnick, VDI or VDB and Defendants were well aware, (far beyond foreseeability, it was a certainty) that Ogulnick would discuss Defendants fraudulent misrepresentations with Plaintiff. Defendants actually encouraged Plaintiff as to some of Defendants misrepresentations to advise Plaintiff of the same so as to fraudulently induce Plaintiff.

122.    The use of wire communications to effect fraud over state lines is as set forth herein.

## Scheme to Defraud

123.    The mail and wire fraud statutes both prohibit, in pertinent part, any scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, or deprive another of the right to honest services by such means.

-49-

124.    The Entity Defendants, under the control of the Individual Defendants, under the control of the Individual Defendants, perpetrated such a scheme to defraud and deprive Plaintiff as set forth herein.

## Materiality

125.    Materiality is an element of each offense.  The fraud perpetrated on Plaintiff VDI caused it to be defrauded of a material amount of money, services and value.  The amounts in question, as set forth herein, are hundreds of thousands or millions of dollars.  These amounts are material.

## Intent

126.    Under both statutes, intent to defraud requires a willful act by the defendant with the intent to deceive or cheat, usually, but not necessarily, for the purpose of getting financial gain for one's self.  Defendants, both the entity Defendants and the Individual Defendants actions demonstrated an intention to defraud.  Defendants' acts were willful.

## Money, Property, or Honest Services

127.    The mail and wire fraud statutes speak of schemes to defraud or to obtain money or property.  They clearly protect against deprivations of tangible property and intangible property.  The scheme to defraud Plaintiff was intended to and did deprive them of tangible and intangible property.

## Aiding and Abetting, Attempt and Conspiracy

128.    Attempting or conspiring to commit mail or wire fraud or aiding and abetting the commission of those offenses carries the same penalties as the underlying offense.  In order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.

-50-

Each Defendant herein, be they an Entity Defendant or an Individual Defendant, demonstrated actions conspiring with the other Defendants.

129.   To prove conspiracy to commit either wire or mail fraud Plaintiff must establish that: two or more persons, directly or indirectly, reached an agreement to devise and execute a scheme to defraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." A conspirator is liable for any other offenses that a co-conspirator commits in the foreseeable furtherance of the conspiracy. All of the above elements have been met as to each and every Defendant by the allegations set forth herein.

## Predicate Offense Crimes

130.   The racketeering statute outlaws committing predicate offense to operate a racketeering enterprise. Mail and wire fraud are predicate racketeering and money laundering predicate offenses. Wire fraud, multiple times, was practiced by the entity Defendants, who were controlled by the Individual Defendants.

## RICO

131.   The Racketeering Influenced and Corrupt Organization (RICO) provisions outlaw acquiring or conducting the affairs of an enterprise engaged in, or whose activities affect, interstate commerce, through certain predicate offenses. The elements are: (1) conducting the affairs; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. "Racketeering activity" means, among other things, any act covered by or prescribed by either the mail or wire fraud statutes. The elements set forth above are all established as to each Defendant set forth herein.

132.   The pattern of predicate offenses must be used by someone

-51-

employed by or associated with a qualified enterprise to conduct or participate in its activities. "The 'conduct or participate' element requires a defendant to have some part in directing those" activities. The pattern of predicate offenses by the Enterprise Defendants as conducted or managed by the Individual Defendants is clear, as set forth herein.

133. The enterprise may be either any group of individuals, any legal entity, or any group "associated in fact." An enterprise "associated in fact" "must have at least three structural elements: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." The Enterprise Defendants, under the control of the Individual Defendants, as set forth hereinabove conducted their affairs so as to commit wire fraud numerous times in a pattern that continues to this day and threatens to continue against others in the future.

134. As a proximate cause of Defendants actions as above set forth Plaintiff has suffered damages according to proof and Plaintiff is entitled to general and compensatory damages as a result thereof.

135. The acts and omissions of the Defendants as alleged herein were willful, wanton, oppressive and malicious and taken with the knowledge that they would cause damage to Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages from Defendants as a result thereof.

136. The RICO statute authorizes treble damages. Plaintiff is entitled to treble damages based upon Defendants RICO violations.

-52-

137.   The RICO statute allows recovery of attorney's fees and costs of bringing the litigation.  Plaintiff is entitled to recovery of all of its legal fees and costs attendant this litigation.

### SEVENTH CAUSE OF ACTION

*(Constructive Trust)*

138.   Plaintiff repeats, realleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 137, inclusive, of this Complaint as though fully set forth at this place.

139.   A constructive trust will compel a person or entity (or multiple people and/or entities) who has property or money to which he is not justly entitled to transfer it to the person entitled thereto.  A constructive trust is imposed by law when such constructive trust is required in or by equity.

140.   As set forth above, any of the causes of action complained of by Plaintiff should  result in the imposition of a constructive trust as to the interests and/or assets of any of the Defendants, directly or indirectly, in the Property  should the Court believe such imposition of a constructive trust will further the aims of justice.

141.   The facts and circumstances set forth hereinabove are such that the Court should impose a constructive trust on any and all monies, funds or other property received, held, controlled or otherwise benefitting by any and all Defendants because of, or related to, their interest in, directly or indirectly, in the Property  or VDCATM.  This constructive trust should include any and all interests, directly or indirectly held by any of the Defendants in any entities related to, directly or indirectly, to the Property and/or VDCATM including but not limited to limited liability companies, partnerships, bank accounts, security accounts, cash or other tangible or intangible property.

-53-

142.   To not impose a constructive trust as requested herein would result in an inequitable result.

**WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:**

_On the First Cause of Action_:

  B. For general and compensatory damages in an amount according to proof at the time of trial;

  C. For an award of punitive and exemplary damages

_On the Second Cause of Action_:

  F.   For general and compensatory damages in an amount according to proof at the time of trial;

  G.   For an award of punitive and exemplary damages;

_On the Third Cause of Action_:

  H.   For general and compensatory damages in an amount according to proof at the time of trial;

  I.   For an award of punitive and exemplary damages;

_On the Fourth Cause of Action_:

  J.   For general and compensatory damages in an amount according to proof at the time of trial;

_On the Fifth Cause of Action_:

  K.   For general and compensatory damages in an amount according to proof at the time of trial;

_On the Sixth Cause of Action_:

  L.   For general and compensatory damages in an amount according to proof at the time of trial;

-54-

M.    For an award of punitive damages and exemplary damages;

*On the Seventh Cause of Action*:

N.    For general and compensatory damages in an amount according to proof at the time of trial.

*On the Eight Cause of Action:*

O.    For general and compensatory damages in an amount according to proof at the time of trial;

P.    For an award of punitive and exemplary damages

Q.    For treble damages as provided for by statute

R.    For attorney's fees as provided by statute.

*On the Ninth Cause of Action:*

S.    For the imposition of a Constructive Trust.

*On All Causes of Action*:

T.    For such other and further relief as the Court may deem just and reasonable.

COMPLAINT FOR DAMAGES

1

2

3

4

5    Dated: _OCTOBER 14_, 2013

6

7                                    Respectfully submitted,

8                                    LAW OFFICES OF ROBERT H. BISNO

9

10

11                                   ROBERT H. BISNO
12                                   _Attorney for Plaintiff_

13                        **DEMAND FOR JURY TRIAL**

14

15    Plaintiff respectfully requests a trial by jury in the instant matter.

16

17

18

19    Dated: _October 14_, 2013

20

21                                   Respectfully submitted,

22                                   LAW OFFICES OF ROBERT H. BISNO

23

24                                   ROBERT H. BISNO
25                                   _Attorney for Plaintiff_

26

27

28

                                    -56-

                        COMPLAINT FOR DAMAGES

# EXHIBIT A

# SECOND AMENDED AND RESTATED
# OPERATING AGREEMENT
# FOR
# VDC AT THE MET, LLC

1.    Parties.  This Second Amended and Restated Operating Agreement for VDC at The Met, LLC (the "**Agreement**"), dated August __16__ , 2011 (the "**Effective Date**") is entered into by and among ILUS INVESTORS, LP, a California limited partnership ("**Ilus**") and VINEYARDS DEVELOPMENT, INCORPORATED, a California corporation ("**VDI**"). Each of Ilus and VDI are also referred to in this Agreement individually as a "**Member**" and collectively as the "**Members**".  This Agreement completely amends, restates and supersedes that certain First Amended and Restated Operating Agreement for VDC at The Met, LLC dated March 28, 2011.

2.    Definitions.  The terms used in this Agreement have the meanings set forth in the Glossary of Defined Terms attached as Exhibit A to this Agreement and in Exhibit C hereto.

3.    Organization.

3.1    Formation.  Pursuant to the Act, the Company was formed by filing the Articles with the California Secretary of State on March 22, 2011 as File No. 201108210173. The rights and obligations of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

3.2    Name of the Company.  The name of the Company is VDC at The Met, LLC. Ilus may, from time to time, in its discretion and in compliance with applicable laws, change the name of the Company.  Ilus, in its discretion, from time to time, may adopt such trade or fictitious names as it deems appropriate for the conduct of the Company's business. Ilus shall file and publish any Fictitious Business Name Statements and shall effect other similar filings as are required by applicable laws or as Ilus shall consider appropriate or advisable.

3.3    Principal Executive Office.  The principal executive office of the Company shall be located at 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950, or such other place or places as Ilus may designate.  The Company shall continuously maintain an office in California where it will keep the records required to be maintained pursuant to Section 17058 of the Act and Section 9.1 hereof.

3.4    Agent For Service of Process.  The Company shall continuously maintain in California an agent for service of process on the Company.

3.5    Purposes.  The purpose of this Company is to acquire, own, manage, maintain, operate, finance, refinance, lease, improve, develop, and dispose of the Property and to engage in any other lawful act or activity for which a limited liability company may be organized under the Act.

3.6    The Names and Addresses of the Members.  The name and business or residence address of each Member appears on the Schedule attached hereto as Exhibit B.

3.7    Term.  The Company was formed as provided in Section 3.1 above and shall dissolve as provided in Section 10.1.

3.8    Expenses of Formation.  All expenses (including without limitation legal fees and costs, accounting fees and costs, filing fees, recording fees) incurred by Ilus in connection with the formation and organization of the Company, the negotiation, preparation, filing and recordation (as applicable) of this Agreement, the Articles, any statements to be filed or recorded in connection herewith, and any other documents or instruments negotiated, prepared or executed in connection herewith, and shall be paid by the Company and shall be disbursed by Ilus from Company funds. The Company shall reimburse Ilus and its Affiliates for organizational expenses (including without limitation legal and accounting fees and costs) incurred to form the Company and to prepare and file the Articles and this Agreement, subject to the Members' approval of such expenses.

4.    Members' Capital Contributions; Capital Accounts; and Loans.

4.1    Initial Contributions.

4.1.1    By Ilus.  Prior to the Effective Date, Ilus made a Capital Contribution in the amount of $2,651,173.83 plus the amount of other Project Costs incurred by Ilus for which Ilus has not received reimbursement.  On the Effective Date, a distribution shall be made to Ilus to reduce the amount of its outstanding Capital Contributions to $2,100,000.00.

4.1.2    By VDI.  On the Effective Date, VDI shall make a Capital Contribution in the amount of $1,500,000, of which $[1,470,000] was contributed by VDI prior to the Effective Date plus any amount required for the Company to make the distribution to Ilus as provided in Section 4.1.1 above.

4.2    Additional Contributions.

4.2.1    By Ilus.

(a)    Ilus shall make additional Capital Contributions to fund Project Costs in accordance with the Project Cost Budget, subject to the following terms and conditions.

(i)    Ilus shall not be obligated to make additional Capital Contributions pursuant to this Section 4.2.1(a) that exceed $146,957.36 (the "**Maximum Aggregate Additional Contribution**") in the aggregate.  The amount by which the Maximum Aggregate Additional Contribution exceeds the cumulative amount of additional Capital Contributions made by Ilus pursuant to this Section 4.2.1(a) is referred to herein as the "**Undisbursed Contribution Amount.**"

(ii)    Ilus shall only be obligated to make additional Capital Contributions as required to provide funds for the Company to pay Project Costs in accordance with the Project Cost Budget.

(iii)    The portion of the Project Cost Budget allocated to the "Contingency Reserve" may be reallocated to other items of the Project Cost Budget as the Members may approve from time to time.

(iv)    As conditions precedent to Ilus's obligation to make any additional Capital Contributions, the following conditions must be satisfied:

(A)    VDI shall deliver to Ilus a written itemized statement ("**Request for Disbursement**") setting forth a description of the work performed, date(s) of such performance, vendors utilized and costs incurred or due with respect to each line item on the Project Cost Budget for which disbursement is requested, and the total amount incurred, expended and/or due for each line item. Each Request for Disbursement shall constitute a representation and warranty by VDI that all conditions precedent as set forth in this Section 4.2.1 have been satisfied with respect to each Request for Disbursement. In no circumstance shall Ilus have any obligation to provide any portion of the funds set forth in the Request for Disbursement fewer than ten (10) days from the date of receipt of the Request for Disbursement.

(B)    The aggregate amount of the Undisbursed Contribution Amount and the amount in VDI Funds Account as of the date of the proposed action shall not be less than the amount required to pay for all Remaining Costs as determined by the Members (and the condition in this Section 4.2.1(a)(iv)(B) shall be deemed to have not been satisfied until the Members agree on such determination).

(C)    Ilus shall have received reasonable evidence satisfactory to Ilus that the work covered by the Request for Disbursement has been performed and the costs have been incurred; invoices, receipts and any other documents evidencing the total amount expended, incurred or due for any requested items; waiver and release of mechanics' liens, in a form reasonably required by Ilus; and any other document, requirement, evidence or information that Ilus may reasonably request.

(D)    No uncured Event of Default exists and no event, omission or failure of a condition has occurred which would constitute an Event of Default after notice or the lapse of time or both.

(E)    No default shall have occurred under the Avalon Loan Documents, and no event or circumstance shall exist which with passage of time would constitute a default under the Avalon Loan Documents.

(F)    All representations and warranties of VDI made in this Agreement shall be true and correct as of the date of the proposed action with the same effect as if made on such date.

(G)    VDI shall have delivered to Ilus all funds, documents, instruments, policies, evidence of satisfaction of conditions and other materials required by Ilus under the terms of this Agreement.

(b)    Except as provided in Section 4.2(a) above, Ilus shall not be obligated to make any additional Capital Contributions to the Company.

4.2.2    By VDI.    VDI shall make additional Capital Contributions as needed by the Company: (i) to fund Project Costs (less any contribution to Project Costs actually made by any buyer of all or a portion of the Property); and (ii) to exercise the extensions of the Avalon

Loan.  With respect to the amounts required to be paid to the lender of the Avalon Loan to extend the Avalon Loan maturity date, VDI shall either: (1) make a Capital Contribution for such amount at least 30 days prior to the last day on which the extension may be exercised pursuant to the Avalon Loan Documents; or (2) deliver to Ilus, at least 30 days prior to the last date on which the extension may be exercised , evidence reasonably satisfactory to Ilus that the Avalon Lender has agreed to extend the maturity date of the Avalon Loan to at least November 15, 2012 and that any conditions to such extension have been satisfied or waived by the Avalon Lender.  The Capital Contribution made by VDI pursuant to subsection 4.2.2(ii)(1) above shall be used by the Company solely for payment of the amounts required to extend the Avalon Loan and, notwithstanding anything to the contrary in this Agreement, Ilus may disburse such amount as necessary to extend the Avalon Loan without the consent or approval of VDI.  VDI's failure to pay any amounts pursuant to this Section 4.2.2 within five (5) business days after Ilus delivers its written demand to VDI shall constitute an Event of Default under this Agreement.  Ilus may, in addition to its other rights and remedies, and in its sole and absolute discretion, contribute and/or loan to the Company all or a portion of the amount (the "**Deficiency**") of such additional Capital Contribution which VDI fails to make, in which case:

(a)    If Ilus makes a Capital Contribution to fund all or a portion of the Deficiency, then Ilus shall be entitled to receive the Additional Capital Preferred Return in accordance with Sections 7.2.3(a) below on the portion of the Deficiency so funded.

(b)    If Ilus makes a loan to the Company to fund all or a portion of the Deficiency, Ilus shall be entitled to receive interest on the amount of the loan at rate equal to 28.5% per annum.

(c)    An amount (the "**Offset Amount**") equal to the Additional Capital Preferred Return or interest accrued or paid with respect to a Deficiency funded by Ilus shall be deducted from the Distributions otherwise payable to VDI, and shall be paid to Ilus.

4.3    <u>Loan Guaranties</u>.  Ryan Ogulnick shall cause, and shall cause his Affiliates, including but not limited to VDI, to perform their respective obligations under the Avalon Loan Documents.  Payment of amounts under any guaranty of the Avalon Loan shall not constitute a loan or Capital Contribution to the Company by Ogulnick, VDI or any of their respective Affiliates.  Any breach of this Section 4.3 shall constitute an Event of Default under this Agreement.

4.4    <u>Treatment of Capital Contributions</u>.  Except as otherwise specifically set forth in this Agreement, no Member shall:

4.4.1    receive any interest on its Capital Contributions or on the balance in its Capital Account;

4.4.2    have the right to withdraw or reduce its Capital Contributions or to receive any Distributions from the Company except for the Distributions to be made in accordance with this Agreement;

4.4.3    have the right to demand or receive property other than cash in return for its Capital Contributions or as Distributions;

4.4.4    be compelled to accept a Distribution of any asset in kind from the Company in lieu of a proportionate Distribution of cash being made to other Members; or

4.4.5    have priority over any other Member with respect to a return of Capital Contributions or the allocations of Profits, Losses or Distributions of Distributable Cash.

4.5    Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers his, her or its Membership Interest in accordance with this Agreement, such Member's Capital Account shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

4.6    Loans. Any Member may lend or advance money to or on behalf of the Company if the Members determine that such funds are necessary for a Company purpose. Except as otherwise provided herein, any loans or advances by a Member shall be repaid on such terms and conditions and shall bear interest at such rates as shall be approved by the Members. The amount of any such loans or advances shall be treated as a Company debt, and not as a Capital Contribution.

5.    Members.

5.1    Limited Liability. Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

5.2    Members Are Not Agents. The Company shall be managed as set forth in Section 6 of this Agreement and no Member shall have any right or power to participate in the management of the Company except as expressly authorized by this Agreement or except as expressly required by the Act. Accordingly, except as provided in Section 6, no Member acting solely in the capacity of a Member is an agent of the Company nor can any Member in such capacity bind or execute any instrument on behalf of the Company, except with the written consent of the Members.

5.3    Remuneration To Members. Except as otherwise specifically provided in this Agreement, no Member (or Affiliate of a Member) is entitled to remuneration for acting in the Company business, subject to the entitlement of Members winding up the affairs of the Company to reasonable compensation pursuant to Section 10.3 below.

5.4    Transactions With The Company. Subject to any limitations set forth in this Agreement and with the prior approval of Ilus after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

5.5    Competing Activities. The Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation (a) being a general partner or limited partner of any partnership, being a member of

any limited liability company (whether as a managing member or otherwise) or a shareholder, officer or director of any corporation; (b) rendering advice or services to other Persons; (c) investing their own capital and revenues or the capital and revenues of others in any fashion; (d) those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company; and (e) owning property in the vicinity of or that otherwise competes with the Property. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Members shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account and to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. The Members hereby waive any and all rights and claims which they may otherwise have against the other Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any of such activities.

6.    Management and Control of the Company.

      6.1   Management of the Company.

            6.1.1   General. Except as otherwise provided in this Section 6, the business, property and affairs of the Company shall be managed as follows.

            (a)    Prior to the Outside Date and thereafter if, on or before the Outside Date, (i) either the Entitlements Completion Date has occurred or the entire Property has been sold in an arm's length transaction to an unrelated third party, and (ii) Ilus has received Distributions of Distributable Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all unrepaid Deficiencies plus the Priority Distribution Amount, and (iii) VDI has not committed any material breach of this Agreement, then the business, property and affairs of the Company shall be managed by the Members and all decisions shall require the approval of both Members.

            (b)    If, on or before the Outside Date, (i) the Entitlements Completion Date has not occurred and the entire Property has not been sold in an arm's length transaction to an unrelated third party, or (ii) Ilus has not received Distributions of Distributable Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all unrepaid Deficiencies plus the Priority Distribution Amount, or (iii) VDI has committed a material breach of this Agreement, then the business, property and affairs of the Company shall be managed exclusively by Ilus, and Ilus shall have full, complete, exclusive and sole authority, power, and discretion to manage and control all aspects of the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

            (c)    Notwithstanding anything to the contrary in this Agreement, if VDI does not satisfy the condition in Section 4.2.2(ii)(2) above, then Ilus may, without the

consent or approval of VDI, cause the Company to extend the Avalon Loan maturity date and to pay any amounts required to do so.

(d)     Notwithstanding anything to the contrary in this Agreement, Ilus may, without the consent or approval of VDI, take such action as may be required to prevent, cure or delay a default under the Avalon Loan.

6.1.2   Management of Funds and Obligations to Pay Money. The Members are authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company.. All checks, drafts, and other instruments obligating the Company to pay money must be signed on behalf of the Company by both Members, except that VDI may sign checks to pay Project Costs if: (a) the amount to be paid is in accordance with the Project Cost Budget or is otherwise approved in advance in writing by Ilus; and (b) the amount to be paid, individually and cumulatively with any related payments, does not exceed $10,000. Checks in excess of $10,000 must be signed or approved in writing by both Members.

6.1.3   VDI's Duties Regarding Entitlements.

(a)     VDI shall be responsible for the day-to-day functions involved in the process of obtaining the Entitlements, provided, however, that VDI shall not have the authority to bind the Company to any obligation or commitment without Ilus's prior written approval. VDI shall use its best efforts to cause the Entitlements Completion Date to occur as soon as reasonably possible following the Effective Date and shall achieve the milestones within the periods provided in the Entitlements Schedule. VDI shall do the following unless Ilus elects otherwise following an Event of Default, and failure to perform these duties shall constitute an Event of Default. Ilus shall have full discretion over the following if and only if an Event of Default occurs or if the Company is to be managed exclusively by Ilus as provided in section 6.1.1(b) above.

(i)     Represent the Company in all material meetings with Governmental Authorities, provided that VDI shall inform Ilus of the existence, purpose, objectives, attendees and reasonable background information regarding any such meeting: (A) within 24 hours after arranging any such meeting; and (B) prior to the occurrence of any such meeting.

(ii)    Procure and negotiate on behalf of the Company any agreements (and amendments thereto) for architectural, engineering or consulting in connection with the Entitlements (the "Contracts"), provided that no Contracts shall be executed nor any binding commitment made until the form, terms and conditions thereof and the party with whom the agreement is to be made have been approved by the Members, except those agreements entered into by Ryan Ogulnick prior to the signing of this LLC Agreement and set forth in Exhibit F.

(iii)   Provide administrative, management, supervision and related services to coordinate the activities and responsibilities of the Project architects, engineers and other contractors, professionals and consultants, including administration of the Contracts, representation of the Company at all meetings with the Project Consultants; advice and recommendations as to the selection of Project Consultants; assembly, review and submission to Ilus, with a recommendation regarding approval, of all requests for payment under

any Contracts; submission to Ilus of suggestions or requests for changes made by the Project Consultants that could improve the design, efficiency, or cost of the Project and which VDI's considers meritorious, together with VDI's recommendation with respect thereto;

(iv)    Keep Ilus reasonably informed on a regular basis (not less frequently than weekly) of the progress of the Entitlements, including the preparation of such reports as are provided for herein or as may reasonably be requested by Ilus.

(v)    Prepare and deliver to Ilus monthly reports on the progress and cost of the Project, and any other reports reasonably requested by Ilus, including without limitation all financial statements and bank statements. Unless otherwise directed by Ilus, such monthly reports shall include a summary of Project Costs for the current month and Project Costs incurred to the date of the report and an update as to the progress of each milestone in the Entitlements Schedule.

(vi)    Endeavor to obtain satisfactory performance from the Project architects, engineers and other consultants, and notify Ilus if any requirements of a Contract are not being met.

(vii)    Attend all regularly scheduled Project meetings and other meetings as appropriate and prepare reasonably detailed and accurate minutes for such meetings and deliver the same to Ilus.

(viii)    Review all applications for payment and supporting documentation prepared by the Project Consultants, and process all documentation required in connection with procedures established by the Members.

(b)    Notwithstanding any provisions of this Agreement to the contrary, VDI shall not take or permit any of the following actions unless and until the same has been approved by the Members:

(i)    approve any contracts with the Project architect, engineer or other consultants;

(ii)    make or approve any change in the Plans and Specifications or Entitlements as previously approved by the Members;

(iii)    make any expenditure or incur any obligation by or on behalf of the Company;

(iv)    grant time extensions, waivers or modifications to any material terms of any Contracts.

(c)    For purposes of this Agreement, the phrases "approval of Ilus", "approved by Ilus", "Ilus's approval", "consented to by Ilus" or words of similar import shall mean the written approval of Ilus, which may be given or withheld in Ilus's sole discretion, unless otherwise expressly provided herein.

(d)    Prior to submitting any plans or other documents or materials

regarding the Entitlements to any Governmental Authority, VDI shall deliver to Ilus copies of all such documents and materials for Ilus's prior written approval.  VDI shall provide Ilus with reasonable advance notice (in no event less than five (5) business days) of all meetings or public hearings regarding the Entitlements, including all meetings and hearings with neighboring property owners, Governmental Authorities and consultants regarding Entitlements or development of the Property, and Ilus may attend such meetings and hearings in its sole discretion.  Ilus shall provide its comments to VDI within five (5) business days after Ilus receives any plans, documents or other materials and VDI's written request for Ilus to review and provide comments to same.

(e)    VDI shall keep or cause to be kept at its place of business in Southern California at 828 Ogden Drive, Los Angeles, CA, 90046, appropriate records reasonably required by Ilus in connection with the Project, including, but not limited to, copies of all of the plans and specifications and amendments, documents pertaining to the Entitlements, Contracts and all amendments thereof and all other documents concerning the Project.  VDI shall deliver a copy of such documents to Ilus at Ilus's request.  Upon the termination date of this Agreement, all of such documents, books and records shall be delivered to Ilus.

6.1.4   Extension of Outside Date.  VDI shall have the option to extend the Outside Date four (4) times (each an "**Extension**") for the periods specified below on the following terms and conditions:

(a)    No Event of Default has occurred and no event has occurred that with notice or time, or both, would constitute an Event of Default under this Agreement;

(b)    On or before the Extension Option Notification Date (as defined in the chart below) with respect to each extension, VDI must deliver to Ilus written notice (the "**Extension Exercise Notice**") of its election to extend the Outside Date pursuant to this Section 6.1.4.  The Extension Option Notification Date, the Extension Option Exercise Date and the date to which the Outside Date may be extended for each extension are as follows:

| | Extension Option Notification Date | Extension Option Exercise Date | Extended Outside Date |
|---|---|---|---|
| First Extension | 1/31/2012 | 3/30/2012 | 6/29/2012 |
| Second Extension | 5/31/2012 | 6/29/2012 | 7/31/2012 |
| Third Extension | 6/29/2012 | 7/31/2012 | 8/31/2012 |
| Fourth Extension | 7/31/2012 | 8/31/2012 | 9/28/2012 |

(c)     For each of the First Extension and the Second Extension, VDI delivers to Ilus immediately available funds in the amount of $70,000 (each, an "**Extension Option Payment**") on or before the applicable Extension Option Exercise Date. The Extension Option Payment shall be fully earned when VDI delivers the Extension Exercise Notice with respect to the applicable Extension, notwithstanding that the Extension Option Payment is not due on that date. Notwithstanding the foregoing, if VDI delivers the Extension Exercise Notice for the First Extension or the Second Extension, and prior to the applicable Extension Option Exercise Date, the Entitlements Completion Date occurs (or the entire Property has been sold in an arm's length transaction to an unrelated third party), and Ilus has received Distributions of Distributable Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all unpaid Deficiencies plus the Priority Distribution Amount, and VDI has not committed a material breach of this Agreement, then VDI's obligation to pay the Extension Option Payment for the applicable Extension shall be waived. If VDI delivers the Extension Exercise Notice and subsequently fails to deliver the applicable Extension Option Payment, VDI's exercise of that Extension shall not be effective. No such payment shall be required for the Third Extension or Fourth Extension. Each Extension Option Payment shall be non-refundable and shall not be treated as a Distribution of Distributable Cash or repayment of any loan made by Ilus.

(d)     If VDI exercises the Second Extension, Third Extension or Fourth Extension, then effective on the applicable Extension Option Exercise Date, VDI's Member Percentage shall be reduced as set forth in the definition of "Member Percentage" in the Glossary of Defined Terms attached hereto as Exhibit A.

(e)     If VDI fails to validly exercise any Extension, that Extension and all subsequent Extensions shall lapse and VDI shall not have the right to further extend the Outside Date.

6.1.5    Approval of Sale Agreements. Ilus shall not withhold its approval of a sale of the Property to an unaffiliated third party pursuant to an arm's length transaction entered into in good faith if:

(a)     The net sale proceeds equals or exceeds the following amount (the "**Minimum Purchase Price**"):

(i)     For a sale of the entire Property, $14,000,000;

(ii)    For a sale of the High Rise Portion, $2,000,000; and

(iii)   For a Sale of the Low Rise Portion, $12,000,000.

(b)    The terms of the proposed sale do not include any contingencies other than a general due diligence contingency and a title review contingency, and the period for the buyer's satisfaction or waiver of the contingency is not more than 30 days after the effective date of the sale agreement.

(c)    The closing date for the sale is not more than 60 days after the effective date of the sale agreement.

(d)    The terms of the proposed sale do not include any termination rights in favor of the buyer other than as a result of the seller's material default.

(e)    The buyer has demonstrated to the satisfaction of Ilus that it has the financial ability and experience to close the transaction.

6.1.6    The terms of the proposed sale include that the Property will be sold as-is and without representation or warranty from the Company.

6.2    <u>Performance of Duties; Liability of Members</u>.  Each Member shall perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.  A Member shall not have any liability to non-Members of the Company by reason of being or having been a Member of the Company or exercising its rights under this Agreement.  The Members may require in all Company contracts that it will not be personally liable thereunder, and that the contracting entity must look solely to the Company and its assets to satisfy Liabilities.

6.3    <u>Devotion of Time</u>.  No Member is obligated to devote all of its time or business efforts to the affairs of the Company.  Each Member shall devote whatever time, effort, and skill as may be reasonably necessary for the operation of the Company.  VDI shall devote the time required to cause the Entitlements Completion Date to occur prior to the Outside Date.

6.4    [Intentionally Omitted].

6.5    <u>Compensation and Reimbursement</u>.  The Company will pay, or reimburse, the Members and their Affiliates for all Liabilities paid or incurred in connection with the performance of its duties under this Agreement and in connection with the Company's business, provided that any such Liabilities are approved by the Members.  Reimbursable expenses include, without limitation, out-of-pocket fees and other amounts paid or incurred for attorneys, accountants, bookkeepers, inspectors, engineers, contractors, project managers, brokers and consultants attributable to the conduct of the Company's business, but not the overhead of any Member, and expenses relating to monitoring, reporting, oversight, and/or supervision of the Company, including all travel related and other expenses incurred in connection therewith.

7.    <u>Allocation of Profits, Losses and Distributions</u>.

7.1    Allocations of Profits and Losses.  Profits and Losses shall be allocated to the Members in accordance with Exhibit "C" attached hereto.

7.2 ·  ·Distributions.

7.2.1    Timing of Distributions.  Distributions of Distributable Cash from a sale
of all or a portion of the Property shall be made promptly following the closing of any such sale.
Other Distributions shall be made as determined by the Members.

7.2.2    Form of Distribution.    A Member, regardless of the nature of the
Member's Capital Contribution, has no right to demand and/or receive any Distribution from the
Company in any form other than money.  No Member may be compelled to accept from the
Company a Distribution of any asset in kind in lieu of a proportionate distribution of money
being made to other Members.  Except upon the dissolution and winding up of the Company, no
Member may be compelled to accept a Distribution of any asset in kind.

7.2.3    Distributions of Distributable Cash.  In each fiscal year of the Company,
Distributions of Distributable Cash shall be made to the Members as follows:

(a)    First, to Ilus up to the amount of the accrued and unpaid Additional
Capital Preferred Return, if any;

(b)    Next, to Ilus up to the amount of any unrepaid Deficiencies funded
by Ilus, if any;

(c)    Next, to Ilus until Ilus has received Distributions pursuant to this
Section 7.2.3(c) totaling an amount (the **"Priority Distribution Amount"**) equal to $3,026,000
in the aggregate if Ilus has received Distributions pursuant to this Section 7.2.3 in the aggregate
amount of $3,026,000 on or before the Outside Date, and otherwise $3,855,000;

(d)    Next, if on or before the Outside Date: (1)(a) the Entitlements
Completion Date has not occurred and the entire Property has not been sold in an arm's length
transaction to an unrelated third party; or (b) Ilus has not received Distributions of Distributable
Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all
unrepaid Deficiencies plus the Priority Distribution Amount; and (2) VDI has not committed any
material breach of this Agreement, then distributions shall be made to VDI up to the amount of
any unrepaid Capital Contributions made by VDI, as long as any such unrepaid Capital
Contributions were made with the prior written approval of Ilus; and

(e)    next, to the Members in the ratio of their respective Membership
Percentages, except that, as provided in Section 4.2.2(c) above, an amount equal to the Offset
Amount (if any) shall be deducted from and credited against the obligation to make the
Distributions otherwise payable to VDI, and shall be paid to Ilus.

7.2.4    Liquidating Distribution.    Upon a dissolution of the Company, the
Members shall take or cause to be taken a full account of the Company's assets and liabilities as
of the date of such dissolution and shall proceed with reasonable promptness to liquidate the
Company's assets and to terminate its business.  The cash proceeds from the liquidation, as and
when available therefor, shall be applied in the following order of priority:

(a)    to the payment of all Liabilities of the Company and the necessary
expenses of liquidation;

(b)    thereafter, to the Members in the amounts and in the priorities set forth in Sections 7.2.3 above.

8.    Transfer and Assignment of Membership Interests.

8.1    General.   No Member shall be entitled to Transfer all or any part of such Member's Membership Interest without the consent of the other Member.  Transfers in violation of this Article 8 shall be invalid and shall not be reflected on the Company's books.

8.2    Transfers of Interests in VDI.

8.2.1    VDI shall not, without the consent of the Members, permit the transfer of any interest in VDI if: (1) Ryan Ogulnick directly or indirectly, would cease to exclusively control VDI or if Ryan Ogulnick would own less than 51% of the "Economic Interest" in VDI; or (2) Ryan Ogulnick would cease to have unreturned capital contributions of at least $1,000,000 prior to the date on which the Entitlements Completion Date has occurred (or the entire Property has been sold in an arm's length transaction to an unrelated third party), and Ilus has received Distributions of Distributable Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all unrepaid Deficiencies plus the Priority Distribution Amount, or (3) Ilus has not approved the transferee prior to the effective date of the transfer.  Any violation by VDI of this Section 8.2 shall constitute an Event of Default under this Agreement.

8.2.2    Prior to the transfer of any interest in VDI, VDI shall cause the shareholders of VDI who desire to Transfer any such interest (an "**offering party**") to first deliver to Ilus written notice setting forth all of the terms of the proposed Transfer and the name, address, and telephone number of the proposed Transferee.  Such written notice shall constitute an offer (an "Offer") by the offering party to sell to Ilus such interest on the terms and conditions set forth in such written notice. Ilus may assign its right to acquire such interest to an Affiliate of Ilus.  Within fifteen (15) days after the Offer is delivered to Ilus, Ilus must, if it desires to accept the Offer, give written notice of acceptance.  If Ilus fails to accept the Offer within fifteen (15) days after the Offer is delivered to Ilus, then the Offer shall be deemed to have been rejected.  If the Offer is accepted, then within fifteen (15) days after written notice of acceptance, the interest shall be Transferred in accordance with the Offer and an assignment and other documents reasonably satisfactory to Ilus shall be executed and delivered to Ilus.  If the Offer is rejected, the offering party shall have the right to Transfer the interest only to the proposed Transferee in accordance with this Agreement and on the terms of the Offer.  However, if the offering party fails to close such a Transfer in accordance with this Agreement and on the terms of the Offer, within forty-five (45) days after the delivery of the Offer to Ilus, such right shall terminate, and the offering party shall not thereafter Transfer the interest without again complying with the foregoing procedures.

9.    Accounting, Records, Reporting By Members.

9.1    Books and Records.   The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes or such other method determined by the Members.  The books and records of the Company shall reflect all the Company

transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all books and records as required by the Code. Any Member may inspect the books and records of the Company during reasonable business hours.

9.2     Filings.  Ilus, at Company, expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities.  Ilus, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations.

9.3     Bank Accounts.  The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.4     Accounting Decisions and Reliance on Others.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by Ilus.  Ilus may rely upon the advice of its accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.5     Tax Matters for the Company .  The Members shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members.  Ilus shall be the "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and to expend the Company funds for professional services and costs associated therewith.  In its capacity as "Tax Matters Partner", Ilus shall oversee the Company tax affairs in the overall best interests of the Company.

9.6     Tax Status and Returns.

9.6.1     Accountants.  The Company's accountant shall be selected by the Members.

9.6.2     Status as Partnership for Tax Purposes.  Any provision hereof to the contrary notwithstanding, solely for United States federal income tax purposes, each of the Members hereby confirms that the Company will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.

9.7     Mandatory Section 754 Election.  Upon a Transfer by a Member of an interest in the Company, which Transfer is permitted by the terms hereof, or upon the death of a Member or the distribution of any Company property to one or more Members, the Members, upon the request of one or more of the transferees or distributees, shall cause the Company's accountants to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Sections 734 or 743 of the Code, as the case may be.  The cost of preparing said

C:\Documents and Settings\dalmer\Desktop\VDCATM LLCA Final.docx          14

election, and any additional accounting expenses of the Company occasioned by said election, shall be borne by said transferees or distributees.

10.    Dissolution and Winding Up.

10.1    Dissolution.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

10.1.1  Upon the happening of any event of dissolution specified in the Articles, if any;

10.1.2  Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Act;

10.1.3  Upon a sale of substantially all of the Property; or

10.1.4  Upon the approval of the Members.

10.2    Certificate of Dissolution.  As soon as possible following the occurrence of any of the events specified in Section 10.1, Ilus shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

10.3    Winding Up.  Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  Ilus shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 7.2.4. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.

10.4    Distributions in Kind.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the taxable income or taxable loss that would have resulted if such asset were sold for such value, such taxable income or taxable loss shall then be allocated pursuant to Section 7, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by Ilus or if any Member objects by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by Ilus or liquidating trustee and approved by Ilus.

10.5    Order of Payment of Liabilities Upon Dissolution.  After determining that all the known Liabilities of the Company in the process of winding up, including, without limitation, Liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members as set forth in Section 7.2.4.

10.6    Limitations on Payments Made in Dissolution.  Except as otherwise specifically
provided in this Agreement, each Member shall only be entitled to look solely at the assets of
Company for the return of his or her positive Capital Account balance and shall have no recourse
for his or her Capital Contribution and/or share of taxable incomes (upon dissolution or
otherwise) against any other Member except as provided in this Section 10.

10.7    Certificate of Cancellation.  Ilus shall cause to be filed in the office of, and on a
form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles
upon the completion of the winding up of the affairs of the Company.

11.    Indemnification and Insurance.

11.1    Indemnification of Agents:  The Company shall indemnify any Person who was
or is a party or is threatened to be made a party to any threatened, pending or completed action,
suit or proceeding by reason of the fact that he or she is or was a Member, manager, officer,
employee or other agent of the Company or that, being or having been such a Member, manager,
officer, employee or agent, he or she is or was serving at the request of the Company as a
manager, director, officer, employee or other agent of another limited liability company,
corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to
hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date
hereof and to such greater extent as applicable law may hereafter from time to time permit.

11.2    Insurance.  The Company shall have the power to purchase and maintain
insurance on behalf of any Person who is or was an agent of the Company against any liability
asserted against such Person and incurred by such Person in any such capacity, or arising out of
such Person's status as an agent, whether or not the Company would have the power to
indemnify such Person against such liability under the provisions of Section 11.1 or under
applicable law.

12.    Amendments.

12.1    Amendments to Agreement.  All amendment to this Agreement shall be in writing
and signed by the Members.

12.2    Amendments to Articles.

12.2.1 Except as provided in Section 12.2.2, the Articles shall not be amended
without the approval of the Members.

12.2.2 Notwithstanding the foregoing, within thirty (30) days after the occurrence
of any of the following events, the Members shall cause a Certificate of Amendment to be filed
in the office of, and on a form prescribed by, the Secretary of State, reflecting such occurrence:

(a)    a change in the name of the Company;

(b)    any change in the statement referred to in Section 17151(b)
regarding whether the Company will be managed by one or more members and not by Ilus;

(c)    any change in the time as stated in the Articles for the dissolution of the Company;

(d)    any change in the events that will cause a dissolution of the Company; or

(e)    the discovery by a Member of any false or erroneous material statement contained in the Articles.

13.    **Representations and Warranties**

13.1    By Ilus.  Ilus hereby represents, warrants and covenants the following to VDI for the purpose of inducing VDI to enter into this Agreement, to consummate the transactions contemplated hereby, all of which shall survive the consummation of the transactions contemplated hereby.

13.1.1 Ilus is duly formed, validly existing and in good standing under the laws of the state of its formation, and is duly qualified in the State of California. Ilus has the power, right and authority to enter into this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby. The individuals executing this Agreement and the instruments referenced herein on behalf of Ilus have the power, right and authority to bind Ilus.

13.1.2 All requisite action has been taken by Ilus and all requisite consents have been obtained in connection with Ilus' execution, delivery and performance of this Agreement and the instruments and documents referenced herein, and the consummation of the transaction contemplated hereby, and no consent of any other party is required.

13.1.3 This Agreement is, and all agreements, instruments and documents to be executed by Ilus pursuant to this Agreement shall be, duly executed by Ilus and are, or shall be, valid and legally binding upon Ilus and enforceable in accordance with their respective terms subject to the effect of applicable bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally.

13.1.4 Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall result in a breach of or constitute a default under any agreement, document, instrument or any other obligation to which Ilus is a party or to which Ilus may be bound or affected, or under any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Ilus.

13.2    By VDI.  VDI hereby represents, warrants and covenants the following to Ilus for the purpose of inducing Ilus to enter into this Agreement, to consummate the transactions contemplated hereby, and as a condition to any rights granted to VDI under this Agreement, all of which shall survive the consummation of the transactions contemplated hereby.

13.2.1 VDI is duly formed, validly existing and in good standing under the laws of the state of its formation, and is duly qualified in the State of California. VDI has the power, right and authority to enter into this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby. The individuals executing this

Agreement and the instruments referenced herein on behalf of VDI have the power, right and authority to bind VDI.

13.2.2 All requisite action has been taken by VDI and all requisite consents have been obtained in connection with VDI's execution, delivery and performance of this Agreement and the instruments and documents referenced herein, and the consummation of the transaction contemplated hereby, and no consent of any other party is required.

13.2.3. This Agreement is, and all agreements, instruments and documents to be executed by VDI pursuant to this Agreement shall be, duly executed by VDI and are, or shall be, valid and legally binding upon VDI and enforceable in accordance with their respective terms subject to the effect of applicable bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally.

13.2.4 Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall result in a breach of or constitute a default under any agreement, document, instrument or any other obligation to which VDI is a party or to which VDI may be bound or affected, or under any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to VDI.

13.2.5 The Purchase Agreement constitutes the entire agreement between the seller of the Property and the Company, Vineyards Development, Inc., Ryan Ogulnick, or any Affiliate of any of them, and has not been amended or supplemented in any respect. There are no other agreements relating to the purchase and sale of the Property other than the Purchase Agreement. The Purchase Agreement was duly and effectively assigned to the Company prior to the Effective Date.

13.2.6 The Company has no obligations or liabilities as of the Effective Date, other than its obligations under the Purchase Agreement and the loan documents with respect to the first trust deed loan made to the Company by Avalon Pacific-Met, L.P., a California limited partnership.

13.2.7 Ryan Ogulnick and VDI warrant and represent to Ilus that all written agreements (the "Existing Written Agreements") entered into by Ryan Ogulnick or VDI in connection with or for the benefit of VDC at the Met, LLC prior to the execution of this Agreement are set forth on Exhibit F attached hereto, and that no other agreements exist. Prior to or concurrently with the execution and delivery of this Agreement, Ryan Ogulnick and VDI shall deliver to Ilus true and complete copies of all Existing Written Agreements. Ryan Ogulnick and VDI hereby assign all Existing Written Agreements to the Company. A breach of this Section 13.2.7 shall constitute an Event of Default.

14. Miscellaneous.

14.1 Counsel to the Company. Counsel to the Company may also be counsel to any Member or any manager or any Affiliate of a Member or a manager. Ilus may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("rules"). The Company has initially selected Appel &. Henick LLP

C:\Documents and Settings\Molmer\Desktop\VDCATM LLCA Final.docx

18.

("**Company Counsel**") as legal counsel to the Company in connection with its formation and organization, including the preparation of this Agreement. The Members acknowledge that Company Counsel represents Ilus and hereby consents to such representation notwithstanding any conflict of interest. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Member (or Affiliate of a Member) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Member (or its Affiliate), or both, in any such disputes or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation. Nothing in this Section 14.1 is intended to mean that the Members may not retain independent counsel to represent it in any matter related to this Agreement.

14.2   <u>Complete Agreement</u>.   This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control. Notwithstanding anything to the contrary in this Agreement, that certain Option Agreement For Purchase and Sale of Membership Interest dated March 28, 2011 between VDI and Ilus is hereby terminated and of no further force or effect and that certain Environmental Indemnity Agreement dated March 28, 2011 between Vineyards Development, Inc., a California corporation, VDI, and Rachel Ogulnick in favor of Ilus remains in full force and effect.

14.3   <u>Binding Effect</u>.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

14.4   <u>Parties in Interest</u>.   Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

14.5   <u>Pronouns; Statutory References</u>.   All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.6   <u>Headings</u>.   All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.7   <u>Interpretation</u>.   In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the

C:\Documents and Settings\Administrator\Desktop\VDCATM LLCA Final.docx          19

request of a particular Member or his or her counsel.

14.8    References to this Agreement.    Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

14.9    Jurisdiction.    Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles, California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 14.13 below, and that when so made shall be as if served upon him or her personally within the State of California.

14.10    Exhibits.    All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

14.11    Severability.    If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

14.12    Additional Documents and Acts.    Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.13    Notices.    Any notice, demand, document or other communication which any party is required or may desire to give, deliver or make to any other party shall be in writing, and may be personally delivered or given or made by overnight delivery service (e.g., Federal Express or other similar service), or by telecopied transmission with printed confirmation of receipt. Such notices will be given to a Member at the address specified in Exhibit B hereto. Any party may designate a different address for itself by notice similarly given. Any notice, demand or document delivered by personal delivery or by telecopied transmission with printed confirmation of receipt shall be deemed complete upon actual delivery. Any notice, demand or document delivered by overnight delivery service (e.g. Federal Express) shall be deemed complete upon actual delivery or attempted delivery provided such attempted delivery is made on a business day.

14.14    Reliance on Authority of Person Signing Agreement.    If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    No Interest in Company Property .    No Member has any interest in specific property of the Company.

14.16   Multiple Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.17   Time is of the Essence.   All dates and times in this Agreement are of the essence.

14.18   Remedies Cumulative.   The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, this Agreement has been executed as of the Effective Date.

**MEMBERS:**

ILUS INVESTORS, LP,
a California limited partnership

By:   Ilus GP US LLC,
      a California limited liability company,
      its General Partner

      By:
      Name: Barry Levine
      Title:  Manager

      By:
      Name: David Ulmer
      Title;  Manager

VINEYARDS DEVELOPMENT,
INCORPORATED,
a California corporation

By:
Name:  Ryan Ogulnick
Title:    CEO

AGREED AS TO SECTIONS 4.3, 13.2 AND ARTICLE 14:

Ryan Ogulnick

## EXHIBIT "A"

### GLOSSARY OF DEFINED TERMS

"**Act**" means the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

"**Additional Capital Preferred Return**" means, with respect to each Capital Contribution made by Ilus to fund all or a portion of a Deficiency pursuant to Section 4.2.2 above, an amount equal to three (3) times the amount of the Capital Contribution.

"**Affiliate**" means (a) any Person directly or indirectly controlling, controlled by, or under common control with another Person, (b) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such other Person, (c) any officer, director or Member of such Person, or (d) if such Person is an officer, director or Member, any corporation or Company for which such Person acts in any such capacity.

"**Agreement**" means this Second Amended and Restated Operating Agreement for VDC AT THE MET, LLC, a California limited liability company, as from time to time amended or restated.

"**Articles**" means articles of organization filed under Section 17050, including all amendments thereto or restatements thereof, or, in the case of a foreign limited liability company, all documents that serve a like function under the laws of the jurisdiction in which the foreign limited liability company is organized.

"**Avalon Lender**" means the holder of the Avalon Loan from time to time.

"**Avalon Loan**" means the loan made to the Company by Avalon Pacific-Met, L.P., a California limited partnership in the original principal amount of $3,300,000.

"**Avalon Loan Documents**" means the promissory note, trust deed and other documents and agreements evidencing, securing and otherwise relating to the Avalon Loan.

"**Capital Contributions**" means the total amount of cash and fair market value of property (including promissory notes) contributed and/or services rendered or to be rendered to the Company by Members, including without limitation the Initial Contributions and any additional Capital Contributions.

"**Capital Transactions**" means any of the following: (i) any sale or other disposition of all or any part of the Property; (ii) any loan secured by all of any part of the assets of the Company; (iii) the condemnation of all or any part of the Property; (iii) the refinancing of Company indebtedness, or (iv) any insurance recovery relating to the Property.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

"**Company**" means VDC AT THE MET, LLC, formed pursuant to the Act.

"**Distributable Cash**" means all cash of the Company derived from any source, whether derived from operations or from the sale of Company assets or other capital transactions including, without limitation, rent received, financing and refinancing proceeds, insurance proceeds and condemnation awards, after excluding an amount of such cash equal to (a) the amount necessary for payment of all Liabilities of the Company then due including, without limitations; all advances or loans made by Members to the Company, and any fees, compensation or other amounts payable to the Members, and (b) such additional amounts as the Members determine to be necessary or desirable as a reserve for the operation of the business and future or contingent Liabilities of the Company.

"**Distribution**" means the transfer of money or property by the Company to the Members without consideration.

"**Economic Interest**" means a Member's right to receive Distributions from the Company and to share in the income, gains, losses, deductions, credits, or similar items of the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including without limitation the right to vote or participate in the management of the Company, or except as provided in Section 17106 of the Act, any right to information concerning the business and affairs of the Company.

"**Entitlements**" means the discretionary approvals by Government Authorities with jurisdiction over the Property required for development of the Property, which is expected by the members to entitle the property with highest density achievable through the entitlement process, to include the construction of a four to five story multi-family residential complex with the appropriate quantity of parking spaces on two to four levels. The development will require several discretionary actions, including a mitigated negative declaration, an amendment to Development Agreement No. 2004-03, an amendment to Specific Development 43 zoning district, variances to allow a reduction in open space and allowance for tandem parking, and site plan review approval by the City of Santa Ana City Council. A summary of the Entitlements is set forth on Exhibit G attached hereto.

"**Entitlements Completion Date**" means the date on which the Entitlements have been issued and approved by the applicable governmental authority and all applicable appeal periods with respect to the Entitlements have expired with no appeal having been filed or if filed any such appeal is filed, such appeal is denied or is otherwise resolved as approved by the Members.

"**Entitlement Schedule**" means the schedule set forth on Exhibit C showing the milestones with respect to the Entitlements.

"**Event of Default**" means any of the following: (a) VDI's failure to pay when due any amount payable pursuant to this Agreement if such failure continues for five (5) business days after notice from Ilus; (b) VDI's failure to obtain the prior written approval of Ilus of any material modification to the Entitlements, any submission to a Government Authority with respect to the Entitlements, or any listings, offers, proposals or agreements pertaining to the sale of any portion of the Property; (c) any material default under this Agreement or any act or omission that constitutes an Event of Default pursuant to this Agreement; and (d) VDI's failure to perform any of its other obligations under this Agreement, if such failure is not cured within 15 days after written notice from Ilus (or such longer period as is reasonably determined by Ilus

to be necessary for completion of the cure, so long as VDI begins promptly and thereafter diligently continues to cure the failure).

"**Government Authorities**" means the United States, the State of California, the County of Orange, and any other political subdivision located therein, and any agency, department, commission, board, bureau or instrumentality of any of them.

"**Initial Contributions**" means the initial amount of capital contributed by the Members to the Company in accordance with Section 4.1.

"**Liabilities**" means all costs, expenses, fees, commissions, obligations, debts, claims, contingencies, judgments and other liabilities, all obligations to indemnify or reimburse guarantors and secured parties, and attorneys' fees and costs.

"**Liquidation**" means: (i) with respect to the Company, the earlier of the date upon which the Company is terminated under Section 708(b)(1) of the Code or the date upon which the Company ceases to be a going concern (even though it may exist for purposes of winding up its affairs, paying its debts and distributing any remaining balance to its Members); and (ii) with respect to a Member where the Company is not in Liquidation, the date upon which the termination of the Member's entire Interest occurs by means of a Distribution or the making of the last of a series of Distributions (in one or more years) to the Member by the Company.

"**Maximum Aggregate Additional Contributions**" is defined in Section 4.2.1(a)(i) above.

"**Membership Interest**" means a Member's rights in the Company, collectively, including the Member's Economic Interest, the right to vote or participate in the management, and any right to information concerning the business and affairs of the Company provided by the Act.

"**Member Percentage**" means 10% for VDI and 90% for Ilus, except that if, on or before the Outside Date Ilus has received Distributions of Distributable Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all unrepaid Deficiencies plus the Priority Distribution Amount, and VDI has paid all Extension Option Payments and has not committed any material breach of this Agreement, then (a) as to any Distributable Cash from the sale of the High Rise Portion, 70% for VDI and 30% for Ilus; and (b) as to any Distributable Cash from the sale of the Low Rise Portion, 83% for VDI and 17% for Ilus. If VDI exercises the option to extend the Outside Date pursuant to Section 6.1.4 above, then the Member Percentage for VDI as stated in subsections (a) and (b) above shall be reduced by the following number of percentage points with respect to each Extension:

| | |
|---|---|
| First Extension | No reduction |
| Second Extension | Three (3) percentage points |
| Third Extension | One (1) percentage point |
| Fourth Extension | One (1) percentage point |

"**Outside Date**" means March 28, 2012, as such date may be extended in accordance with Section 6.1.4 above. If, on or before the Outside Date determined as provided above, (a)

Ilus has received Distributions of Distributable Cash sufficient to pay all accrued and unpaid Additional Capital Preferred Return plus all unpaid Deficiencies plus the Priority Distribution Amount, and VDI has paid all Extension Option Payments and has not committed any material breach of this Agreement, and (b) the Entitlements have been issued and approved by the applicable governmental authority but all applicable appeal periods with respect to the Entitlements have not expired, then the Outside Date shall be extended to the earlier of: (i) the date on which the appeal periods with respect to the Entitlements have expired with no appeal having been filed; or (ii) the date on which an appeal is filed; or (iii) the date that is 30 days after the date on which the Outside Date would have occurred but for this extension.

"**Person**" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company or other entity, whether domestic or foreign.

"**Priority Distribution Amount**" is defined in Section 7.2.3(c) above.

"**Project**" means the acquisition of the Property and the planning and other work related to obtaining the Entitlements.

"**Project Consultants**" means the architects, engineers and other contractors, professionals and consultants performing services in connection with the Project.

"**Project Costs**" means the costs incurred in acquiring and financing the acquisition of the Property and in completing the Project, including, without limitation, all financing and other cost items shown on the Project Cost Breakdown.

"**Project Cost Budget**" means the itemized schedule of costs on a line item basis attached to this Agreement as Exhibit E, covering all costs of obtaining the Entitlements and of owning and operating the Property, as amended from time to time with the Members' approval.

"**Property**" means that certain real property described in Exhibit D hereto.

"**Purchase Agreement**" means that certain Purchase and Sale Agreement and Joint Escrow Instructions dated December 9, 2010 by and between Vineyards Development, Inc., a California corporation and California Geneva Commons Return, LLC, a Missouri limited liability company, as amended by that certain First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated December 27, 2010, that certain Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated February 4, 2011, and that certain Third Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated March 22, 2011.

"**Regulations**" means, unless the context clearly indicates otherwise, the regulations in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Remaining Costs**" means the amount that the Members from time to time determine to be necessary to pay the costs to complete the Project.

"**Request for Disbursement**" is defined in Section 4.2.1(a)(iv)(A) above.

"**Schedule**" means the Schedule attached hereto as <u>Exhibit B</u>, which contains the names and residence or business addresses of the Members, their Initial Contributions, and their initial Member Percentages.

"**Transfer**" means to sell, lease, assign, exchange, encumber, hypothecate, pledge, pass by inter vivos gift, devise or intestate succession, or otherwise transfer, voluntarily or involuntarily (including, without limitation, by way of merger, consolidation, reorganization, forced sale, by operation of law or otherwise).

"**Undisbursed Contribution Amount**" is defined in Section 4.2.1(a)(iv) above.

"**VDI Funds Account**" means an account controlled by the Company, into which all VDI's Capital Contributions shall be deposited pending disbursement pursuant to this Agreement.

## EXHIBIT "B"

## <u>SCHEDULE OF MEMBERS</u>

Members:

Vineyards Development, Inc.
c/o Ryan Ogulnick
828 N. Ogden Dr.
Los Angeles, CA 90046
Fax: 323.798.4010

Ilus Investors, LP
c/o Ilus GP US, LLC
51 Gibraltar Drive, Suite 2D
Morris Plains, NJ 07950
Fax: 212.460.5188
Attention:  Barry Levine

EXHIBIT "C"

## ALLOCATIONS OF PROFITS AND LOSSES

### I.    DEFINITIONS

1.1.    Capitalized terms used in this <u>Exhibit "C"</u> shall have the meanings set forth in this Article I and in Article 1 of the Agreement, unless defined elsewhere in this Agreement:

(a)    Adjusted Capital Account" shall equal, with respect to each Member and at any time, the Member's Capital Account at such time (x) increased by the sum of (A) the amount of the Member's share of company minimum gain (as defined in Regulation §§ 1.704-2(g)(1) and (3)), (B) the amount of the Member's share of Member nonrecourse debt minimum gain (as defined in Regulation § 1.704-2(i)(5)), and (C) any amount of the deficit balance in its Capital Account the Member is obligated to restore on liquidation of the Company and (y) decreased by reasonably expected adjustments, allocations and distributions described in Regulation §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

(b)    "Capital Account" means, with respect to each Member, the amount of money contributed by such Member to the capital of the Company, increased by the Gross Asset Value of any property contributed by such Member to the capital of the Company (net of Liabilities securing such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and the amount of any Profits allocated to such Member, and decreased by the amount of money distributed to such Member by the Company (exclusive of a guaranteed payment within the meaning of Section 707(c) of the Code paid to such Member), the Gross Asset Value of any property distributed to such Member by the Company (net of Liabilities securing such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), and the amount of any Losses charged to such Member. To the extent an adjustment to the tax basis of any Company asset is made pursuant to Code Sections 734(b) or 743(b), and such adjustment is required by Regulation § 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the Capital Accounts of the Members shall be adjusted to reflect an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), which is specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations. In the event the Gross Asset Values of Company assets are otherwise adjusted pursuant to the terms of this Agreement, the Capital Accounts of the Members shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Company recognized gain or loss equal to the amount of such aggregate net adjustment and such gain or loss was allocated to the Members pursuant to the appropriate provisions of this Agreement. The foregoing Capital Account definition and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation § 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. The transferee of all or a portion of an Economic Interest shall succeed to that portion of the transferor's Capital Account which is allocable to the portion of the Economic Interest transferred. A Member who has more than one Economic Interest in the Company shall have a single Capital Account that reflects all such Economic Interests, regardless of the class of Economic Interests owned by such Member and of the time or manner in which the Economic Interests were acquired.

(c)  "Company Asset" means any property or asset of the Company, and "Company Assets" means the aggregate of all of the property and assets of the Company.

(d)  "Company Liability" means any enforceable debt or obligation for which the Company is liable or which is secured by any Company property.

(e)  "Company Minimum Gain" means an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of any Company property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Fiscal Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Fiscal Year with the Minimum Gain on the last day of the current Fiscal Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain and increases and decreases in Company Minimum Gain are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time and shall be interpreted consistently therewith.

(f)  "Company Nonrecourse Liability" means a Company Liability to the extent that no Member or Related Person bears the economic risk of loss (as defined in Regulation § 1.752-2) with respect to the liability.

(g)  "Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to assets for such taxable year, except that if the Gross Asset Value of the assets differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by Ilus.

1.2.  "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)  The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset, as determined by Ilus in his reasonable discretion;

(b)  The Gross Asset Values of all Company Assets shall be adjusted to equal their respective fair market values (as determined by the Ilus in his reasonable discretion) as of the following:

(i)  The acquisition of additional Membership Interests by any new or existing Member in exchange for more than a de minimis Capital Contribution if Ilus reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic

interests of the Members in the Company;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest if Ilus reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(iii)     The liquidation of the Company within the meaning of Regulation § 1.704-1(b)(2)(ii)(g).

(c)     The Gross Asset Value of any Company Assets distributed to any Member shall be the gross fair market value of such asset, as determined by Ilus in his reasonable discretion, on the date of such distribution; and

(d)     The Gross Asset Values of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent that Ilus determines that an adjustment pursuant to subsection (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d).

1.3.     If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (a), (b), or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

1.4.     "Profits and Losses" means, for each Fiscal Year or other applicable period of the Company, an amount equal to the Company's taxable income or loss for such year or period and shall be determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant hereto shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Regulation § 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant hereto, shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company Asset is adjusted (as provided in clause (b) or (c) of the definition of Gross Asset Value herein), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of Company property with

respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(e)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period.

(f)    To the extent that an adjustment to the adjusted tax basis of any Company Asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation § 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

(g)    Notwithstanding any other provision of this Agreement, any items that are specially allocated pursuant to Exhibit "C" shall not be taken into account in computing Profits and Losses.

1.5.    "Related Person" means a person having a relationship to a Member that is described in Regulation § 1.752-4(b).

## 2.    ALLOCATION OF PROFITS AND LOSSES

2.1.    Allocation of Profits and Losses.

(a)    Except as otherwise required by Section 704 of the Code and the Regulations thereunder, and except as provided in Section 2.2 of this Exhibit "C," Profits and Losses, as the case may be, and each item of income, gain, loss and deduction entering into the computation thereof, for each Fiscal Year (or other allocation period), beginning with the period starting on the date of this Agreement, shall be allocated as follows:

(i)    Losses from Operations.    Losses from the operations of the Company shall be allocated each Fiscal Year, beginning with the period starting on the date of this Agreement, as follows:

First, to the Members, pro rata in accordance with their then Member Percentages, in an amount equal to the excess of (i) cumulative Profits from operations previously allocated pursuant to Section 2.1(a)(iii)[D] over (ii) cumulative Operating Losses previously allocated pursuant to this Section 2.1(a)(i)[A].

Second, to the Members, pro rata in accordance with their then Member Percentages.

(ii)    Losses from Capital Transactions.    Losses of the Company from Capital Transactions shall be allocated each Fiscal Year, beginning with the period starting on the date of this Agreement, as follows:

[A]    First, to the Members, pro rata in accordance with their then Member Percentages, in an amount equal to the excess of (i) cumulative Profits from Capital Transactions previously allocated pursuant to Section 2.1(a)(iv)[E] and cumulative Profits from operations previously allocated pursuant to Section 2.1(a)(iii)[D] over (ii) cumulative Losses from Capital Transactions previously allocated pursuant to this Section 2.1(a)(ii)[A] and cumulative Losses from operations previously allocated pursuant to Section 2.1(a)(i)[D] hereof.

[D]    Second, to the Members, pro rata in accordance with their then Member Percentages, except that any Losses realized upon the disposition of the Property or at the time of the liquidation of the Company shall be allocated to the Members, pro rata according to their relative Capital Account balances, until each Member's Capital Account is reduced to zero and then to the Members, pro rata in accordance with their then Member Percentages.

(iii)    Profits from Operations. Profits from operations shall be allocated each Fiscal Year, beginning with the period starting on the date of this Agreement as follows:

[A]    First, to the Members, pro rata in accordance with their then Member Percentages, in an amount equal to the excess if any, of (i) cumulative Losses from operations allocated pursuant to Section 2.1(a)(i)[D] hereof for all prior taxable years over (ii) cumulative Profits from operations allocated pursuant to this Section 2.1(a)(iii)[A] for all prior taxable Fiscal Years.

[D]    Second, to the Members, pro rata in accordance with their then Member Percentages.

(iv)    Profits from Capital Transactions.    Profits from Capital Transactions shall be allocated each Fiscal Year, beginning with the period starting on the date of this Agreement as follows:

[A]    First, to the Members, pro rata in accordance with their then Member Percentages, in an amount equal to the excess, if any, of (i) cumulative Losses from Capital Transactions previously allocated pursuant to Section 2.1(a)(ii)[D] hereof and cumulative Losses from operations previously allocated pursuant to Section 2.1(a)(i)[D] hereof, for all prior taxable years, over (ii) cumulative Profits from Capital Transactions previously allocated pursuant to this Section 2.1(a)(iv)[A] and cumulative Profits from operations previously allocated pursuant to Section 2.1(a)(iii)[D] hereof, for all prior Fiscal Years.

[D]    Second, to the Members, an amount which, when added to the then aggregate balance in the Members' Capital Accounts (reduced by the excess of (i) the amount of cumulative Profits from operations, if any, previously allocated to them over (ii) Available Cash from operations previously distributed to them pursuant to Section 7.2(c)(iii) hereof), equals the amount of the Capital Contributions made to the Company by the Members. The aggregate amount allocated pursuant to this Section 2.1(a)(iv)[E] shall not exceed the amount of such Capital Contributions.

[E]    Third, to the Members, pro rata, in accordance with their then Member Percentages.

(b)    The Losses from operations allocated pursuant to Section 2.1(a)(i) and the allocated pursuant to Section 2.1(a) (ii) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an "Adjusted Capital Account Deficit" (as such term is hereinafter defined) at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 2.1(a)(i) hereof or Section 2.1(a)(ii) hereof, the limitation set forth in this paragraph shall be applied separately to each Member so as to allocate the maximum permissible Losses to each Member under Treas. Reg. §1.704-1(b)(2)(ii)(d).

2.2.    Other Allocation Provisions.

(a)    Notwithstanding any other provision of this Article II to the contrary, items of Company income and gain shall be allocated so as to comply with the minimum gain chargeback requirements of Regulation §§ 1.704-2(f) and 1.704-2(i)(4).

(b)    If during any Fiscal Year a Member unexpectedly receives an adjustment, allocation or distribution described in Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases a deficit balance in the Member's Adjusted Capital Account, there shall be allocated to the Member items of income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such deficit as quickly as possible. The foregoing is intended to be a "qualified income offset" provision as described in Regulation § 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in all respects in accordance with that Regulation.

(c)    Notwithstanding anything to the contrary in this Article II, Company losses, deductions, or Code Section 705(a)(2)(B) expenditures that are attributable to a particular Member nonrecourse liability shall be allocated to the Member that bears the economic risk of loss for the liability in accordance with the rules of Regulation § 1.704-2(i).

(d)    Notwithstanding any provision of Section 2.1(a)(i) or (ii) of this Exhibit "C," no allocation of Losses shall be made to a Member if it would cause the Member to have a negative balance in its Adjusted Capital Account. Allocations of Losses that would be made to a Member but for this Section 2.2(d) shall instead be made to other Members pursuant to Section 2.1(a)(i) or (ii) of this Exhibit "C" to the extent not inconsistent with this Section 2.2(d). To the extent allocations of Losses cannot be made to any Member because of this Section 2.2(d), such allocations shall be made to the Members in accordance with Section 2.1(a)(i) or (ii) of this Exhibit "C" notwithstanding this Section 2.2(d).

(e)    Solely for the purpose of adjusting the Capital Accounts of the Members, and not for tax purposes, if any property is distributed in kind to any Member, the difference between its fair market value (as determined by Ilus or the liquidating agent, as the case may be, in its reasonable discretion) and its book value at the time of distribution shall be treated as gain or loss recognized by the Company and allocated pursuant to the provisions of Section 2.1 of this Exhibit "C."

(f)    Any allocations made pursuant to this Article II shall be made in the following order:

(i)    Section 2.2(a) of this Exhibit "C";

    (ii)    Section 2.2(b) of this Exhibit "C";
    (iii)   Section 2.2(c) of this Exhibit "C";
    (iv)   Section 2.2(e) of this Exhibit "C"; and
    (v)    Section 2.1 of this Exhibit "C," as modified by Section 2.2(d) of this Exhibit "C."

These provisions shall be applied as if all distributions and allocations were made at the end of the Fiscal Year. Where any provision depends on the Capital Account of any Member, that Capital Account shall be determined after the operation of all preceding provisions for the year. These allocations shall be made consistently with the requirements of Regulation § 1.704-2(j).

2.3.    <u>Allocations for Income Tax Purposes</u>. The income, gains, losses, deductions and credits of the Company for Federal, state and local income tax purposes shall be allocated in the same manner as the corresponding items entering into the computation of Profits and Losses were allocated pursuant to Sections 2.1 and 2.2 of this Exhibit "C"; provided that solely for Federal, state and local income and franchise tax purposes and not for book or Capital Account purposes, income, gain, loss and deduction with respect to property properly carried on the Company's books at a value other than its tax basis shall be allocated (i) in the case of property contributed in kind, in accordance with the requirements of Section 704(c) of the Code and such Regulations as may be promulgated thereunder from time to time, and (ii) in the case of other property, in accordance with the principles of Section 704(c) of the Code and the Regulations thereunder as incorporated among the requirements of the relevant provisions of the Regulations under Section 704(b) of the Code. Any elections or other decisions relating to such allocations shall be made by Ilus.

<u>Excess Nonrecourse Liability Safe Harbor</u>. Pursuant to Regulation § 1.752-3(a)(3), solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company (as defined in Regulation § 1.752-3(a)(3)), the Members' respective interests in Company profits shall be in accordance with their respective Capital Account balances.

## EXHIBIT "D"

## PROPERTY

Vacant land approximately 3.1 acres in size with the street address of 201 1st American Way, Santa Ana, CA 92707, also identified as Orange County Assessor Parcel # 411-074-03, located at the SEC of Imperial Promenade and MacArthur Boulevard, legally described as follows:

Real property in the City of Santa Ana, County of Orange, State of California, described as follows:

PARCEL A:

LOT 1 AS SHOWN ON EXHIBIT "B" OF LOT LINE ADJUSTMENT LL NO. 98-001, RECORDED APRIL 9, 1998 AS INSTRUMENT NO. 19980210009 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

PARCEL B:

A NON-EXCLUSIVE RECIPROCAL EASEMENT FOR VEHICULAR INGRESS, EGRESS AND ACCESS, AS SET FORTH IN THAT CERTAIN DECLARATION AND GRANT OF EASEMENTS RECORDED APRIL 9, 1998 AS INSTRUMENT NO. 19980210011 AND IN THAT CERTAIN AMENDED AND RESTATED DECLARATION AND GRANT OF EASEMENTS RECORDED APRIL 15, 1998 AS INSTRUMENT NO. 19980222444, AND IN THAT CERTAIN AMENDED AND FULLY RESTATED RECIPROCAL EASEMENT AGREEMENT RECORDED NOVEMBER 11, 2004 AS INSTRUMENT NO. 2004001056213, ALL OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM THAT PORTION INCLUDED WITHIN PARCEL A HEREINABOVE DESCRIBED.

PARCEL C:

AN EASEMENT FOR THE CONSTRUCTION, INSTALLATION, MAINTENANCE AND REPAIR OF A STORM DRAIN AND RELATED IMPROVEMENTS, AS SET FORTH IN THAT CERTAIN STORM DRAIN EASEMENT AND MAINTENANCE AGREEMENT RECORDED APRIL 18, 2005 AS INSTRUMENT NO. 2005000291720 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

APN: 411-074-03

## EXHIBIT "E"

## PROJECT COST BREAKDOWN

| Item | Amount |
|---|---|
| Architect | $225,000 |
| Civil Engineer | 24,000 |
| Closing Costs | n/a |
| Dust and Noise Study | n/a |
| Entitlement Consultant | 180,000 |
| Greenhouse Effect Experts | n/a |
| Insurance | 3,100 |
| Landscape Architect | 12,000 |
| Legal | 25,000 |
| Developer Costs | n/a |
| Property Taxes | n/a |
| Association CAM | 8,562 |
| City Fees | 25,000 |
| Structural Engineer | n/a |
| Survey | n/a |
| Negative Dec. | 138,000 |
| Misc. | n/a |
| Total Soft Costs: | $640,662 |

EXHIBIT "F"

EXISTING WRITTEN AGREEMENTS

| Existing Written Agreement | Dated | Party 1 | Counterparty | Agreement Type | Description / Title of Agreement |
|---|---|---|---|---|---|
| 1. Churchill Engineering Company | 3/4/2011 | Coe Architecture/Ryan Ogulnick* | James E. Churchill | Proposal | As-needed general code consulting services |
| 2. Coe Architecture | 3/14/2011 | VDI* | Christopher Coe | Proposal | Architectural contract |
| 3. Englekirk Structural Engineering | 3/8/2011 | VDI* | Russell Tamouye, | Service Estimate | Structural engineering work |
| 4. Fuscoe Engineering | 3/24/2011 | VDI* | John Oliver | Form Agreement | Civil engineering services |
| 5. Golden Alliance Insurance | 3/28/2011 | VDC | | Proposal (policy to be provided) | Commercial General Liability and Umbrella Coverage |
| 6. R. Donald McIntyre, Esq. | 4/8/2011 | Vineyards Development Company, LLC | R. Donald McIntyre | Retainer | Land use attorney |
| 7. Melendrez | 3/1/2011 | VDC | | Proposal | Landscape architecture services |

*Agreements to be assigned

D-1

EXHIBIT "G"

## SUMMARY OF ENTITLEMENTS

| Submission | Submitted To | Method of Decision | Reviewing Bodies | Description of Items Sought |
|---|---|---|---|---|
| Ordinance approving amendment to existing development agreement 2004-03 | City of Santa Ana | Public Hearing | City Council | Development agreement will require an amendment in the event that the site plan and use of site changes. |
| Amendment to Specific Development 43 zoning district | City of Santa Ana | Public Hearing | City Council | The zoning of project has a restriction on the number of residential units; must obtain Council approval to gain approval of additional residential units. |
| Resolution approving variance for tandem parking | City of Santa Ana | Public Hearing | City Council | City codes do not allow tandem parking; requires approval of Council. |
| Site plan review approval | Planning Commission | Public Hearing | Planning Commission | Project is located in a SD zone which City considers to be a District zone. District zones have their own set of codes and, as such, Planning Commission must approve the plan to ensure it meets those objectives and standards. |

# EXHIBIT B

# ILUS INVESTORS, LIMITED PARTNERSHIP

---

## LIMITED PARTNERSHIP AGREEMENT

---

June 7, 2011

## TABLE OF CONTENTS

### ARTICLE 1
### DEFINITIONS AND INTERPRETATION

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Sections and Headings | 6 |
| 1.3 | Rules of Construction | 6 |
| 1.4 | Currency | 7 |
| 1.5 | Applicable Law | 7 |
| 1.6 | Severability | 7 |
| 1.7 | No Waiver | 7 |
| 1.8 | Determinations | 7 |

### ARTICLE 2
### FORMATION OF THE PARTNERSHIP

| | | |
|---|---|---|
| 2.1 | Formation and Existence | 8 |
| 2.2 | Name | 8 |
| 2.3 | Registered Office, Registerd Agent | 8 |
| 2.4 | Fiscal Year | 8 |

### ARTICLE 3
### PURPOSE OF THE PARTNERSHIP

| | | |
|---|---|---|
| 3.1 | Partnership Purpose | 8 |
| 3.2 | Nature of the Partnership | 9 |

### ARTICLE 4
### CAPITAL OF THE PARTNERSHIP AND CAPITAL ACCOUNTS

| | | |
|---|---|---|
| 4.1 | Capital Contributions | 9 |
| 4.2 | Capital Accounts | 9 |
| 4.3 | No Right to Withdraw Capital | 10 |
| 4.4 | No Interest | 10 |

### ARTICLE 5
### INTERESTS IN THE PARTNERSHIP

| | | |
|---|---|---|
| 5.1 | Partnership Interests | 10 |
| 5.2 | Subsequent Subscriptions | 10 |

### ARTICLE 6
### CALLS FOR CAPITAL CONTRIBUTIONS

| | | |
|---|---|---|
| 6.1 | Capital Calls | 11 |
| 6.2 | Restriction on Calls | 11 |
| 6.3 | Contribution to Capital | 11 |
| 6.4 | Non-Participation | 11 |

### ARTICLE 7
### DETERMINATION AND ALLOCATION OF NET INCOME OR LOSS

7.1   Allocation of Profit and Loss Generally ............................................................ 12
7.2   Special Allocation Rules ................................................................................... 12
7.3   Curative Allocations ......................................................................................... 14
7.4   Loss Limitation ................................................................................................. 14
7.5   Other Allocation Rules ..................................................................................... 14
7.6   Tax Allocations; Code Section 704(c) .............................................................. 14

### ARTICLE 8
### DISTRIBUTIONS

8.1   Distributions Prior to Liquidation .................................................................... 15

### ARTICLE 9
### EXPENSES

9.1   Expenses of the Partnership .............................................................................. 15
9.2   Reimbursement of the General Partner ............................................................. 16

### ARTICLE 10
### FUNCTIONS AND POWERS OF THE PARTNERS
### AND MANAGEMENT OF THE PARTNERSHIP

10.1   Powers of the General Partner ........................................................................ 16
10.2   Amendments to the Certificate ....................................................................... 18
10.3   Restriction of Power of General Partner to Dissolve Partnership ................... 18
10.4   Sale of Property .............................................................................................. 18
10.5   Limitation on Power of Limited Partners ....................................................... 18
10.6   Confidentiality ................................................................................................ 18

### ARTICLE 11
### ACCOUNTING AND REPORTING

11.1   Partnership Records ........................................................................................ 19
11.2   Access by Limited Partners to Information ..................................................... 19
11.3   Annual Reports ............................................................................................... 20
11.4   Taxation .......................................................................................................... 20
11.5   Tax Elections .................................................................................................. 20
11.6   Tax Matters Partner ........................................................................................ 20

### ARTICLE 12
### REPRESENTATIONS, WARRANTIES AND COVENANTS

12.1   Representations, Warranties and Covenants of the General Partner ................ 21
12.2   Representations and Warranties of the Limited Partners ................................ 21
12.3   Survival of Representations, Warranties and Covenants ................................. 22

## ARTICLE 13
## LIABILITIES AND INDEMNIFICATION OF THE PARTNERS

| | | |
|---|---|---|
| 13.1 | Liability of the Limited Partners | 22 |
| 13.2 | Liability of the General Partner | 23 |
| 13.3 | No Liability to Partnership or Limited Partners | 23 |
| 13.4 | Indemnification of General Partner | 23 |
| 13.5 | Indemnification by Limited Partners | 25 |

## ARTICLE 14
## DURATION, DISSOLUTION AND RELATED MATTERS

| | | |
|---|---|---|
| 14.1 | Termination Events | 25 |
| 14.2 | Procedure Prior to Dissolution | 25 |
| 14.3 | Compliance With Certain Requirements of Regulations; Deficit Capital Accounts | 26 |
| 14.4 | No Returns of Capital | 26 |
| 14.5 | No Request for Dissolution by Limited Partners | 26 |
| 14.6 | Termination of Agreement on Dissolution | 27 |
| 14.7 | Dissolution of General Partner | 27 |

## ARTICLE 15
## TRANSFERS OF PARTNERSHIP INTERESTS

| | | |
|---|---|---|
| 15.1 | Transfers of Partnership Interests | 27 |
| 15.2 | Requirements for a Third Party to Become a Partner | 27 |
| 15.3 | Limited Partner Partnership Interests Subject to Trust or Pledge | 28 |
| 15.4 | Transfer by Operation of Law | 28 |
| 15.5 | Release of Transferor | 28 |

## ARTICLE 16
## CONFLICTS OF INTEREST

| | | |
|---|---|---|
| 16.1 | Conflicts of Interest | 29 |
| 16.2 | No Commingling of Funds | 29 |

## ARTICLE 17
## AMENDMENT

| | | |
|---|---|---|
| 17.1 | Amendment | 29 |
| 17.2 | Notice of Amendment | 29 |

## ARTICLE 18
## CHANGE OF GENERAL PARTNER

| | | |
|---|---|---|
| 18.1 | Removal of General Partner | 29 |
| 18.2 | Transfer to Replacement General Partner | 30 |
| 18.3 | Release of General Partner | 30 |

# ARTICLE 19
## DISPUTE RESOLUTION

| | | |
|---|---|---|
| 19.1 | Matters to be Arbitrated | 30 |
| 19.2 | Procedure for Arbitration | 31 |

# ARTICLE 20
## MISCELLANEOUS

| | | |
|---|---|---|
| 20.1 | Rights of Set-Off | 31 |
| 20.2 | Withholding for Taxes | 31 |
| 20.3 | Notices | 32 |
| 20.4 | Entire Agreement | 32 |
| 20.5 | Enforceability and Assignment | 32 |
| 20.6 | Remedies | 32 |
| 20.7 | Time of Essence | 32 |
| 20.8 | Termination | 33 |
| 20.9 | Compliance by Limited Partners | 33 |
| 20.10 | Counterparts | 33 |

<u>AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT</u>

**THIS AGREEMENT** made as of the 7th of June, 2011,

AMONG:

ILUS GP US, LLC,
a limited liability company formed under the laws
of the State of California,

(hereinafter referred to as the "**General Partner**"),

- and -

PROILUS INVESTORS, LLC,
a limited liability company formed under the laws
of the State of New Jersey,

(hereinafter referred to as "**LP1**"),

- and -

**RIDGEMOUNT INVESTMENTS INC.,**
a corporation formed under the laws of the State of
Delaware,

(hereinafter referred to as "**LP2**", and together with
LP1, the "**Limited Partners**").

WHEREAS ILUS INVESTORS, LP (the "**Partnership**") was formed as a limited partnership under the laws of the State of California on March 25, 2011 by the filing of Certificate of Limited Partnership in accordance with the California Uniform *Limited Partnership Act of 2008* (the "Act").

NOW, THEREFORE, in consideration of the respective covenants and agreements of the parties herein contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

**ARTICLE 1**
**DEFINITIONS AND INTERPRETATION**

1.1     <u>Definitions</u>

For the purposes of this Agreement (including the recitals hereto), the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

"**Act**" means the *California Uniform Limited Partnership Act of 2008*, as the same may be amended or replaced from time to time, and all regulations from time to time promulgated thereunder;

"**Admittance Notice**" has the meaning set out in Section 5.2;

"**Adjusted Capital Account Deficit**" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year or other accounting period determined after (a) crediting to such Capital Account any amounts which such Partner is obligated to restore thereto or is deemed to be obligated to restore thereto pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5) and (b) debiting to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith;

"**Affiliate**" of any person means another person if one is a subsidiary entity of the other, or if both are subsidiary entities of the same person, or if each of them is controlled by the same person;

"**Breaching Limited Partner**" has the meaning set out in Section 13.5;

"**Business Day**" means a day on which chartered banks are open for business in New York, New York, other than a Saturday or a Sunday;

"**Call Date**" has the meaning set out in Section 6.1(b);

"**Called Amount**" has the meaning set out in Section 6.1(a);

"**Capital Account**" has the meaning set out in Section 4.2;

"**Capital Call**" has the meaning set out in Section 6.1(a);

"**Certificate**" means the declaration filed under the Act establishing the Partnership as a limited partnership, as the same may be amended from time to time;

"**Code**" means the United States *Internal Revenue Code of 1986*, as the same may be amended or replaced from time to time, the regulations from time to time promulgated thereunder, published Internal Revenue Service rulings and court decisions in respect thereof and for purposes of this Agreement any reference to a provision of the Code or any regulation made thereunder shall include a reference to any amendment or successor provision thereto;

"**Confidential Information**" means all confidential or proprietary information and intellectual property (including trade secrets, information concerning pricing or cost, technical information, and other information) relating to the business, operations and affairs of the General Partner, the Partnership and each of their Affiliates;

**"Contributions"** means, with respect to each Partner at any particular time, the aggregate amount of cash or other property contributed as capital to the Partnership by such Partner;

**"Control"** means, in respect of any person, the following:

(a)    in the case of any other person or company that is not a partnership, limited partnership or limited liability company,

    (i)    holding voting securities or having the power to vote voting securities carrying more than 50% of the votes for the election of directors or trustees; and

    (ii)    the votes carried by such securities are entitled, if exercised, to elect a majority of the directors or trustees of the person;

(b)    in the case of a limited liability company or partnership, other than a limited partnership, holding more than 50% of the interests in the limited liability company or partnership; or

(c)    in the case of a limited partnership, the general partner;

provided that, where used in reference to a Limited Partner, **"control"** includes the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person or company, whether through ownership of voting securities, by contract or otherwise;

**"Dispute"** has the meaning set out in Section 19.1;

**"Dispute Notice"** has the meaning set out in Section 19.1;

**"Fiscal Year"** has the meaning set out in Section 2.4;

**"General Partner"** means ILUS GP US, LLC , a limited liability company formed under the laws of the State of California, in its capacity as general partner of the Partnership, or any successor or permitted assignee of the General Partner in such capacity, as expressly contemplated hereunder;

**"Indemnitee"** has the meaning set out in Section 13.4(a);

**"Indemnitee Losses"** means, in respect of any matter, all claims, demands, proceedings, losses, damages, liabilities, deficiencies, costs and expenses arising as a consequence of such matter, including all legal and other professional fees and disbursements, interest, penalties and amounts paid in settlement;

**"Investment Percentage"** with respect to any Partner, means, at any particular time, the percentage that the Contributions of such Partner bears to the aggregate Contributions of all Partners;

**"Issuance Items"** has the meaning set out in Section 7.2(h);

- 3 -

"**Limited Partners**" has the meaning set out in the recitals to this Agreement and "**Limited Partner**" means any one of them;

"**Non-Participating Partner**" has the meaning set out in Section 6.4;

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c);

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3);

"**Partner**" means a holder of Partnership Interests, or any successor or permitted assignee as expressly contemplated hereunder;

"**Partnership**" has the meaning set out in the recitals to this Agreement;

"**Partnership Expenses**" means the operating and other expenses of the Partnership described in Section 9.1 including, for greater certainty, any expenses of the Partnership charged by an Affiliate of the General Partner or incurred in connection with any services provided by an Affiliate of the General Partner;

"**Partnership Interest**" means, in respect of a Partner, all of the rights, entitlements, liabilities and obligations of such Partner under this Agreement, in its capacity as such;

"**Partnership Minimum Gain**" has the meaning given such term in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d);

"**Partner Nonrecourse Debt**" has the meaning given such term in Treasury Regulations Section 1.704-2(b)(4);

"**Partner Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3);

"**Partner Nonrecourse Deductions**" has the meaning given such term in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2);

"**person**" means a natural person, a corporation, a company, a limited liability company, a partnership, a trust, a syndicate, an association, a government (or any agency thereof) or any other legal or business entity whatsoever;.

"**Profit**" or "**Loss**" means, for each Fiscal Year or other accounting period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), including each item thereof, with the following adjustments:

- 4 -

(a)     income of the Partnership that is exempt from federal income tax and that is not otherwise taken into account in computing Profit or Loss shall be added to such taxable income or loss;

(b)     expenditures by or on behalf of the Partnership that are described in Section 705(a)(2)(B) of the Code (or that are treated as described in Section 705(a)(2)(B) pursuant to Section 1.704-1(b)(2)(iv)(*i*) of the Treasury Regulations) and that are not otherwise taken into account in computing Profit and Loss shall be subtracted from such taxable income or loss;

(c)     unrealized gains and losses that are treated as having been realized in connection with distributions in kind shall be taken into account in accordance with Sections 1.704-1(b)(2)(iv)(*e*) and 1.704-1(b)(2)(iv)(*f*) of the Treasury Regulations;

(d)     gain or loss resulting from any taxable disposition of Partnership property is computed by reference to the adjusted book value of the property disposed of, determined in accordance with Section 1.704-1(b)(2)(iv)(*d*) through (*h*) of the Treasury Regulations, notwithstanding the fact that the adjusted book value differs from the adjusted tax basis of the property for federal income tax purposes;

(e)     in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there is taken into account the depreciation computed based upon the adjusted book value of the asset;

(f)     to the extent an adjustment to the adjusted tax basis of any Partnership property pursuant to Code Section 734(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's Partnership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profit or Loss; and

(g)     notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 7.2 or Section 7.3 hereof shall not be taken into account in computing Profit or Loss;

"**Revaluation**" means the occurrence of any event described in clause (i), (ii) or (iii) of Section 4.2(c) in which the book basis of property is adjusted to its fair market value;

"**Purpose**" has the meaning set out in Section 3.1;

"**Register**" has the meaning set out in Section 11.1;

"**Regulatory Allocations**" has the meaning set out in Section 7.3;

"**Removal Date**" has the meaning set out in Section 18.1(b);

"**Rules**" has the meaning set out in Section 19.2;

- 5 -

"subsidiary" of any Person at any time means (a) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees is at such time owned directly or indirectly by such Person or one or more of such Person's subsidiaries, (b) any partnership of which such Person is a general partner or of which 50% or more of the partnership interest is at the time directly or indirectly owned by such Person or one or more of such Person's subsidiaries, (c) any limited liability company of which 50% of more of the limited liability company interest is at the time directly or indirectly owned by such Person or one or more of such Person's subsidiaries or (d) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such Person or one or more of such Person's subsidiaries;

"Treasury Regulations" means the Income Tax Regulations (final, temporary and, as applicable, proposed) promulgated under the Code, as they may be in effect from time to time.  References to specific sections of the Regulations shall be to such sections as amended, supplemented or superseded by Regulations currently in effect;

"Transfer" means a sale, assignment, transfer, pledge, mortgage, charge, encumbrance or other disposition;

"Transferee" has the meaning set out in Section 15.2(a);

"Transferor" has the meaning set out in Section 15.2(a); and

1.2     **Sections and Headings**

The division of this Agreement into Articles and Sections and the insertion of headings and an index are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.  The terms "this Agreement", "hereof", "hereunder" and similar expressions refer to this Agreement and not to any particular Article or Section or other portion hereof and include any agreement or instrument supplemental or ancillary hereto.  Unless otherwise specified, any reference herein to an Article or a Section refers to the specified Article or Section of this Agreement.

1.3     **Rules of Construction**

In this Agreement:

(a)     words importing the singular number only shall include the plural and vice versa and words importing the masculine gender shall include the feminine and neuter genders and *vice versa*;

(b)     the words "include", "includes" and "including" mean "include", "includes" or "including", in each case, "without limitation";

(c)     reference to any statute, agreement or other instrument in writing means such statute, agreement or other instrument in writing as amended, modified, replaced or supplemented from time to time;

- 6 -

(d)  unless otherwise indicated, time periods within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends; and

(e)  whenever any payment to be made or action to be taken hereunder is required to be made or taken on a day other than a Business Day, such payment shall be made or action taken on the next following Business Day.

**1.4**      **Currency**

Unless otherwise indicated, all dollar amounts referred to in this Agreement are expressed in U.S. Dollars.

**1.5**      **Applicable Law**

This Agreement shall be construed, interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by, the laws of the State of California applicable in such state and the parties hereto hereby consent to the non-exclusive jurisdiction of the courts of the State of California. In the event of one party to this Agreement commencing legal proceedings against another party, or a third party commencing legal proceedings to which more than one party to this Agreement is a party, no party shall make any application or take any other step for the purpose of having any such proceeding or proceedings be tried by a jury.

**1.6**      **Severability**

If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If any payments required to be made under this Agreement shall be in excess of the amounts allowed by law, the amounts of such payments shall be reduced to the maximum amounts allowable by law.

**1.7**      **No Waiver**

The failure of any party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to such provision or any other provision of this Agreement. No purported waiver shall be effective as against any party unless consented to in a writing by such party that specifically states that it is intended to waive a provision hereof. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent or other breach.

**1.8**      **Determinations**

Except to the extent specifically and expressly provided for by the terms of this Agreement, all decisions, determinations, judgments, elections and actions (including any

exercise of any discretion) that may be made or done, and all consents that may be given, shall be made, done or given, as the case may be, by the General Partner in connection with the matters contemplated by this Agreement and the business, affairs and activities of the Partnership.

## ARTICLE 2
## FORMATION OF THE PARTNERSHIP

### 2.1        Formation and Existence

The General Partner confirms that the Partnership was formed on March 25, 2011 pursuant to the Certificate of Limited Partnership filed under the Act,.

### 2.2        Name

The Partnership shall carry on its activities under the name "Ilus Investors, LP" or such other name or names as the General Partner may from time to time deem appropriate. The General Partner shall promptly notify each Limited Partner of any change in the name of the Partnership.

### 2.3        Registered Office; Registered Agent

The registered office of the Partnership is 1875 Century Park East, Suite 2230, Los Angeles, California 90067, and its principal address is 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950 or such other address in the United States of America as the General Partner may designate from time to time.   The General Partner shall promptly notify each Limited Partner of any change in the principal address of the Partnership.  The registered agent of the Partnership is Paracorp, Inc.

### 2.4        Fiscal Year

The first fiscal period of the Partnership shall end on December 31, 2011 and thereafter each fiscal period shall commence on January 1 in each year and shall end on the earlier of December 31 of the same year or on the date of dissolution or other termination of the Partnership, unless changed by the General Partner in its sole and absolute discretion. Each such fiscal period is herein referred to as a "Fiscal Year".  If the General Partner changes the Fiscal Year of the Partnership, it shall provide each Limited Partner with ten Business Days' advance written notice of such change.

## ARTICLE 3
## PURPOSE OF THE PARTNERSHIP

### 3.1        Partnership Purpose

The Partnership has been formed for the primary purpose of indirectly or directly acquiring, holding, managing, developing, financing, selling and disposing of investments in real estate or any lawful activity, which the General Partner may deem appropriate (the "Purpose"). In furtherance of such Purpose, the Partnership shall have the power to do any and all things

- 8 -

necessary or incidental to such Purpose and to take such actions as the General Partner may deem appropriate with due regard to such Purpose.

### 3.2      Nature of the Partnership

(a)      The Partnership shall be a limited partnership created only for the purpose specified in Section 3.1, and this Agreement shall not be deemed to create an agreement (in the nature of a partnership or any other arrangement) among the Partners with respect to any activities whatsoever other than the activities within the Purpose of the Partnership as specified in Section 3.1.

(b)      No Partner shall have any power to bind the Partnership or the other Partners except as specifically provided in this Agreement. None of the Partners or the Partnership shall be responsible or liable for any indebtedness or obligation of any other Partner incurred either before or after the execution and delivery of this Agreement, except as to those joint responsibilities, liabilities, indebtedness or obligations incurred pursuant to, and as limited by, the terms of this Agreement.

## ARTICLE 4
## CAPITAL OF THE PARTNERSHIP AND CAPITAL ACCOUNTS

### 4.1      Capital Contributions

The capital of the Partnership shall consist of the Contributions of the Partners from time to time. The Partners hereby confirm that each of the Partners, as at the date hereof, has subscribed for the following Partnership Interest and has paid the following amounts as a contribution to the capital of the Partnership in full satisfaction of the subscription price therefor and such Contributions shall be credited to such Partner's Capital Account:

| Partner | Contributions |
|---|---|
| General Partner | $1.00 |
| LP2 | $1,050,000 |
| LP1 | $1,050,000 |

### 4.2      Capital Accounts

(a)      The General Partner shall establish and maintain a separate capital account (a "Capital Account") for each Partner. A Partner's Capital Account shall be (i) increased by (A) the amount of such Partner's Contributions, and (B) such Partner's allocations of Profit pursuant to Section 7.1, (ii) decreased by (x) the amount of money and the fair market value of any property of the Partnership distributed to such Partner by the General Partner and (y) such Partner's allocations of Loss pursuant to Section 7.1, and (iii) adjusted to reflect any liabilities that are assumed by such Partner or the Partnership (within the meaning of Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations), all in accordance with Sections 1.704-1(b)(2)(iv) and 1.704-2 of the Treasury Regulations.

(b)    If any Partnership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor.

(c)    In the event of (i) an additional Contribution by any Partner of more than a *de minimis* amount of property which results in a change in the contributing Partner's Investment Percentage, (ii) a distribution by the General Partner to a Partner of more than a *de minimis* amount of property of the Partnership which results in a change in the contributing Partner's Investment Percentage or (iii) the liquidation of the Partnership, the book basis of the property shall be adjusted to its fair market value as of the date of such Contribution, distribution or liquidation, and the Capital Accounts of all the Partners shall be adjusted simultaneously to reflect the aggregate net adjustment to book basis as if the Partnership recognized Profit or Loss equal to the amount of such aggregate net adjustment; provided, however, that the adjustments resulting from clause (i) or (ii) above shall be made only if the General Partner determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners.

## 4.3    No Right to Withdraw Capital

No Partner shall have the right to receive any distributions or otherwise to withdraw any positive balance in its Capital Account or any or all of its Contributions except as expressly provided in this Agreement.

## 4.4    No Interest

Except as expressly provided for herein, no interest shall be paid by the Partnership on any capital contributed to the Partnership or on any amount in a Capital Account. No Partner shall be liable to pay interest on any capital returned to such Partner or on any negative balance in its Capital Account.

## ARTICLE 5
## INTERESTS IN THE PARTNERSHIP

## 5.1    Partnership Interests

Each of the Partners shall hold a Partnership Interest in the Partnership. Each Partner shall have the right to receive distributions in respect of its Partnership Interest only as expressly provided for in this Agreement.

## 5.2    Subsequent Subscriptions

Subject to Article 15 new Limited Partners shall only be admitted to the Partnership with the prior written consent of the General Partner on the terms and subject to the conditions determined by the General Partner in its sole and absolute discretion, but in accordance with the provisions of this Agreement. Prior to admitting a new Limited Partner to the Partnership which new Limited Partner is not an Affiliate of the General Partner or one of the existing Limited Partners, the General Partner shall send a written notice (the "Admittance Notice") of such admittance of a new Limited Partner to each of the Limited Partners. No new Limited Partner shall be admitted to the Partnership pursuant to or under this Section 5.2 unless

an Admittance Notice has been delivered by the General Partner in accordance with this Section 5.2.

## ARTICLE 6
## CALLS FOR CAPITAL CONTRIBUTIONS

**6.1**      **Capital Calls**

(a)      Subject to Section 6.2, the General Partner may, in its sole and absolute discretion, at any time and from time to time, request in writing (a "Capital Call") that each Limited Partner contribute to the capital of the Partnership *pro rata* according to its then current Investment Percentage (the "Called Amount").

(b)      Each Capital Call shall set out the Called Amount for each Limited Partner and the date (the "Call Date") upon which the Called Amount shall be paid to the Partnership or as the General Partner directs.

(c)      The Call Date upon which the Limited Partners are required to contribute the Called Amount to the capital of the Partnership shall be no earlier than 10 Business Days following delivery of the Capital Call to each Limited Partner.

(d)      For greater certainty, the General Partner shall not be required to contribute any additional capital to the Partnership pursuant to a Capital Call or otherwise.

**6.2**      **Restriction on Calls**

(a)      No Capital Call shall be made by the General Partner without the prior written consent of each of the Limited Partners.

**6.3**      **Contribution to Capital**

Subject to Section 6.4, each Limited Partner shall, on or before the Call Date, contribute to the Partnership its Called Amount. A Limited Partner's contribution may be made in cash, in immediately available funds, unless the General Partner determines otherwise, in its sole and absolute discretion, by bank draft or certified cheque or certified funds made payable to the Partnership, by electronic wire transfer to the bank account of the Partnership or to such person(s) and in such manner as may be otherwise directed by the General Partner in the Capital Call.

**6.4**      **Non-Participation**

(a)      If a Limited Partner does not contribute its Called Amount (a "Non-Participating Partner") or contributes less than the total amount of its Called Amount, such Non-Participating Partner shall be notified in writing (the "Deficiency Notice") by the General Partner of such deficiency and of the amount of such deficiency, and such Non-Participating Partner shall have a period of five (5) business days (the "Deficiency Cure Period") from the date of receipt of such Deficiency Notice to contribute additional amounts necessary to reach the Called Amount. After the expiration of the Deficiency Cure Period, if the Non-Participating Partner has failed to

provide its Called Amount, such Non-Participating Partner's Investment Percentage shall be recalculated at the Call Date by the General Partner such that its Investment Percentage shall be the percentage that the Contributions of such Non-Participating Partner bears to the aggregate Contributions of all Partners at the time of calculation.

(b)    A Limited Partner shall be entitled to contribute, in addition to its Called Amount, the difference between the total Called Amount for the Non-Participating Partner and the amount of the Called Amount contributed by the Non-Participating Partner up to the full amount of the Non-Participating Partner's Called Amount in the event the Non-Participating Partner fails to contribute any amount towards its Called Amount.

(c)    The General Partner shall have the right, in its sole and absolute discretion but in accordance with the provisions of this Agreement, to change, modify or amend the manner in which a Non-Participating Partner's Investment Percentage will be diluted or decreased in respect of any or all Capital Calls, provided that all Partners shall be treated equally and equitably in similar circumstances.

## ARTICLE 7
## DETERMINATION AND ALLOCATION OF NET INCOME OR LOSS

### 7.1        Allocation of Profit and Loss Generally

After giving effect to the special allocations set forth in Sections 7.2 and 7.3 and subject to Section 7.4, for purposes of maintaining Capital Accounts and in determining the rights of the Partners among themselves, the Partnership's Profit and Loss for each Fiscal Year shall be allocated to the Partners in proportion to their respective Investment Percentages.

### 7.2        Special Allocation Rules

The following special allocations shall be made in the following order:

(a)    *Minimum Gain Chargeback.*   Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article 7, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Partner shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    *Partner Minimum Gain Chargeback.*   Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 7, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Partner who has a share of the Partner

Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 7.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)  *Qualified Income Offset.*  In the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), Section 1.704-1(b)(2)(ii)(*d*)(*5*), or Section 1.704-1(b)(2)(ii)(*d*)(*6*), items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible, provided that an allocation pursuant to this Section 7.2(c) shall be made only if and to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 7 have been tentatively made as if this Section 7.2(c) were not in this Agreement.

(d)  *Gross Income Allocation.*  In the event any Partner has an Adjusted Capital Account Deficit at the end of any Fiscal Year, each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.2(d) shall be made only if and to the extent that such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 7 have been made as if Section 7.2(c) and this Section 7.2(d) were not in this Agreement.

(e)  *Nonrecourse Deductions.*  Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Partners in proportion to their respective Investment Percentages.

(f)  *Partner Nonrecourse Deductions.*  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)  *Section 754 Adjustments.*  To the extent an adjustment to the adjusted tax basis of any item of Partnership property, pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) or Section 1.704-1(b)(2)(iv)(*m*)(*4*), to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation of the Partnership Interest of such Partner, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in accordance with their respective Investment Percentages in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) applies, or to the Partner to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) applies.

- 13 -

(h)    *Allocations Relating to Taxable Issuance of Partnership Interests.* Any income, gain, loss, or deduction realized as a direct or indirect result of the issuance of Partnership Interests by the Partnership to a Partner (the "**Issuance Items**") shall be allocated to the Partners so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Issuance Items had not been realized.

7.3    <u>Curative Allocations</u>

The allocations set forth in Sections 7.2(a), 7.2(b), 7.2(c), 7.2(d), 7.2(e), 7.2(f), 7.2(g), and 7.4 (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 7.3. Therefore, notwithstanding any other provision of this Article 7 (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to Sections 7.1 and 7.2(h).

7.4    <u>Loss Limitation</u>

Notwithstanding Section 7.1, a Loss allocation shall not be made to a Partner to the extent that such allocation would cause such Partner to have an Adjusted Capital Account Deficit. A Loss allocation that would be made to a Partner but for this Section 7.4 shall instead be made (a) first to the other Partners to the extent of and in proportion to the amounts of such Loss that they could then be allocated without themselves having Adjusted Capital Account Deficits (or, if such other Partners would not have Adjusted Capital Account Deficits, in proportion to their respective Investment Percentages) and (b) thereafter to the Partners in proportion to their respective Investment Percentages.

7.5    <u>Other Allocation Rules</u>

(a)    Allocations of Profit, Loss and items of income, gain, loss and deduction for any period during which the Partners' relative interests in the Partnership have changed shall be made in a manner which the General Partner determines is in accordance with applicable federal income tax principles set forth in Section 706 of the Code and the Treasury Regulations thereunder and otherwise in a manner consistent with applicable law.

(b)    Tax credits of the Partnership shall be allocated to the Partners in proportion to their respective Investment Percentages.

7.6    <u>Tax Allocations; Code Section 704(c)</u>

Except as otherwise provided in this Section 7.6, each item of income, gain, loss and deduction of the Partnership for federal income tax purposes shall be allocated among the Partners in the same manner as such items are allocated for book purposes under this Article 7.

In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted tax basis of such property to the Partnership for federal income tax purposes and its initial fair market value at the time of the contribution of the property to the Partnership using the allocation method determined by the General Partner. In the event the fair market value of any Partnership property is adjusted pursuant to a Revaluation, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its fair market value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement, provided that any items of loss or deduction attributable to property contributed by a Partner shall, to the extent of an amount equal to the excess of (a) the federal income tax basis of such property at the time of its contribution over (b) the fair market value of such property at such time, be allocated in its entirety to such contributing Partner and the tax basis of such property for purposes of computing the amounts of all items allocated to any other Partner (including a transferee of the contributing Partner) shall be equal to its fair market value upon its contribution to the Partnership. Allocations pursuant to this Section 7.6 are solely for purposes of U.S. federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profit, Loss, other items, or distributions pursuant to any provision of this Agreement.

## ARTICLE 8
## DISTRIBUTIONS

### 8.1    Distributions Prior to Liquidation

The General Partner may, at such times and subject to the maintenance of reasonable reserves for operations and Partnership Expenses as determined by the General Partner in its sole discretion, determine and cause the distribution of the Partnership's Profit to the Partners in accordance with their respective Investment Percentages.

## ARTICLE 9
## EXPENSES

### 9.1    Expenses of the Partnership

Except as otherwise specifically provided herein, the Partnership will pay all expenses directly related to its own operation, including (a) all expenses of legal counsel, accountants (including auditors retained to conduct audits, if any), professional advisors and service providers retained by the Partnership for Partnership purposes; (b) interest and other costs of borrowed money; (c) all costs and expenses related to the formation and organization of the Partnership and the acquisition by the Partnership of investments; (d) subject to Section 13.4, all indemnification amounts paid to an Indemnitee and all expenses relating to litigation or to the enforcement and protection of rights relating to the Partnership; (e) all taxes, fees or other governmental charges levied against the Partnership; and (f) all expenses incurred in connection

with the fulfilment of statutory, contractual or other compliance requirements and in connection with reporting to or communicating with Limited Partners.

**9.2**      **Reimbursement of the General Partner**

Save and except as set out in Article 9 above, the General Partner shall receive no compensation or a right to distributions from the Partnership for its services hereunder but the Partnership shall reimburse the General Partner for all of its out-of-pocket expenses incurred on behalf of the Partnership in furtherance of the Purpose in connection with its acting as General Partner hereunder in accordance with the terms hereof.

### ARTICLE 10
### FUNCTIONS AND POWERS OF THE PARTNERS
### AND MANAGEMENT OF THE PARTNERSHIP

**10.1**      **Powers of the General Partner**

The General Partner, acting honestly and in good faith and in furtherance of and having due regard to the Purpose, shall have the duty and authority to manage the operations and affairs of the Partnership in furtherance of the Purpose and to make all decisions regarding the activities of the Partnership having due regard to the Purpose and the General Partner shall have the exclusive authority to bind the Partnership subject to the prior authorization of the Limited Partners required hereunder, if any. No person dealing with the Partnership shall be required to verify the power of the General Partner to take any measure or any decision in the name of the Partnership. Without limiting the foregoing, but always in pursuance of the activities of the Partnership having due regard to the Purpose, the General Partner shall be vested with the following powers, which shall be exercised subject to and in accordance with the provisions of this Agreement and the Act:

(a)    to manage the Partnership on a day-to-day basis;

(b)    to bind the Partnership with respect to all affairs of the Partnership within the scope of the Purpose set forth in Section 3.1;

(c)    to make all decisions and to execute and carry out all agreements on behalf of the Partnership involving matters or transactions in furtherance of, in connection with or ancillary to the activities of the Partnership;

(d)    to enter into, execute, deliver, acknowledge, make, modify, supplement or amend any documents or instruments in the name and on behalf of the Partnership which the General Partner deems necessary or appropriate to achieve the Purpose of the Partnership, including contracts, agreements, leases, subleases, easements, deeds, notes, mortgages, property management agreements and other documents or instruments of any kind or character or amendments of any such documents or instruments;

(e)    to make Capital Calls and distributions on behalf of the Partnership;

- 16 -

(f)    to open and manage in the name of the Partnership bank accounts and to name signing officers for these accounts, to borrow funds in the name of the Partnership from time to time as the General Partner sees fit and to spend or invest the capital of the Partnership in the exercise of any right or power possessed by the General Partner;

(g)    to retain accounting, legal, investment banking, tax, valuation, appraisal, engineering, marketing and other professional advisors or consultants on behalf of the Partnership as it considers advisable, including appointing auditors;

(h)    to make or incur and to pay expenses on behalf of the Partnership as it considers appropriate;

(i)    to pay all debts, liabilities and obligations owed by the Partnership;

(j)    subject to Article 8 and Article 14, to decide in its sole and absolute discretion any time when property of the Partnership shall be distributed to the Partners and the amount of any such distribution;

(k)    to deal in and with the assets of the Partnership and to make all decisions on behalf of the Partnership in respect of the assets of the Partnership;

(l)    to sell, convey, transfer or otherwise dispose of all or substantially all of the Partnership's assets, subject to and in accordance with the terms and conditions of this Agreement;

(m)    to manage or administer and dispose of any and all assets of the Partnership, and in general to engage in any and all phases of activities of the Partnership;

(n)    to mortgage, charge, assign, hypothecate, pledge or otherwise create a security interest in all or any of the assets of the Partnership, now owned or hereafter acquired;

(o)    to terminate and dissolve the Partnership in accordance with this Agreement;

(p)    to prudently invest cash assets of the Partnership that are not immediately required for the business of the Partnership in short-term investments;

(q)    subject to limits on delegation under the Act and applicable law, to delegate its powers and duties under this Agreement to another person or entity as the General Partner sees fit; and

(r)    to generally perform all such other acts it considers necessary or desirable in connection with the activities and affairs of the Partnership or to carry out the intent and purpose of this Agreement.

**10.2**      <u>Amendments to the Certificate</u>

The General Partner shall file on behalf of the Partnership, on a timely basis whenever required, any amendment to or renewal of the Certificate and any other declarations, certificates, documents or amendments thereto that might be required by the laws of the State of California or any other jurisdiction in which the Partnership may carry on its activities.

**10.3**      <u>Restriction of Power of General Partner to Dissolve Partnership</u>

Notwithstanding anything in this Agreement to the contrary, the General Partner shall not be entitled to dissolve the Partnership except in accordance with Article 14.

**10.4**      <u>Sale of Property</u>

The General Partner shall have the authority and power to sell, transfer, convey, or otherwise dispose of all or substantially all of the assets of the Partnership on the terms and conditions determined by the General Partner, including a sale, transfer, conveyance or other disposition for cash consideration or non-cash consideration (including debt or equity securities in a private or public company, trust, fund, partnership or other entity). The General Partner shall have the power to retain any non-cash consideration in respect of such sale in the Partnership and shall not be obligated to distribute such non-cash consideration to the Limited Partners.

**10.5**      <u>Limitation on Power of Limited Partners</u>

No Limited Partner, as such, shall take an active part in the business of the Partnership, take part in the management or control of the activities of the Partnership, transact any business for the Partnership or have the power to execute any documents or instruments for or on behalf of the Partnership. No Limited Partner may bring any action for partition or sale of the Partnership assets, whether real or personal.

**10.6**      <u>Confidentiality</u>

(a)      Each Limited Partner hereby agrees that such Limited Partner shall not, without the prior written consent of the General Partner, at any time disclose any Confidential Information to any person nor use the same for any purpose other than for the purposes of evaluating or monitoring its investment in the Partnership or enforcing its rights as a Limited Partner, nor disclose or use for any purpose other than for the purposes of evaluating or monitoring its investment in the Partnership or enforcing its rights as a Limited Partner any other information relating to the business, operations or affairs of the Partnership, in each case that it may acquire as a result of being a Limited Partner and each Limited Partner hereby acknowledges that the improper use or disclosure of such information could have a material adverse effect upon the Partnership or upon one or more Partners and that any rights to obtain Partnership information pursuant to applicable law shall be limited to those rights provided for in this Agreement and that any other rights shall not be available to the Limited Partners, or applicable to the Partnership; provided that such restrictions shall not apply to (i) disclosure by such Limited Partner to its Affiliates, employees, accountants, auditors, legal and financial advisors to the extent necessary for such persons to fulfill their obligations to such Limited Partner; provided that such Limited Partner communicates to each such person that such

- 18 -

information is and is to be held confidential and such persons agree to be bound by such restriction and that the Partnership is considered a third-party beneficiary with respect to such agreement, (ii) information that is or becomes generally available to the public other than as a result of any disclosure made by a person in violation of this Section 10.6, (iii) information already in a party's possession without restriction on disclosure, (iv) information that comes into a party's possession from a third party without restriction on disclosure, other than in violation of any agreement of which the recipient party is aware, or (v) information that is required to be disclosed by law or by any court, governmental or regulatory authority or securities exchange. The obligations and undertakings of each Limited Partner under this Section 10.6 shall be continuing and shall survive termination of the Partnership.

(b)    In the event of any dispute proceedings relating to a breach of this Section 10.6 by a Limited Partner, such Limited Partner shall pay, to the fullest extent permitted by law, all costs and expenses incurred by the Partnership, including attorneys' fees, if it is judicially determined (or determined through arbitration) that such Limited Partner was in breach of this Section 10.6. To the fullest extent permitted by law, each Limited Partner hereby (i) agrees that the remedy at law for damages resulting from its default under this Section 10.6 is inadequate because the substantial value that the Partnership derives from information concerning the Partnership and its investments requires that such information be kept confidential, and (ii) consents to the institution of an action for specific performance of its obligations to keep confidential the Partnership information in the event of such a breach of this Section 10.6.

## ARTICLE 11
## ACCOUNTING AND REPORTING

### 11.1    Partnership Records

The General Partner shall keep, during the term of the Partnership and for a period of six (6) years thereafter, at the General Partner's principal business address, proper and complete records and books of account reflecting the assets, liabilities, income and expenditures of the Partnership and a record including, among other things, a list of the names and addresses of all the Limited Partners and the Partnership Interests held by each of them (the "Register"). Subject to Section 10.6, such books, records and registers will be kept available for inspection by and at the sole expense of any Limited Partner or its duly authorized representatives during regular business hours at the office of the General Partner for any purpose reasonably related to such Limited Partner's Partnership Interest and a Limited Partner or its representatives shall be entitled to make copies or extracts therefrom.

### 11.2    Access by Limited Partners to Information

Subject to Sections 10.6 and 11.1, Limited Partners may obtain a copy of the information contained in the Register referred to in Section 11.1 by fax or mail on written request, within 30 days from the date of receipt of such request, subject to the Limited Partner:

(a)    agreeing, in writing, that the information contained in the Register will not be used by such Limited Partner except for any purpose reasonably related to such Limited Partner's Partnership Interest; and

(b)    paying, if requested, a fee in an amount not exceeding the reasonable costs to the Partnership of providing the information.

**11.3      Annual Reports**

Within 90 business days of the end of each Fiscal Year, to the extent practical, the General Partner shall send to each person who was a Limited Partner at the end of such Fiscal Year a report summarizing the status of the activities of the Partnership as at the end of the Fiscal Year, which shall include:

(a)    a report describing the performance of the Partnership; and

(b)    the financial statements of the Partnership for such Fiscal Year, including the balance sheet for the Partnership as of the end of such Fiscal Year, statements of income for such Fiscal Year, a statement of source and use of funds and a statement of changes in the Capital Accounts of each of the Partners.

**11.4      Taxation**

(a)    To the extent practical, the General Partner shall send, in a timely manner and in any event within 180 days of the end of each Fiscal Year, to each person who was a Limited Partner at any time during a Fiscal Year, such information and documents as are necessary for such person to make such filings as are required, if any, under the Code with respect to that Fiscal Year. The General Partner shall file or cause to be filed, on behalf of itself and the Limited Partners, annual Partnership information returns and any other information required to be filed under the Code and any other applicable U.S. tax legislation in respect of Partnership matters.

(b)    The General Partner will prepare and provide to the Partners all additional information about the affairs of the Partnership and its subsidiaries as may be necessary to enable the Partners to file all required tax returns.

**11.5      Tax Elections**

The General Partner shall make or cause to be made, on behalf of the Partnership, any elections permitted to be made by the Partnership under the Code, including but not limited to elections pursuant to Code Sections 754 and 709, and not otherwise expressly provided for herein as determined to be most advantageous to the Partners.

**11.6      Tax Matters Partner**

A Partner shall be designated to receive all notices from the Internal Revenue Service which pertain to the tax affairs of the Partnership. Such Partner shall be the Partnership's "Tax Matters Partner" pursuant to Code Section 6231(a)(7), with all powers and duties commensurate with such designation. Initially, ILUS GP US, LLC shall be the Partnership's Tax Matters Partner.

- 20 -

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

12.1    Representations, Warranties and Covenants of the General Partner

The General Partner hereby represents, warrants, covenants and agrees with each Limited Partner that:

(a)    [there are no consents or approvals of governmental authorities or third parties that are required for or in respect of its execution and delivery of this Agreement;

(b)    neither the entering into nor the delivery of this Agreement nor the execution and performance of its obligations and covenants provided or contemplated by this Agreement will conflict with or constitute a default or breach under any of its constating documents, rules, by-laws or under any law, rule or regulation to which it is subject;

(c)    the execution and delivery of this Agreement by it shall not constitute or cause a default under any contract or agreement by which it is bound;

(d)    no agreement or obligation exists or shall exist that restricts its ability to perform its obligations under this Agreement;

(e)    there is no litigation, action or proceeding to which it is party that could have an adverse effect on, or enjoin, restrict or otherwise prevent, the consummation of any of the transactions contemplated by this Agreement or its ability to perform its obligations under this Agreement;

(f)    this Agreement has been duly authorized, executed and delivered by it and constitutes a valid and binding obligation of the General Partner enforceable against the General Partner in accordance with its terms in all material respects;

(g)    it is and shall continue to be a limited liability company organized, validly existing and in good standing under the laws of the State of California and is and shall continue to be duly authorized and qualified to do all things required of it under this Agreement and any agreement executed in connection with the transactions herein contemplated; and

(h)    it is not now, and shall not, for so long as it is the General Partner, carry on any business other than acting as the General Partner without the written consent of the Limited Partners.

12.2    Representations and Warranties of the Limited Partners

Each of the Limited Partners hereby represents and warrants and agrees with each other Partner that:

(a)    there are no consents or approvals of governmental authorities or third parties that are required for the execution and delivery of this Agreement other than those, if any, that have been obtained;

(b)    neither the entering into nor the delivery of this Agreement nor the execution and performance of its obligations and covenants provided or contemplated by this Agreement will conflict with or constitute a default or breach under any of its constating documents, rules, by-laws or under any law, rule or regulation to which it is subject;

(c)    the execution and delivery of this Agreement shall not constitute or cause a default under any contract or agreement by which it is bound;

(d)    no agreement or obligation exists that restricts its ability to perform its obligations under this Agreement;

(e)    there is no litigation, action or proceeding to which it is party that if adversely determined could have a material adverse effect on, or enjoin, restrict or otherwise prevent, the consummation of any of the transactions contemplated by this Agreement or its ability to perform its obligations under this Agreement;

(f)    this Agreement has been duly authorized, executed and delivered by it and constitutes a valid and binding obligation of such Partner enforceable against such Partner in accordance with its terms in all material respects;

(g)    it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation, and is duly authorized and qualified to do all things required of it under this Agreement and any agreement executed in connection with the transactions herein contemplated; and

(h)    it has the capacity and authority to enter into this Agreement and nothing prohibits or restricts the right or ability of it to carry out the terms hereof.

**12.3**      <u>Survival of Representations, Warranties and Covenants</u>

The representations, warranties and covenants made pursuant to Sections 12.1 and 12.2 shall survive the execution and delivery of this Agreement and each Partner covenants and agrees to ensure that each representation, warranty and covenant made by it pursuant to Section 12.1 or 12.2, as the case may be, remains true as long as it remains a Partner.

**ARTICLE 13**
**LIABILITIES AND INDEMNIFICATION OF THE PARTNERS**

**13.1**      <u>Liability of the Limited Partners</u>

Except as may otherwise be required by the Act or as expressly provided for herein, the liability of each Limited Partner, in its capacity as such, for the debts, liabilities, losses and obligations of the Partnership is limited to its Contributions.  To the fullest extent

- 22 -

permitted under applicable law, no Limited Partner, in its capacity as such, shall have any fiduciary duty to the Partnership or any other Partner.

**13.2        Liability of the General Partner**

Except as otherwise provided in the Act, the General Partner has the liabilities of a partner in a partnership without limited partners to (a) persons, other than the Partnership and the other Partners and (b) subject to the other provisions of this Agreement, the Partnership and the other Partners.

**13.3        No Liability to Partnership or Limited Partners**

(a)    None of the General Partner or any of its Affiliates, nor any direct or indirect shareholder, director, officer, partner, employee, agent, member, manager, advisor or representative of the General Partner or any of its Affiliates, shall be liable to any Limited Partner or the Partnership for:

(i)    any action taken or failure to act as General Partner, or on behalf of the General Partner, with respect to the Partnership which does not constitute or result from fraud, wilful misconduct or gross negligence of or the material violation of applicable laws or material breach of this Agreement or a fiduciary duty owed to the Partnership by any such person;

(ii)    any action or inaction arising from the reliance upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants retained by any of them; or

(iii)    the action or inaction of any third-party agent, contractor or consultant selected by any of them, provided said agent, contractor or consultant is not an Affiliate of the General Partner or Affiliate of an Affiliate of the General Partner.

(b)    The General Partner shall hold the benefit of this Section 13.3 for its own benefit and in trust for the benefit of its Affiliates and all of its and its Affiliates' respective direct and indirect shareholders, directors, officers, partners, employees, agents, members, advisors and representatives.

**13.4        Indemnification of General Partner**

(a)    The General Partner, its Affiliates and each of their respective direct and indirect shareholders, directors, officers, partners, employees, agents, members, managers, advisors and representatives (in each case, an "Indemnitee") shall, to the fullest extent permitted by applicable law, be indemnified, held harmless and reimbursed out of the assets of the Partnership in respect of any and all Indemnitee Losses sustained or incurred in connection with or arising as a result of any action, suit, claim, demand or proceeding, whether civil, criminal, investigative or otherwise and whether by or in the right of the Partnership, that is threatened or commenced against an Indemnitee for or in respect of anything done or permitted to be done or omitted to be done in the execution of the duties, responsibilities, powers and authorities of an Indemnitee hereunder on behalf of the Partnership or in any way arising as a result of or in connection with

this Agreement or the activities of the Indemnitee on behalf of the Partnership. Notwithstanding the foregoing, no Indemnitee shall be entitled to indemnification by the Partnership hereunder to the extent that (i) any such Loss arises as a result of the fraud, wilful misconduct, gross negligence or the material violation of applicable laws or material breach of this Agreement or any fiduciary duty owed to the Partnership by the Indemnitee, (ii) such Loss arises in respect of any economic losses incurred by any Indemnitee as a result of the ownership of a Partnership Interest or in respect of any expenses of the Partnership that the Indemnitee has agreed to bear, or (iii) such Loss relates to loss of profit or indirect or consequential damages to the Indemnitee. The Partnership shall pay the reasonable expenses incurred by any such Indemnitee indemnifiable hereunder, as such expenses are reasonably incurred, in connection with any proceeding in advance of the final disposition.

(b)     Promptly after becoming aware of any matter that may give rise to a claim for indemnification hereunder, the General Partner will provide to the Limited Partners written notice of such matter specifying (to the extent that information is available and not subject to Section 10.6) the factual basis for any claim and the amount of such claim (or if an amount is not then determinable, an estimate of the amount of the claim, if an estimate is feasible in the circumstances). The General Partner will keep the Limited Partners informed of the status of any claims on a regular basis and the amount of any expenses paid by the Partnership on behalf of the Indemnitee.

(c)     The General Partner, acting honestly and in good faith, shall be entitled to apply any assets of the Partnership in its possession to pay any obligation or liability of the Partnership pursuant to this Section 13.4.

(d)     The General Partner shall hold the benefit of this Section 13.4 for its own benefit and for the benefit of the other Indemnitees. The Indemnitees shall continue to be entitled to indemnification in accordance with this Section 13.4 notwithstanding any termination or removal of the General Partner as general partner of the Partnership.

(e)     Each Indemnitee, if otherwise entitled to indemnification from the Partnership hereunder, shall use reasonable efforts to seek indemnification from other available third party sources other than any Limited Partner (including under any insurance policies by which such person is covered) and shall account to the Partnership for any amounts received by it from such sources. If such Indemnitee is a person other than the General Partner, it shall obtain the written consent of the General Partner prior to entering into any compromise or settlement in respect of such claim that would result in an obligation of the Partnership to indemnify such Indemnitee.

(f)     If liabilities arise out of the conduct of the business and affairs of the Partnership and of any other person for which the Indemnitee entitled to indemnification from the Partnership hereunder was then acting in a similar capacity, the amount of the indemnification provided by the Partnership shall be limited to the Partnership's proportionate share thereof as determined in good faith by the General Partner in light of its fiduciary duties to the Partnership and the Limited Partners.

(g)     The indemnity provided for under this Section 13.4 is intended to indemnify each applicable Indemnitee to the maximum extent permitted by applicable law and any limitations or

- 24 -

restrictions on indemnification provided for under this Section 13.4 are to be narrowly construed, as permitted under applicable law.

**13.5      Indemnification by Limited Partners**

Notwithstanding any other provision of this Agreement, each Limited Partner (in each case a "**Breaching Limited Partner**") agrees that it shall be strictly liable for, and shall indemnify, hold harmless and reimburse each Indemnitee and each other Limited Partner from all Indemnitee Losses (excluding losses related to lost profit and indirect or consequential damages) sustained or incurred in connection with or arising as a result of any misrepresentation or the breach of any warranty or covenant of such Breaching Limited Partner contained in this Agreement.

**ARTICLE 14**
**DURATION, DISSOLUTION AND RELATED MATTERS**

**14.1      Termination Events**

The Partnership shall continue until the earliest to occur of:

(a)      the determination of the General Partner to terminate the Partnership, in its sole and absolute discretion, but subject to the General Partner:

(i)      obtaining the prior written consent of all of the Limited Partners; and

(ii)     providing the Limited Partners with 60 days prior written notice of such determination and a copy of the consent provided for under paragraph (i) above before the Partnership is dissolved in accordance with Section 14.2;

(b)      the determination of the General Partner to sell all or substantially all of the assets of the Partnership and dissolve the Partnership thereafter, in its sole and absolute discretion, but subject to the General Partner:

(i)      obtaining the prior written consent of all of the Limited Partners; and

(ii)     providing the Limited Partners with 60 days prior written notice of such determination and a copy of the consent provided for under paragraph (i) above before the Partnership is dissolved in accordance with Section 14.2.

**14.2      Procedure Prior to Dissolution**

(a)      Prior to the occurrence of an event specified in Section 14.1 and, in any event, prior to the dissolution of the Partnership, the Partnership shall be liquidated in an orderly manner. The General Partner shall act as liquidator to wind up the affairs of the Partnership pursuant to this Agreement, or if the General Partner is otherwise absent or is unable to act as the liquidator, a liquidator shall be appointed by the written consent of all of the Limited Partners to wind up the affairs of the Partnership. Subject to applicable laws, the General Partner shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Partnership assets pursuant to such liquidation for the purpose of obtaining, in its opinion, fair

- 25 -

value for such assets, having due regard to the activity and condition of the relevant markets and general financial and economic conditions. Prior to the distribution of all of the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement.

(b)     Profit and Loss arising in connection with the liquidation of the Partnership shall be allocated as provided in Article 7.

(c)     The General Partner or an appointed liquidator, as the case may be, shall give written notice of the proposed date of dissolution of the Partnership not less than 15 days prior to such date, or as soon as practicable prior to the dissolution.

(d)     Upon dissolution of the Partnership, the General Partner will, after satisfying all liabilities and obligations of the Partnership owing to creditors of the Partnership (including, without limitation, any loans owed to Partners) or providing for such liabilities and obligations by establishing reasonable reserves or otherwise as the General Partner or any appointed liquidator shall reasonably deem appropriate, as promptly as practicable, distribute the Partnership's assets, based on their fair market values at such time, to the Partners in accordance with the positive balances in their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods. The dissolution shall be accomplished in the most efficient operating and tax manner. As such, the distributions may be in cash or in-kind as determined based on advice of tax advisors and as approved by the General Partner.

14.3     **Compliance With Certain Requirements of Regulations; Deficit Capital Accounts**

In the event the Partnership is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)($g$), distributions shall be made pursuant to Section 8.1 to the Partners who have positive Capital Accounts in compliance with Treasury Regulations Section 1.704-1(b)(2)(ii)($b$)(2). If any Partner has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Partner shall have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such deficit shall not be considered a debt owed to the Partnership or to any other Person for any purpose whatsoever.

14.4     **No Returns of Capital**

No Partner is entitled to any reimbursement of its Contribution to the capital of the Partnership except as funds or other property are available for distribution pursuant to Article 8 and Section 14.2.

14.5     **No Request for Dissolution by Limited Partners**

Except as provided for in this Agreement and the Act, no Limited Partner shall have the right to ask for the dissolution of the Partnership, for the winding-up of its affairs or for the distribution of its assets.

14.6        **Termination of Agreement on Dissolution**

Notwithstanding the dissolution of the Partnership, this Agreement shall not terminate until the provisions of Section 14.2 shall have been complied with.

14.7        **Dissolution of General Partner**

Notwithstanding anything in this Agreement to the contrary, the General Partner shall not, to the fullest extent permitted by law, take, or agree to take, any action (corporate or otherwise) to dissolve, liquidate, file a proposal for bankruptcy, wind up or make any arrangement or assignment for the benefit of creditors or appoint any trustee, receiver or receiver-manager to administer its affairs, unless it has first given 90 days prior notice in writing to the Limited Partners.

## ARTICLE 15
## TRANSFERS OF PARTNERSHIP INTERESTS

15.1        **Transfers of Partnership Interests**

Except as otherwise expressly set forth herein, no Limited Partner shall Transfer (including any Transfer of all or a part of its interest to a person who becomes an assignee of such Limited Partner's beneficial interest in the Partnership's profits, losses and distributions even though not becoming a substitute Limited Partner) any Partnership Interest or any rights or obligations it has under this Agreement without the prior written consent of the General Partner except that, subject to compliance with Section 15.2 below, each Limited Partner may, without such prior written consent: (a) Transfer all or a portion of its Partnership Interest to any Affiliate of such Limited Partner.

15.2        **Requirements for a Third Party to Become a Partner**

(a)        No Transfer of a Partnership Interest by a Partner (the "**Transferor**") shall be made or be effective to make a transferee of a Partnership Interest (the "**Transferee**") a Partner hereunder or entitled to any rights hereunder unless or until:

(i)        the Transferee shall have agreed in writing with the other Partners to assume and be bound by all the obligations of the Transferor pursuant to this Agreement with respect to the Partnership Interest transferred arising from and after the date of such Transfer, and to be subject to all the restrictions to which the Transferor is subject under the terms of this Agreement, which agreement shall be in form and substance satisfactory to the General Partner; and

(ii)        the General Partner has received documentation evidencing such Transfer as is acceptable to the General Partner duly completed and executed by both parties to such Transfer.

(b)        No Transfer of a Partnership Interest will be accepted by the General Partner after the sending of the notice of dissolution provided for in Section 14.2.

- 27 -

(c)    The General Partner may deny any Transfer of a Partnership Interest if the General Partner has reason to believe that the Transfer is not being made in compliance with applicable securities laws.

(d)    The Transferee of any Limited Partner's Partnership Interest shall be treated as having made all of the Contributions made by, and received all of the allocations and distributions received by, the Transferor of the relevant part of such Partnership Interest.

(e)    Any purported transfer which violates this Article 15 shall, to the fullest extent permitted by law, be null and void and the General Partner shall refuse to register any such transfer on the Register and other books and records of the Partnership, and the purported buyer, assignee, transferee, pledgee, mortgagee or other recipient shall have no interest in or rights to Partnership assets, profits, losses or distributions, and neither the General Partner nor the Partnership shall be required to recognize any such interests or rights.

### 15.3    Limited Partner Partnership Interests Subject to Trust or Pledge

The General Partner shall not be bound to see to the execution of any trust, express, implied or constructive, or of any charge, pledge or equity to which any Partnership Interest is subject, to ascertain or inquire whether any sale or transfer of any such Partnership Interest by a Limited Partner or its personal representatives is authorized by such trust, charge, pledge or equity or to recognize any person having any interest therein except for the person recorded as such Limited Partner. No Transfer shall relieve the Transferor from any obligations to the Partnership incurred prior to the Transfer becoming effective.

### 15.4    Transfer by Operation of Law

Where a person becomes entitled to a Partnership Interest on the incapacity, death, bankruptcy or winding-up of a Limited Partner, or otherwise by operation of law, in addition to the requirements of Section 15.2, such entitlement will not be recognized or entered in the Register evidencing ownership of a Partnership Interest and such person shall not be admitted as a Limited Partner until that person:

(a)    has produced evidence satisfactory to the General Partner of such entitlement; and

(b)    has acknowledged in writing that such person is bound by the terms of this Agreement.

### 15.5    Release of Transferor

If a Limited Partner Transfers, in accordance with this Agreement, all of its Partnership Interest in the Partnership, such Transferor shall thereupon have no further obligations hereunder, provided that such Transferor shall remain responsible for any and all of its debts and other liabilities under this Agreement arising prior to the time of such Transfer.

# ARTICLE 16

## ARTICLE 16
## CONFLICTS OF INTEREST

**16.1**    <u>Conflicts of Interest</u>

The Partners hereby acknowledge that the General Partner, independently, may carry on business that is similar to the business of the Partnership or that may create a conflict of interest with respect to it acting as the General Partner of the Partnership.

**16.2**    <u>No Commingling of Funds</u>

Funds of the Partnership will not be commingled with the funds of the General Partner or of any other entity or person.

## ARTICLE 17
## AMENDMENT

**17.1**    <u>Amendment</u>

This Agreement may be amended at the discretion of the General Partner and without the consent of the Limited Partners, provided that:

(a)    any amendment to this Article 17, together with material changes to Articles 3, 7, 8, 10, 13, 14, 15, 16, 17 and Article 19 and Sections 20.3, 20.5 and 20.6, may not be made without the prior unanimous consent of the Limited Partners; and

(b)    no amendment shall be made to this Agreement which would adversely affect the rights (economic or otherwise) of a Limited Partner without the prior written consent of such Limited Partner; provided that, if such Limited Partner is not treated differently in any material respect from any other Limited Partner then such amendment will be valid.

**17.2**    <u>Notice of Amendment</u>

The Limited Partners will be provided with full details of any amendment or proposed amendment, as applicable, to this Agreement under Section 17.1, as soon as is reasonably practicable and in any event within 60 days of the effective date of the amendment.

## ARTICLE 18
## CHANGE OF GENERAL PARTNER

**18.1**    <u>Removal of General Partner</u>

(a)    The Limited Partners may unanimously determine to remove the General Partner and to appoint a replacement general partner.

-29-

(b)     The General Partner may be removed upon satisfaction of the conditions set out in Section 18.1(a) by the delivery of notice in writing to the General Partner. The General Partner shall be deemed to have been removed and cease to be a general partner at 11:59 p.m. (PST) on the date (the "**Removal Date**") upon which the General Partner receives such written notice, and the replacement general partner shall be deemed to be admitted immediately prior to the removal of the General Partner and shall continue the Partnership without dissolution.

(c)     Except as provided in Sections 14.7, and 18.1(a), the General Partner may not resign and may not sell, assign, transfer or otherwise dispose of its Partnership Interest without the prior written consent of the Limited Partners.

(d)     A Partnership Interest held by the General Partner, if any, shall be unaffected by the removal of the General Partner pursuant to this Section 18.1 and the appointment of a replacement general partner.

18.2     <u>Transfer to Replacement General Partner</u>

A replacement general partner will execute a counterpart of this Agreement, make such Contribution to the Partnership as determined through negotiation with the Limited Partners prior to its admittance as General Partner and will forthwith assume the obligations of the General Partner as of and from the date of its admission and shall thereafter have the right to exercise all rights of the General Partner and to receive the share of net income or net loss of the Partnership to which it is entitled based on its Investment Percentage. The General Partner and replacement general partner shall do all things and take all steps necessary to effectively transfer the management of the Partnership and all rights to which the General Partner is entitled hereunder to the replacement general partner and shall execute and deliver all deeds, certificates, declarations and other documents necessary or desirable to effect such transfer.

18.3     <u>Release of General Partner</u>

In the event of a change of the General Partner, the Partnership and the Limited Partners shall release and hold harmless the General Partner from all Indemnitee Losses that may be asserted against the General Partner with respect to events which occur in relation to the Partnership after the Removal Date.

## ARTICLE 19
## DISPUTE RESOLUTION

19.1     <u>Matters to be Arbitrated</u>

Any dispute, controversy or claim ("**Dispute**") arising out of, under or in connection with this Agreement, including any question regarding its existence, validity, enforceability, performance or termination which cannot be resolved or settled by the parties hereto, shall be referred to and finally settled by binding arbitration from which there shall be no appeal in accordance with this Article 19 upon written notice by any party hereto to the other parties (the "**Dispute Notice**").

19.2       Procedure for Arbitration

Arbitration will be conducted in accordance with and pursuant to the **National Arbitration Rules of the American Arbitration Association** (the "**Rules**") then in effect. The place of arbitration will be in New York, New York or such other place as the parties to the Dispute may agree. The language of the arbitration will be English. The arbitration will be the sole and exclusive forum for resolution of the Dispute. The Dispute shall be settled and decided by one arbitrator appointed by the parties to the Dispute within 15 Business Days of delivery of the Dispute Notice. If the parties cannot agree on an arbitrator within such 15-Business Day period, the arbitrator shall be selected pursuant to the Rules. The arbitrator shall be authorized and have the power to award costs and expenses associated with the arbitration (including, legal fees) to the successful or prevailing party. The arbitral award (including any award as to the costs of the arbitration) will be final and binding and not subject to review or appeal for any reason whatsoever. The arbitral award or judgement of the arbitrator may be entered, recognized and enforced by any court having jurisdiction.

All matters relating to any Dispute which is the subject matter of arbitration hereunder, including all submissions made to the arbitrator and the decision of the arbitrators shall be maintained in strict confidence by the parties hereto and the parties shall cause any witnesses, counsel or professional advisers retained in connection with such arbitration likewise to maintain all such matters in strict confidence.

## ARTICLE 20
## MISCELLANEOUS

20.1       Rights of Set-Off

Notwithstanding anything in this Agreement to the contrary, the Partnership and the General Partner shall have the right to set off against any amount that would otherwise have been paid to a Limited Partner hereunder, any amount owing by the Limited Partner to the Partnership, including any amount owing as a result of a breach by the Limited Partner of its obligations hereunder or in connection with any of the Limited Partner's indemnification obligations hereunder.

20.2       Withholding for Taxes

Any and all payments made under this Agreement shall be made subject to withholding and deduction on account of taxes or other amounts where required by law or the administration thereof by relevant governmental authorities. Prior to withholding or deducting on account of taxes or other amounts from any payment to a Limited Partner that has represented to the General Partner in writing that it is exempt from withholding requirements, the General Partner shall provide notice to such Limited Partner of its intention to withhold or deduct pursuant to this Section 20.1 and shall reasonably co-operate with such Limited Partner, at such Limited Partner's expense, in contesting the requirement to withhold or deduct such taxes or other amounts; provided however that the General Partner shall not be required to withhold payment of any such taxes or other amounts to the relevant governmental authority notwithstanding the Limited Partner's contest thereof. Where an amount is withheld from amounts paid to the Partnership on account of taxes or other amounts or where the Partnership is required to withhold such amounts from distributions and the General Partner determines that the

- 31 -

requirement to withhold relates to or arises from the status of any particular Partner, such amount will be deemed for all purposes of this Agreement to have been distributed to such Partner at the time it was withheld.

20.3      **Notices**

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered, faxed or mailed by certified or registered mail, return receipt requested and first-class postage paid) if to (a) any Limited Partner, at such Limited Partner's address as set out in the Register, and (b) the General Partner or the Partnership, at the addresses set out in Section 2.3, Attention: Barry Levine, with a copy to 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950, Attention: David Ulmer, 200 King Street West, Suite 1602, Toronto, Ontario M5H 3T4. Any such notice, request, demand or communication shall be deemed to have been duly given if personally delivered, sent by fax, (or any other electronic means of transmission, including by electronic mail via the internet) or sent by mail and shall be deemed received, unless earlier received, (i) if sent by certified or registered mail, return receipt requested, when actually received, (ii) if sent by overnight mail or courier, when actually received, (iii) if sent by fax, upon receipt of a transmission confirmation form, and (iv) if delivered by hand, on the date of receipt. Any party hereto may designate a different address to which notices and demands shall thereafter be directed by written notice given in the same manner and directed to the Limited Partners and the General Partner as set out above.

20.4      **Entire Agreement**

This Agreement represents the entire agreement among the parties hereto governing the subject matter hereof, and supersedes and cancels all prior negotiations, correspondence or agreements, written or oral, among the parties hereto with respect thereto and, for greater certainty, this Agreement supersedes and replaces any prior limited partnership agreement of the Partnership.

20.5      **Enforceability and Assignment**

Subject to the provisions hereof, this Agreement shall be binding on and enforceable by the parties and their respective successors and permitted assigns. Except as specifically permitted by this Agreement, no party may assign any of its rights or obligations hereunder.

20.6      **Remedies**

Each party acknowledges that a violation of any provision of this Agreement will result in immediate and irreparable harm to the other parties which cannot be compensated adequately by recovery of damages alone and agrees that, in the event of any such violation or threatened violation, the other parties shall, in addition to any other rights or remedies available at law, in equity or otherwise, be entitled to seek temporary and permanent injunctive relief, specific performance and other equitable remedies.

20.7      **Time of Essence**

Time shall be of the essence of this Agreement.

### 20.8     Termination

This Agreement may be terminated in accordance with its terms or by agreement in writing of all of the parties at the time of such agreement.

### 20.9     Compliance by Limited Partners

Each Limited Partner will, on request by the General Partner, immediately execute every certificate or other instrument necessary to comply with any law or regulation of the State of California for the continuation and good standing of the Partnership or to otherwise carry out the provisions of this Agreement.

### 20.10     Counterparts

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same instrument.

[Remainder of page left intentionally blank.]

IN WITNESS WHEREOF the parties hereto have executed this Agreement.

**GENERAL PARTNER**

**ILUS GP US, LLC**

By:  _David Ulm_____
        Name:  David Ulmer
        Title:  Manager

**LIMITED PARTNERS**

**LP2, RIDGEMOUNT INVESTMENTS INC.**

By:  _____
        Name:  Alex Iscoe
        Title:  Principal

**LP1, PROTILUS INVESTORS, LLC**

By:  _____
        Name:  Ari A. Schottenstein
        Title:  Authorized Signatory

- 34 -

# EXHIBIT C

# OPERATING AGREEMENT
## OF
## ILUS GP US, LLC

THIS OPERATING AGREEMENT OF ILUS GP US, LLC (the "LLC"), dated the 7th day of June, 2011, is made by and between PROTILUS INVESTORS, LLC maintaining an office at 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950 and RIDGEMOUNT INVESTMENTS INC. maintaining an office at 200 King Street West, Suite 1602, Toronto, Ontario M5H 3T4 Canada.

## WITNESSETH:

WHEREAS, the parties hereto desire to enter into this Operating Agreement to define and express all of the terms and conditions of Ilus GP US, LLC, a California limited liability company, and their respective rights and obligations with respect thereof;

WHEREAS, the LLC has been formed to serve as the General Partner of Ilus Investors, Limited Partnership, a California limited partnership; and

WHEREAS, the parties hereto desire to be bound by this Operating Agreement pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall have the meanings as set forth below:

"Act" means the California Limited Liability Company Act, as amended from time to time.

"Agreement" means this Operating Agreement, as the same from time to time may be amended, modified, supplemented or restated.

"Bankruptcy" means, with respect to any Member or Manager, that such Member or Manager shall have (1) made an assignment for the benefit of creditors; (2) filed a voluntary petition in bankruptcy; (3) been adjudicated a bankrupt or insolvent; (4) filed a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) filed an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding set forth in (4) above; or (6) sought, consented to, or acquiesced in the appointment of a trustee, receiver, or liquidator of all or any substantial part of his properties; or if 180 days after the commencement of any proceeding against the Member or Managers seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or within 150 days after the appointment without his consent or acquiescence of a trustee, receiver, or liquidator of the Member or Managers of all or any substantial part of his properties, the appointment is not vacated or stayed, or within 90 days after the

1

expiration of any such stay, the appointment is not vacated.

"Capital Account" means the account established and maintained for each Member on the books of the LLC, which is initially equal to the capital contribution of each Member to the LLC and thereafter is increased by (i) additional cash contributions, if any, made by or for the benefit of the Member to the LLC, (ii) the fair market value to the Member of any property contributed by or for benefit of the Member to the LLC (net of any liability assumed by the LLC and any liability to which such property is subject), and (iii) the amount of any income including income exempt from Federal income tax or gain allocated to the Member for federal income tax purposed; and decreased by (a) the amount of any Distributions of cash made to the Member, (b) the fair market value to the LLC of any Distributions of property made to the Member (net of any liability assumed by the Member and any liability to which such property is subject), (c) the Member's share of any costs paid or incurred by the LLC to organize the LLC, and (d) the amount of any losses allocated to the Member for federal income tax purposes, all in accordance with federal tax accounting principles.

"Cash Expenses" means with respect to any fiscal period, all the costs and expenses of any type paid during such period by the LLC in connection with the operations and management of the LLC including the funding of any reserves which are deemed appropriate by the Managers in order to further the purpose of the LLC, but specifically excluding depreciation, amortization, other non-cash charges, payments and Distributions.

"Cash Flow" means with respect to any fiscal period, the amount by which Cash Receipts exceed Cash Expenses for such period.

"Cash Receipts" means with respect to any fiscal period, all cash receipts of the LLC (inclusive of capital contributions to the extent they are used to establish reserves, borrowings and liquidations or reserves in excess of amounts deemed by the Managers to be necessary) during such period. Cash Receipts shall not include amounts transferred from reserves to pay expenses of the LLC.

"Certificate" means the Articles of Organization to be filed with respect to the LLC in the office of the California Secretary of State, as the same may be from time to time amended, modified or supplemented in accordance with the provisions of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of this Agreement.

"Distributions" means distributions of cash or other property made by the LLC to the Members. The repayment of any Member's loans made to the LLC and any payment of fees to a Member or reimbursement of disbursements shall not be considered Distributions.

"LLC" means the limited liability company to which this Agreement pertains, as such limited liability company may from time to time be constituted.

"LLC Interest" shall refer to a Member's entire right, title and interest in the LLC including a Member's percentage share of Distributions of Cash Flow from the LLC as well as the Member's right (if any) to participate in the management and affairs of the LLC.

"LLC Percentage Interest" shall mean, as to each Member, the percentage interest in the LLC allocated to such Member on the books and records of the LLC. The LLC Percentage Interest for each Member shall be determined by a fraction, the numerator of which is equal to that Member's capital contribution and the denominator of which is the total capital contributions by all Members. The LLC

Percentage Interest for each of the Members may be adjusted from time to time, as set forth herein, but is initially:

| Member | Percentage |
|---|---|
| Protilus Investors, LLC | Fifty Percent (50%) |
| Ridgemount Investments Inc. | Fifty Percent (50%) |

"Manager" means the manager(s) of the LLC, including any additional or successor manager(s). The initial Managers shall be: Barry L. Levine and David Ulmer.

"Members" means any Person who is admitted to the LLC as a Member pursuant to the provisions of this Agreement. As of the execution of this Agreement, the Members are as follows:

| Member | Address |
|---|---|
| Protilus Investors, LLC | 51 Gibraltar Drive, Suite 2D<br>Morris Plains, New Jersey 07950 |
| Ridgemount Investments Inc. | 200 King Street West, Suite 1602<br>Toronto, Ontario M5H 3T4 Canada |

"Person" means any individual, corporation, partnership (general or limited), association, limited liability company, trust, estate or other entity.

"Profits and Losses" means for each fiscal year of the LLC or other period, an amount equal to the LLC's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) and other applicable provisions of the Code. All items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss.

"State" means the State of California.

## ARTICLE II

## ORGANIZATION

2.1  Formation of LLC. The Members hereby form the LLC pursuant to the provisions of the laws of the State of California and the terms and provisions of this Agreement. The LLC shall be organized on the date of the filing of the Certificate. The Managers shall execute or cause to be executed and filed the Certificate and such other documents and instruments with such appropriate authorities as may be necessary or appropriate from time to time to comply with all requirements for the formation and operation of a limited liability company in the State.

2.2  Name. The name of the LLC shall be Ilus GP US, LLC, and such name shall be used at all times in connection with the business and affairs of the LLC.

2.3  Purposes of the LLC. The purposes of the LLC are:

(a) To act as the General Partner of Ilus Investors, LP; and

3

(b) To engage in any other lawful business as the Managers may approve in accordance herewith.

2.4  Principal and Registered Office; Registered Agent.

(a) The principal office of the LLC shall be:

> 51 Gibraltar Drive, Suite 2D
> Morris Plains, New Jersey 07950

(b) The registered office of the LLC shall be:

> 1875 Century Park East, Suite 2230
> Los Angeles, California 90067

(c) The registered agent of the LLC shall be:

> Paracorp, Inc.

2.5  Term.  The term of the LLC shall commence on the date of the filing of the Certificate and shall continue in perpetuity unless sooner terminated in accordance with the terms of this Agreement or otherwise as provided by law.

2.6  Title to LLC Property.  All of the right, title and interest in any property of the LLC and any other tangible property or intangible property, or other assets acquired by the LLC shall be held in the name of the LLC as an entity.  Upon the acquisition of the Property, the Managers shall execute such documents as may be necessary to reflect the LLC's ownership interest in the Property and shall record the same in such public offices as shall be necessary to reflect such ownership interest by the LLC.  No Member shall have an ownership interest in any property of the LLC in his or her individual name or right and each Member's LLC Interest shall be personal property for all purposes.

2.7  Power of Attorney.  Subject to the authority granted in Article IV hereof, each Member hereby irrevocably constitutes and appoints the Managers as such Member's true and lawful attorney and agent, with full power and authority in such Member's name, place and stead, to execute, acknowledge, deliver, file and record in the appropriate public offices all certificates and other instruments (including without limitation counterparts of this Agreement and the LLC's Certificate) and amendments thereto which the Managers deem appropriate for the LLC to qualify or to continue as a limited liability company in the State.  The foregoing grant of authority (a) is a special power of attorney coupled with an interest in favor of the Managers and shall be irrevocable and shall survive the death or insanity of Member; and (b) may be exercised for the Member by a facsimile signature of the Managers.

2.8  Further Assurances.  The parties hereto will execute whatever certificates and documents, and the Managers will file, record and publish such certificates and documents, which are required to form and operate a limited liability company under the laws of the State.  The parties hereto will also execute, and the Managers will file, record and publish, such certificates and documents as the Managers, upon advice of counsel, may deem necessary or appropriate to comply with other applicable laws governing the formation and operation of a limited liability company.

4

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1  Contributions of the Members.  The Members of the LLC have made or will, upon the execution of this Agreement, make capital contributions as follows:

| | |
|---|---|
| Protilus Investors, LLC | Ten Dollars ($10.00) |
| Ridgemount Investments Inc. | Ten Dollars ($10.00) |

3.2  Contributions Required.  No Member shall be required to contribute any capital to the LLC other than as provided in Section 3.1. The LLC Percentage Interest of each Member shall be adjusted, from time to time, to reflect a fraction, the numerator of which is equal to that Member's capital contributions and the denominator of which is the total capital contributions by all Members.

3.3  Returns of Distributions.  If a Member has received a Distribution of the share or any part of his capital contribution to the LLC, such Member shall remain liable to the LLC for any sums (not in excess of his capital contribution so returned) necessary to discharge the LLC's liabilities to all creditors who extended credit or whose claims arose before such return.

3.4  No Priority.  No Member shall have the right to demand or receive property other than cash in return for his capital contribution or as a Distribution of income.  No Member shall have priority over any other Member either as to the return of his capital contribution from the LLC or as to any distributions except as specifically provided in this Agreement.

3.5  Loans to the LLC.  Loans to the LLC shall be permitted from the Managers and the other Member(s). The amount of a loan, if any, made to the LLC by a Member shall not be considered an increase in such Member's capital contribution or otherwise constitute a contribution to the LLC, nor shall the making of such loan entitle such Member to an increased LLC Percentage Interest. Loans to the LLC shall bear such reasonable rate of interest and shall feature such other terms as shall be agreed upon by the Managers and the person making such loan. All loans by Members to the LLC shall be fully subordinated to payment of all sums due to non-Member creditors of the LLC

## ARTICLE IV

## RIGHTS, POWERS AND OBLIGATIONS OF THE MANAGERS

4.1  Management of LLC Business; Appointment of Managers.  Subject to the authority of the Managers as set forth in Articles 4.2 and 4.8 hereof, the Managers shall be responsible for the management of the LLC's business, with all rights and powers generally conferred by law or necessary, advisable or consistent therewith but subject to the limitations of Article II related to the stated purposes of the LLC. Among other things, the Managers shall have the power on behalf of the LLC to sell, assign or otherwise dispose of any of the LLC's assets on such terms and conditions as the Managers may determine.  Any person entering into any agreement, contract or any loan with the LLC or otherwise dealing with the LLC shall not be required to inquire as to the authority of the Managers to act for and on behalf of the LLC and, except as hereinabove set forth, such person may conclusively rely upon the act or acts of the Managers as

5

being the act or acts of the LLC and binding upon and enforceable against the LLC.

4.2  Authority of the Managers.  Subject to Article 4.3 the Managers shall have full power and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the LLC for the purposes herein stated, and to make all decisions affecting such business and affairs including, without limitation, the power to:

(a)  Enter into agreements and contracts and give receipts, releases and discharges;

(b)  Purchase liability and other insurance to protect the LLC's properties and business;

(c)  Execute any and all other instruments and documents which may be necessary or in the opinion of the Managers desirable to carry out the intent and purpose of this Agreement;

(d)  Make any and all expenditures which the Managers, in their sole discretion, deem necessary or appropriate in connection with the management of the affairs of the LLC and the carrying out of their obligations and responsibilities under this Agreement;

(e)  Engage on behalf of the LLC, attorneys, consultants, accountants or such other persons, firms or corporations as the Managers may deem necessary or advisable, for such compensation as the Managers may deem reasonable; .

(f)  Open, maintain and close accounts at banks and other financial institutions and draw checks or otherwise provide for the payment of monies; and

(g)  Do any and all of the foregoing upon such terms and conditions as the Managers shall deem proper, and to execute, acknowledge and deliver any and all instruments in connection with any or all of the foregoing.

(h)  Sell, dispose, trade or exchange the LLC assets in the ordinary course of the LLC's business other than a disposition of substantially all of the LLC's assets;

(i)  All the funds, receipts and other monies of the LLC shall be subject to withdrawal only by check made in the name of the LLC and signed by any two (2) Managers or by one (1) Manager with the written consent of the other Manager(s); and

(j)  Issue any deed, bill of sale, mortgage, lease, contract of sale or other commitment purporting to transfer or encumber the interest of the LLC in all or any portion of any property at any time held in its name, so long as same shall be signed on behalf of the LLC by any two (2) Managers or by one (1) Manager with the written consent of the other Manager(s).

4.3  Transactions Requiring Members' Consent.  The Managers shall not undertake any of the following actions without the prior written consent of all of the Members:

(a)  Amend this Agreement;

(b)  Deviate from any of the purposes of the LLC as set forth in Section 2.3;

(c)  Dissolve or wind up the LLC;

6

(d) Admit any other Members;

(e) Transfer an LLC Interest except to an existing Member of the LLC;

(f) Increase or decrease the L.L.C. Percentage Interest of any Member;

(g) Take any action to reconstitute the LLC in the event of the dissolution of the LLC for any reason; and/or

(h) The filing of a voluntary bankruptcy petition by the LLC or consenting to or acquiescing in an involuntary bankruptcy petition by the LLC (either of which requires the affirmative written vote of all Members).

4.4  Other Activities Permitted.  The Managers shall devote to the LLC's business such time as is necessary for the proper performance of his duties as Managers.  Subject to Section 5.2, the Managers may engage in any other business, investment or profession.  The LLC shall have no rights in or to any such business, profession or investment or to the income or profits derived therefrom.

4.5  Liability of the Managers.  The Managers shall not be liable, responsible, or accountable in damages or otherwise to the LLC or any of its Members for any failure to take any action or the taking of any action within the scope of authority conferred on him by this Agreement, made in good faith ("Permitted Acts of the Manager").  The Managers shall not be liable to the Members because any taxing authorities disallow or adjust any deductions or credits in the LLC's income tax returns or for the return of all or any portion of the capital contributions of the Members.  The Managers shall be liable, responsible, and accountable in damages to the LLC and the Members for any acts performed by the Managers arising out of or resulting from the fraud, criminal action, or bad faith of the Managers or the failure of the Managers to comply in any material respect with any covenant, condition or other agreement of the Managers contained herein ("Excluded Acts of the Manager").  Nothing in this Article IV shall be deemed to make the Managers liable, responsible, or accountable to Persons other than the LLC and the Members.

4.6.  Indemnification of the Managers.  The Managers shall be entitled to indemnification from the LLC on account of any claim, liability, action, or damage arising from or relating to any Permitted Acts of the Managers and on account of all reasonable attorney's fees incurred in connection therewith.  The Managers shall not be entitled to indemnity from the LLC on account of any claim, liability, action or damage arising from or relating to any Excluded Acts of the Managers.  Any indemnity under this Section 4.6 or otherwise shall be paid out of and to the extent of the LLC assets only.

4.7  Number and Changes in Managers.  The number of Managers shall be determined from time to time by approval of the Members.  No Manager may be removed as Manager, by action of the Members or otherwise.  A Manager may voluntarily resign as Manager.  If there are no Managers, then one or more successor Managers shall be determined by the election of the Members.

4.8  Consent Required.  Unless specifically stated otherwise, whenever in this Operating Agreement the action, vote, approval, consent or decision of the Managers is required, it is understood and acknowledged by all parties hereto that the consent of all of the Managers shall be required for such action to take place, such vote, approval or consent to be obtained or such decision to be made.

## ARTICLE V

## RIGHTS AND OBLIGATIONS OF MEMBERS

5.1  Management of Business.  No Member shall take part in the management or control of the business of the LLC, nor shall any Member have any authority to transact any business for or in the name of the LLC, nor shall any Member have the power to sign for or bind the LLC.  Notwithstanding the foregoing, a Person who is both a Manager and Member has the rights and powers, and is subject to the restrictions and liabilities, of a Manager and also has the rights and powers, and is subject to the restrictions and liabilities of a Member to the extent of his participation in the LLC as a Member.  Any exercise by the Members of their rights under this Agreement shall be deemed to be in an action affecting the agreement among the Members and not an action affecting the management or control of the business of the LLC

5.2  Outside Activities.  Each Member may engage in any other business, investment or profession including the investment in, ownership of or operation of business activities that are in competition with the LLC.

5.3  Liabilities of Members.  The Members shall have no personal liability with respect to liabilities and obligations of the LLC and shall not be required to make any contributions to the capital of the LLC other than their capital contributions provided for in Sections 3.1 and 3.3 hereof.

5.4  Meetings of and Voting by Members.

(a)  A meeting of the Members may be called at any time by the Managers.  Meetings of Members shall be held at the LLC's principal place of business, or such other location as the Members agree.  Not less than ten (10) nor more than thirty (30) days before each meeting, the Managers or Member(s) calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the time, place and purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy.  A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney in fact.

(b)  Wherever this Agreement requires the "written consent," "approval" or "election" by the Members, the affirmative unanimous vote of all of the Members shall be required to approve the matter.

(c)  In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of all of the Members.

## ARTICLE VI

## LLC DISTRIBUTIONS;
## ALLOCATIONS OF INCOME, LOSS AND CREDIT

6.1  Distributions of Cash Flow Generally.  The Managers shall have complete discretion whether and when to make Distributions of Cash Flow to the Members and shall retain such funds in the LLC as they deem necessary to cover the LLC's reasonable business needs, which shall include reserves against possible losses and the payment or making provision for the payment, when due, of obligations of the LLC and obligations secured by, or by lien on, or security interest in, property of the LLC.  Subject to the foregoing, the LLC shall from time to time distribute to each Member entitled thereto the amount of any Cash Flow or

8

which the Managers, in their sole discretion, deems advisable. Notwithstanding anything to the contrary contained in this Agreement, the Company must distribute such amount of cash as is necessary to pay the Members' allocable share of Profit.

6.2  Status as Creditor.  At the time a Member becomes entitled to receive a distribution from the LLC, the Member shall not have the status of, and shall not be entitled to remedies available to, a creditor of the LLC.

6.3  Distributions of Cash Flow.  Any Cash Flow shall be distributed to the Members in accordance with the LLC Percentage Interests of the Members.

6.4  Allocations.  Profits and Losses shall be allocated to the Members in accordance with their LLC Percentage Interests.

6.5  Allocations of Tax Credits.  All tax credits to which the LLC shall be entitled under the Code shall be allocated among the Members in accordance with the ratio in which Members divide the taxable income of the LLC (within the meaning of Section 702(a)(8) of the Code) for the taxable year in which the credit arises, regardless of whether the LLC realizes a profit or sustains a loss for such taxable year.

6.6  Special Allocations.

(a)  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, any Built In Gain (as defined below) with respect to any property contributed to the capital of the LLC shall be allocated to the Member contributing such property at the time such Built In Gain is recognized by the LLC.  In addition, depreciation attributable to such property shall be allocated among the Members in accordance with the Treasury Regulations under Code Section 704(c).  For purposes of this Subsection 6.5(a), "Built In Gain" shall be the difference between the fair market value of the property contributed to the LLC (unreduced by any liabilities secured by the property or to which the property is subject) and the adjusted basis of said property, determined immediately before the contribution of said property to the LLC.

(b)  In the event any Member's LLC Percentage Interest shall change during any taxable year, notwithstanding any other provision of this Agreement, the Managers, in a manner consistent with the requirements of Section 706 of the Code, or equivalent legislation and applicable Treasury Regulations, shall allocate the LLC's Profits and Losses, and each item of income, deduction or credit of the LLC with respect to such Member, in a manner which takes into account his varying LLC Percentage Interest during such taxable year.  The Managers allocations under this Subsection shall be binding on all Members.

(c)  If the Code or any applicable Treasury Regulations shall require that any item of income, deduction, gain, loss or credit of the LLC be allocated among the Members in a manner inconsistent with the allocations provided for in this Article in order to be respected by the Internal Revenue Service, then notwithstanding any other provision of this Agreement, the Managers shall reallocate all such items in a manner which conforms with the Code or any applicable Treasury Regulations and most closely approximates the allocations otherwise provided for in this Article.  The Manager's allocations under this Subsection shall be binding on all Members.

6.7  Binding Effect.  The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of LLC income, gain, loss and deduction for Federal income tax purposes.

6.8  Elections.  The Managers shall make all elections for Federal income tax purposes that the Managers reasonably determine to be in the best interest of the Members and to be advisable.

9

## ARTICLE VII

## RECORDS, REPORTS AND TAXES

**7.1 Fiscal Year.** The fiscal year of the LLC for both accounting and Federal income tax purposes shall end on December 31 of each year, and, for accounting and Federal income tax purposes the LLC shall report its operations and Profits and Losses in accordance with the accrual method of accounting.

**7.2 Books and Records.** At all times during the continuance of the LLC, the Managers shall keep or cause to be kept accurate and complete books of account of the LLC. All of the books of account shall at all times be maintained at the principal office of the LLC or at the office of the LLC's accountants, or at such other place as the Managers shall determine. The LLC's books of account shall be open to inspection and examination by the Members or their representatives.

**7.3 Capital Account.** There shall be established and maintained on the books of the LLC a Capital Account for each Member.

**7.4 Tax Returns; Elections.**

(a) The Managers shall be the "tax matters partner" for purposes of the Code and shall notify the Members of any audit or other matters of which the Managers are notified or become aware. The Managers shall cause all income tax and information returns for the LLC to be prepared by the LLC's accountant and shall cause each tax return to be timely filed with the appropriate authorities. Copies of such tax and information returns shall be kept at the principal office of the LLC or at such other place as the Managers shall determine and shall be available for inspection by the Members or their representatives during normal business hours.

(b) The LLC may, but is not required to, make an election for Federal income tax purposes to the extent permitted by applicable law and regulations, as follows:

(i) in case of a transfer of all or part of any Members' LLC interest, the LLC may elect in a timely manner pursuant to Section 754 of the Code and pursuant to corresponding provisions of applicable state and local tax laws to adjust the bases of the assets of the LLC pursuant to Sections 734 and 743 of the Code; and

(ii) all other elections required or permitted to be made by the LLC shall be made in such a manner as the Managers, in consultation with the LLC's attorneys or the LLC's accountant, determine to be most favorable to the Members.

(c) No Member shall take any action or refuse to take any action which would cause the LLC to forfeit the benefits of any tax election previously made or agreed to be made by the LLC.

10

## ARTICLE VIII

## WITHDRAWAL AND REPLACEMENT OF MANAGER AND MEMBERS; TRANSFER OF LLC INTERESTS

8.1  Restriction on Transfer.

(a)  Except as otherwise expressly provided in this Article VIII, no Member may assign or otherwise transfer all or any part of his LLC Interest or grant a security interest in such Member's LLC Interest or create any participation in such Member's right to receive Distributions or returns of capital. Any transaction by a Member in violation of the provisions of this Article VIII shall, as between such Member on one hand and the LLC and the other Members on the other hand, be null and void.

(b)  A Member may sell, assign or transfer all or any portion of his LLC Interest to any Person upon obtaining the prior written consent of all of the Members to the proposed sale, assignment or transfer, provided that no consent shall be required if the sale, assignment or transfer is to an existing Member. The transaction shall be null and void unless all of the remaining Members consent in writing to the sale, assignment or transfer and the purchaser, assignee or transferee complies with Section 8.4.

8.2  Death of a Member.  Upon the death of a Member (hereinafter sometimes referred to as the "Departing Member"), the LLC or its designee shall have the option (but not the obligation) to purchase from the Departing Member or his personal representative or estate, or from any trust created by the Departing Member to which the Departing Member's LLC Interest was transferred upon death, all, but not less than all, of the Departing Member's LLC Interest at a price equal to the product of the Fair Market Value (defined below) of the LLC and the Departing Member's LLC Interest. Such Departing Member or his representative shall have the obligation to sell to the LLC or its designee the Departing Member's LLC Interest in accordance with this section. The closing of such purchase and sale shall take place at the offices of the LLC on a date designated by the purchasing LLC or its designee, which shall not be more than one hundred and twenty (120) days following the death of the Departing Member. The purchase price shall be payable in such number of equal monthly installments as determined by the LLC or its designee, provided that the term so selected by the LLC or its designee shall not exceed sixty (60) months. Provided, further, however, any lump sum death benefit received by the LLC or its designee pursuant to any life insurance policy insuring the life of the Departing Member must be paid in cash at closing and not in monthly installments as otherwise allowed under this section. Interest payable in connection with any installment purchase shall be at the prime rate of interest published in the Midwest Edition of The Wall Street Journal three business days prior to closing. If the LLC or its designee do not elect to purchase the Departing Member's LLC Interest in accordance with this section, then the Departing Member's LLC Interest may be transferred in accordance with the Departing Member's will or the laws of intestacy. Provided, however, unless the transferee is admitted as Member in accordance with this Article VIII, the transferee of such LLC Interest shall not be a Member of the LLC, but a mere transferee of a Member not having any right to vote his Membership Interest or otherwise participate in the management of the Company. For purposes hereof, "Fair Market Value" shall mean fair market value as agreed upon by and between the Departing Member's personal representative and the LLC, and if such Persons cannot agree on said fair market value, then such fair market value shall be determined by a qualified, third-party appraiser, experienced in such valuations and selected by the Departing Member's personal representative and the Company.

8.3  Conditions Applicable to Transfers.  Notwithstanding anything to the contrary contained in this Agreement:

(a)  Any sale, assignment or transfer, whether direct or indirect, of any LLC Interest shall be made in

11

full compliance with (i) all applicable statutes, law, ordinances, rules and regulations of all Federal, state and local governmental bodies, agencies and subdivisions having jurisdiction over the Property and (ii) the contracts, deeds of trust, mortgages, certificates, easement agreements, insurance policies, service agreements and any other agreements affecting the Property, so that the operation of the Property can continue without interruption and without violation of any applicable law or any such instruments.

(b)  No change in ownership of the LLC Interest of any Member shall be binding upon the LLC or any other Member unless and until (i) true copies of instruments of transfer executed and delivered pursuant to or in connection with such transfer shall have been delivered to the Managers; (ii) the transferee shall have delivered to the Managers an executed and acknowledged assumption agreement pursuant to which the transferee assumes to be bound by all of the provisions of this Agreement (including, without limitation, if pursuant to the provisions of this Agreement, the transferee is to become, as a result of such transfer, a Member of the LLC, an acknowledgment thereof); (iii) the Managers shall have consented thereto; and (iv) the transferee shall have execute, acknowledged and delivered any instruments required under the Act to effect such transfer.

8.4  Transferees by Operation of Law.  If, notwithstanding the provisions of this Article VIII, any Person acquires all or any part of the LLC Interest of a Member in violation of this Article VIII by operation of law or judicial proceeding, the holder(s) of said LLC Interest shall be entitled to receive only the share of income, gain, deductions, credits and losses and the return of contributions to which said Member would otherwise be entitled, and said Person shall have no right to participate in the management of the LLC and vote on matters coming before the LLC.

8.5  Admission of Additional Members.  Except as hereinabove provided, no additional Members may be admitted to the LLC without the prior unanimous consent of all Members.

## ARTICLE IX

## DISSOLUTION, LIQUIDATION AND TERMINATION

9.1  Dissolution.

(a)  Notwithstanding any provisions of the Act to the contrary, the LLC will dissolve without further action of the Members upon the affirmative vote of all the Members. No Member has any right to withdraw from the LLC. No other event, including any event that would cause the withdrawal of a Member under the Act, will cause a dissolution and any Member suffering the occurrence of any such event will continue as such.

(b)  Dissolution shall be effective on the date determined by the Members, but the LLC shall not terminate until the assets thereof have been distributed in accordance with the provisions hereinafter set forth.

9.2  Liquidating Trustee.

(a)  Upon dissolution of the LLC, the liquidating trustee (who shall be the Managers) shall proceed diligently to wind up the affairs of the LLC and distribute its assets in the following order of priority:

(i)   To the payment of the debts and liabilities of the LLC (other than those to Members) and the expenses of liquidation;

(ii)  The expenses of liquidation;

12

(iii)    To the setting up of such reserves as the liquidating trustee may deem reasonably
necessary for any contingent or unforeseen liabilities or obligations of the LLC
arising out of or in connection with the LLC; provided that any such reserve shall be
paid over by the liquidating trustee to a Person (if an individual, not Member or one
in the employ of any Member), as escrowee, to be held by such Person (or
designated successor) for the purpose of disbursing such reserves in payment of any
of the aforementioned contingencies and, at the expiration of such period as the
liquidating trustee shall deem advisable, to distribute the balance thereafter
remaining in the manner hereinafter provided;

(iv)    To the repayment of any advances that may have been made by any of the Members
to the LLC, but, if the amount available for such repayment shall be insufficient,
then pro rata in accordance with the amounts of such advances; and

(v)    To the Members in accordance with their positive Capital Accounts after
adjustments to their Capital Accounts for Profits and Losses and any Distributions
that may have been made.

(b)    Pending such distribution, the liquidating trustee shall continue to exploit the rights and
properties of the LLC consistent with the liquidation thereof, exercising in connection therewith all the power
and authority of the Managers as herein set forth.

9.3  Accounting on Dissolution.  Upon dissolution of the LLC, the liquidating trustee shall cause the
LLC's accountant to make full and proper accounting of the assets, liabilities, and operation of the LLC, as of
and through the last day of the month in which the dissolution occurs.

9.4  Distribution in Kind.  No Member shall have the right to demand and receive property other than
cash.  The liquidating trustee shall, in any event, have the power to sell the LLC's assets for cash in order to
provide for payment of liabilities and establish a reserve as aforesaid or otherwise.  All saleable assets of the
LLC may be sold in connection with any liquidation at public or private sale at such price and upon such
terms as the liquidating trustee, in his sole discretion, may deem advisable.  Any Member or Manager and
any Person in which any Member or Manager is in any way interested may purchase assets at such sale.
Distributions of LLC assets may be made in cash or in kind, in the sole and absolute discretion of the
liquidating trustee.

## ARTICLE X

## GENERAL

10.1  Notices.  Any notice or consent required or provided for by any provision of this Agreement
shall be in writing and shall be deemed to have been duly and properly given or served for any purpose only
if delivered personally with receipt acknowledged or sent by registered or certified mail, return receipt
requested, postage and charges prepaid.  Any such notice, consent or other communication shall be deemed
to have been given the day it was (a) received by the LLC or (b) personally delivered with receipt
acknowledged.

10.2  Further Assurances.  Each of the parties hereto agrees to execute, acknowledge, deliver, file,
record and publish such further certificates, instruments, agreements and other documents, and to take all
such further action as may be required by law or deemed by the Members to be necessary or useful in

13

furtherance of the LLC's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

10.3 Prohibition Against Partition. Each Member hereby permanently waives and relinquishes any and all rights he may have to cause all or any part of the property of the LLC to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members, or any of them.

10.4 Waiver. No consent or waiver, express or implied, by any Member or Manager in the performance by any other Member or Manager of his obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member or Manager of the same or any other obligation of such Member hereunder. Failure on the part of a Member or Manager to complain of any act or failure to act of any other Member or Manager or to declare such other Member or Manager in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member or Manager of his rights hereunder.

10.5 Severability. If any provision of this Agreement or the application thereof to any Person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

10.6 Additional Remedies. The rights and remedies of any Member or Manager hereunder shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision thereof, it being the intention of this Section 10.6; to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

10.7. Choice of Law. This Agreement and all matters relating to the LLC shall be governed and construed in accordance with the law of the State of California.

10.8 Entire Agreement. This instrument incorporates the entire agreement among the parties hereto, regardless of anything to the contrary contained in the Certificate or other instrument, memorandum or notice purporting to summarize the terms hereof, whether or not the same shall be recorded or published.

10.9 Amendments. This Agreement may not be modified or amended except as otherwise provided herein and with the consent of all of the Members.

10.10 Gender and Number. Unless the context otherwise requires, when used herein, the singular includes the plural and vice versa, and the masculine includes the feminine and neuter and vice versa.

10.11 Benefit. Subject to transfer restrictions set forth in Article VIII, this Agreement is binding upon and inures to the benefit of the parties hereunder, their heirs, legal representatives, successors and permitted assigns.

10.12 Captions. Captions are inserted for convenience only and shall not be given any legal effect.

10.13 Execution. This Agreement may be executed in any number of counterparts, and each such counterpart will, for all purposes, be deemed an original instrument, by all such counterparts together will constitute by one and the same Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement on the day and year first above written.

**MEMBERS:**

PROTILUS INVESTORS, LLC

By: _____

Ari A. Schottenstein,
Authorized Signatory

RIDGEMOUNT INVESTMENTS INC.

By: _____

Alexander Iscoe,
Authorized Signatory

**MANAGERS:**

_____

Barry L. Levine

_____

David Ulmer

15

EXHIBIT D



# EXHIBIT E

## Robert H. Bisno
9255 Sunset Blvd., Suite 920
Los Angeles, CA 90069
Phone (310) 277-3670  Fax (310) 277-3787

As of July 1, 2011

Mr. Ryan Ogulnick
ryan@vineyardsdevelopment.com

Re: Entitlement Representation: Geneva Commons/The Met, Santa Ana, CC

Dear Ryan:

This letter sets forth an agreement ("Agreement") between you and Vineyards Development, Incorporated (VDI), (Collectively,"You") and me and Bisno Development Enterprises, (Collectively, "BDE") This agreement is not binding upon VDC At The Met, LLC ("VDC"). VDC is not a party to this Agreement

This Agreement is for me and or BDE to provide entitlement and related consultancy and real estate advisory services, as set forth herein, for You. This Agreement is not an agreement to represent You or your Affiliates, or any of them, as an attorney or in any legal capacity. You and your Affiliates have independent legal counsel and it is not me or my offices.

1.    You have agreed that BDE will represent You in the entitlement of certain real property, being that (approximately) 3 acre parcel at the intersection of MacArthur Blvd. and Pinnacle Lane, in the City of Santa Ana, CA (the "Property"). BDE will also consult with You in the design and other aspects of the development of improvements on the Property.

2.    The term of our Agreement shall be effective as of January 1, 2011, and will continue until either BDE completes the task of entitling the 2 acre parcel for 250 or more units, eighteen months herefrom, or BDE elects to terminate its representation, but the fees and other compensation provided for in paragraph 4 will survive any termination of this agreement. You may direct BDE and me to cease and desist representing You in the matters described herein but should so direct BDE or me, the compensation provided herein will not be changed.  BDE MAY ONLY TERMINATE THIS AGREEMENT "FOR CAUSE" AS THE TERM IS SET FORTH IN SECTION 6 HEREIN. IF BDE is requested to entitle the (approximately) 1 acre parcel, the term of this Agreement will continue until BDE accomplishes that task.

3.    BDE will perform entitlement services and development and real estate consultancy services as necessary to entitle an (approximate) 2 acre portion of the Property for 250 or more residential units and to entitle the remaining (approximate) 1 acre portion of, the Property, at a later date based on then current market conditions.

Ryan Ogulnick
July 1, 2011

4.      BDE will bill at $750 per hour to a maximum of $26,000 in any month. You will pay the amount BDE bills within 15 days of the time BDE sends you a bill. Based on BDE's experience with other entitlement efforts, but for this $26,000 monthly limitation, BDE's monthly invoices could easily exceed the monthly limitation as gaining entitlements are time consuming.

THE PARTIES ACKNOWLEDGE THAT THE PROPERTY IS OWNED BY VDC AT THE MET LLC AND ANY OBLIGATION HEREINABOVE IS NOT THE RESPONSIBILITY OF VDC AT THE MET LLC BUT IS YOUR THE RESPONSIBILITY AND THE RESPONSIBILITY OF THE ENTITY IN OR THROUGH WHICH YOU HAVE AN INTEREST IN VDC AT THE MET LLC. IF BDE ENTERS INTO AN AGREEMENT WITH VDC ANY AMOUNTS RECEIVED BY BDE UNDER THAT AGREEMENT WILL OFFSET YOUR OBLIGATIONS UNDER THIS PARAGRAPH.

In addition to the above described compensation You agree to provide, and hereby assign to BDE, or it's assignee a profits interests of 40% which includes all proceeds, income and other consideration (whether fixed, contingent, residual, deferred, percentages, royalties, and other things of value), received by You and your affiliates, whether arising from contracts, settlements, recoveries, litigation, or otherwise, from the sale or development, recapitalization, refinancing, contribution to partnership or other entity, of any portion of the Property, after payment of the minimum payments or yields of any secured lender on the Property or preferred equity in the LLC that owns the property and return of your investment (up to a maximum of $8,800,000 in the aggregate).

Payment of the amounts of monthly compensation set forth above are subject to You being able to raise additional capital to continue pursuing entitlements for the Property. You agree to use your best efforts in attempting to raise that additional capital. You also agree to use your best reasonable efforts to cause VDB to enter into an agreement to pay for or reimburse you for some or all of the compensation set forth herein.

To the extent that any provision of this Agreement creates an Event of Default under the Second Amended And Restated Operating Agreement For VDC At The Met, LLC (the "Second Amended Operating Agreement") It shall be tolled until the performance of the provision or provisions herein can be implemented or effected without causing an Event of Default (as described in the Second Amended Operating Agreement)

BDE has advised you, and you hereby acknowledge that BDE's compensation is negotiable between us. We have discussed and have agreed upon this compensation arrangement.

2

Ryan Ogulnick
July 1, 2011

5.     In general, BDE may incur various costs and expenses in performing services for you or your Affiliates under this Agreement. Standard charges for such office items as postage, photocopying, facsimile transmissions, computer usage or computer services will not be billed to you. You will be billed for out-of-pocket costs and amounts paid to third parties unrelated to my firm such as filing fees, messengers, and will be billed for travel costs including any transportation, parking, mileage, food, entertainment, and other incidental costs (out-of-Southern California travel will only be incurred with your approval). Any charges billed to You will be itemized on the monthly statements.

6.     You do not have the right to terminate our relationship before 12 months from the time formal application to the City of Santa Ana is made for the entitlements we request. AS SET FORTH ABOVE YOU MAY DIRECT ME OR BDE TO DESIST WORKING ON THE PROJECT. As set forth herein, if you elect to terminate BDE, OR DIRECT BDE OR ME TO DESIST WORKING ON THE PROJECT such termination OR DIRECTION TO DESIST WORKING ON THE PROJECT will not change, alter or reduce BDE's compensation as set forth herein. BDE has the right to terminate our relationship for Good Cause. Good Cause includes, among other things, your breach of this Agreement, the arising of a conflict of interest, or any other fact or circumstance that would render our continuing relationship unlawful or unethical or your refusal to accept positions that BDE advocates in good faith are necessary or helpful to advance the entitlement effort of the Property. If our contractual relationship is terminated BDE's profit percentage as set forth hereinabove shall apply and all fees and expenses to date which are due or which may be billed hereunder shall remain due and payable.

7.     The prevailing party in any action or proceeding arising out of or to enforce any provisions of this Agreement is entitled to all costs and reasonable legal fees.

8.     All provisions of this agreement that are stated to survive this Agreement shall survive the termination or cancellation of this Agreement. The terms of this Agreement cannot be modified or altered except in a writing signed by the parties hereto. This Agreement is binding upon the heirs, successors and permitted assigns of the parties. This is the entire Agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties. This Agreement shall not be construed against any purported drafting party. Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, as may be reasonably necessary and requested by the other party to carry out the purposes and intent of this agreement.

9.     If any provision of this Agreement is determined by a court of competent jurisdiction to be void, voidable, invalid or unenforceable, the remainder of this Agreement shall

3

Ryan Ogulnick
July 1, 2011

nonetheless remain in full force and effect. And, should a Court so determine a provision or provisions are void, voidable, invalid or unenforceable, BDE shall retain all rights to bring an action for Quantum Meruit and or Unjust Enrichment, in addition to any and all other claims.

10.     This Agreement has been entered into in the State of California, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of California without regard to any conflict of laws principles.

11.     Although BDE may from time to time offer an opinion about possible results regarding your matter or matters, BDE has not and cannot guarantee any particular result. You acknowledge that BDE has made no promises about the outcome of any matter that BDE is involved with on your behalf, and that any opinion offered by BDE in the future will not constitute a guarantee.

12.     You acknowledge that you have been advised to and have had the opportunity to retain independent counsel to review this Agreement on your behalf and that you are relying upon such counsel's advice, or deliberately waiving your right to obtain such advice in connection with the legal matters of this agreement.

13.     This Agreement may be executed by fax signatures and any faxed or photocopied version of this agreement which bears a faxed or photocopied signature shall be binding, valid and admissible in any proceeding, for all purposes, as though the same were an original.

14.     Liquidated Damages:  Because actual damages are difficult to estimate, we have agreed that in the event you or your Affiliate terminate or breach this Agreement, the amount of $4,000,000 is a reasonable estimate and we agree to that as liquidated damages.

I will, of course, be happy to discuss these matters with you in greater detail if you have any questions. If the foregoing meets with your approval and acceptance, if you would be so kind as to sign this agreement in the space provided for your signatures, I would be most appreciative.

Sincerely,

ROBERT H. BISNO

AGREED AND ACCEPTED

4

Ryan Ogulnick
July 1, 2011

Ryan Ogulnick:

By _____

Date _____

5

# EXHIBIT F

## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (this "Agreement") is entered into on this __16th__ day of August, 2011 (the "Effective Date") by and between VDC AT THE MET, LLC, a California limited liability company (the "Client" or "VDC"), with a principal place of business at 828 N. Ogden Drive, Los Angeles, CA, 90046, and BISNO DEVELOPMENT ENTERPRISES LLC, a California limited liability company (the "Contractor" or "Bisno" and together with VDC, the "Parties" and each individually, a "Party"), an independent contractor, with a principal place of business at 9255 Sunset Boulevard, Suite 920 Los Angeles, CA 90069.

### WITNESSETH:

WHEREAS, the Parties hereto desire to enter into this Agreement to define and express all of the terms and conditions of this Agreement, and the respective rights and obligations of the Parties hereto; and

WHEREAS, the Parties hereto desire to be bound by this Agreement pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

### ARTICLE I
### TERM OF CONTRACT

1.01. This Agreement will become effective as of the Effective Date, and will continue in effect until terminated as provided in this Agreement, unless terminated earlier. Either Party may terminate this Agreement without cause as provided in Paragraph 6.01 herein.

### ARTICLE II
### SERVICES TO BE PERFORMED BY CONTRACTOR

2.01. Contractor agrees to perform the services specified in the description of services (the "Description of Services") attached to this Agreement as Exhibit "A" and incorporated into this Agreement by reference as if fully set forth within this Agreement.

2.02. Contractor will determine the method, details, and means of performing the services more fully described in the Description of Services.

2.03. Contractor enters into this Agreement, and will remain throughout the term of the Agreement, as an independent contractor. Contractor agrees that he is not and will not become an employee, partner, agent, or principal of Client while this Agreement is in effect. Contractor agrees he is not entitled to the rights or benefits afforded to Client's employees, including, but not limited to, disability or unemployment insurance, workers' compensation, medical insurance, sick leave, or any other employment benefit. Contractor is responsible for providing, at his own expense, disability, unemployment, and other insurance, workers' compensation, training, permits, and licenses for himself and for his employees and subcontractors.

2.04. Contractor is responsible for paying when due all income taxes, including estimated taxes, incurred as a result of the compensation paid by Client to Contractor for services under this Agreement, and if Contractor files for and receives an extension for payment of taxes, by the extension deadline. Contractor agrees to indemnify Client for any claims, costs, losses, fees, penalties, interest, or damages suffered by Client resulting from Contractor's failure to pay any and all taxes.

2.05. Contractor may, at Contractor's own expense, use any employees or subcontractors as Contractor deems necessary to perform the services required of Contractor under this Agreement. Client may not control, direct, or supervise Contractor's employees or subcontractors in the performance of those services.

## ARTICLE III
## COMPENSATION

3.01. In consideration for the services to be performed by Contractor, Client agrees to pay Contractor the sum of Eight Thousand Dollars ($8,000.00) per month for each month Contractor performs the services to be performed under this Agreement (the "Compensation"). All monthly payments shall be payable in arrears. Client acknowledges that Contractor is receiving, or will receive, additional compensation from others for related tasks for which Client is paying Contractor hereunder. Client is not bound by any agreement Contractor has with any third party nor is Client obligated to pay any sums due to Contractor under any other agreement. Contractor warrants and represents that the attached Exhibit "B" is a true and correct copy of the current draft of the aforementioned agreement between Contractor and other third parties. Contractor may request that payment be made by wire transfer. Client may deduct any wire fees from the Compensation that Client's financial institution charges for wire transfer fees associated with this Paragraph 3.01.

3.02. For services rendered under this Agreement, Client agrees to pay Contractor the sum set forth in Paragraph 3.01 of this Agreement on the commencement of this Agreement. Client further agrees to pay and Contractor agrees to accept the sum of Forty Eight Thousand Dollars ($48,000.00) as full and final payment under this Agreement (but not under any agreement to which Client is not a signatory) for services provided by Contractor from January 1, 2011-June 30, 2011. Client acknowledges that Contractor is receiving, or will receive, additional compensation from others for related tasks for which Client is paying Contractor hereunder. Client is not bound by any other agreement Contractor has with any third party nor is Client obligated to pay any sums due to Contractor under any other agreement.

3.03. Contractor will be responsible for all expenses incurred in performing services under this Agreement.

## ARTICLE IV
## OBLIGATIONS OF CONTRACTOR

4.02. Contractor may represent, perform services for, and contract with as many additional clients, persons, or companies as Contractor, in his sole discretion, sees fit. However, nothing contained in this Paragraph 4.01 shall be construed to mean or otherwise grant Contractor the right or ability to enter into any agreements, arrangements, or contracts on Client's behalf. Contractor does not have the authority to bind Client. Contractor shall not enter into any agreements, arrangements, and/or contracts on behalf of Client without Client's express written consent to enter into such agreements, arrangements, and/or contracts.

4.02. Contractor may perform the services under this Agreement at any suitable time and location he chooses.

4.03. Contractor will supply all tools, materials, and equipment required to perform the services under this Agreement.

4.04. Contractor agrees to hold harmless and indemnify Client for any and all claims arising out of any injury, disability, or death of any of Contractor's employees or agents.

4.05. Contractor will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of services under the terms of this Agreement or on the part of the employees or agents of Contractor unless those acts or omissions are due to willful misconduct. Client will indemnify and hold Contractor free and harmless from any obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the services rendered to Client under the terms of this Agreement, unless Contractor is judged by a court of competent jurisdiction to be guilty of willful misconduct.

2

4.06. Contractor represents that he has the qualifications and skills necessary to perform the services under this Agreement in a competent, professional manner, without the advice or direction of Client. This means Contractor is able to fulfill the requirements of this Agreement. Failure to perform all the services required under this Agreement constitutes a material breach of the Agreement. Contractor has complete and sole discretion for the manner in which the work under this Agreement will be performed.

4.07. Contractor agrees to indemnify, defend, and hold Client free and harmless from all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest, penalties, attorneys' fees, and costs, that Client may incur as a result of a breach by Contractor of any representation or agreement contained in this Agreement.

4.08. Neither this Agreement nor any duties or obligations under this Agreement may be assigned by Contractor without the prior written consent of Client.

**ARTICLE V**
**OBLIGATIONS OF CLIENT**

5.01. Client agrees to comply with all reasonable requests of Contractor necessary to the performance of Contractor's duties under this Agreement.

5.02. Neither this Agreement nor any duties or obligations under this Agreement may be assigned by Client without the prior written consent of Contractor.

**ARTICLE VI**
**TERMINATION OF AGREEMENT**

6.01. Notwithstanding any other provision of this Agreement, either party may terminate this Agreement at any time by giving Thirty (30) days written notice to the other party. Unless otherwise terminated as provided in this Agreement, this Agreement will continue in force until the services provided for in this Agreement have been fully and completely performed.

6.02. This Agreement will terminate automatically on the occurrence of any of the following events:

> (a) Bankruptcy or insolvency of either party;
> (b) Sale of the business of either party; or
> (c) Death or dissolution of either party.

6.03. If either party defaults in the performance of this Agreement or materially breaches any of its provisions, the non-breaching party may terminate this Agreement by giving written notification to the breaching party. Termination will take effect immediately on receipt of notice by the breaching party or Five (5) days after mailing of notice, whichever occurs first. For the purposes of this paragraph, material breach of this Agreement includes, but is not limited to, the following:

> (a) Client's failure to pay Contractor any compensation due within Five (5) days after written demand for payment;
> (b) Contractor's failure to complete the services specified in the Description of Services;
> (c) Contractor's material breach of any representation or agreement contained in Paragraph 4.06; or
> (d) Client's material breach of any representation or agreement contained in this Agreement.

**ARTICLE VII**
**PROPRIETARY RIGHTS**

3

7.01. Contractor agrees that all designs, plans, reports, specifications, drawings, inventions, processes, and other information or items produced by Contractor while performing services under this Agreement will be assigned to Client as the sole and exclusive property of Client and Client's assigns, nominees, and successors, as will any copyrights, patents, or trademarks obtained by Contractor while performing services under this Agreement. On request and at Client's expense, Contractor agrees to help Client obtain patents and copyrights for any new developments. This includes providing data, plans, specifications, descriptions, documentation, and other information, as well as assisting Client in completing any required application or registration.

7.02. Any written, printed, graphic, or electronically or magnetically recorded information furnished by Client for Contractor's use are the sole property of Client. This proprietary information includes, but is not limited to, customer requirements, customer lists, marketing information, and information concerning Client's employees, products, services, prices, operations, and subsidiaries. Contractor will keep this confidential information in the strictest confidence, and will not disclose it by any means to any person except with Client's approval, and only to the extent necessary to perform the services under this Agreement. This prohibition also applies to Contractor's employees, agents, and subcontractors. On termination of this Agreement, Contractor will return any confidential information in his possession to Client.

**ARTICLE VIII**
**GENERAL PROVISIONS**

8.01. Any notices required to be given under this Agreement by either party to the other may be effected by personal delivery in writing or by mail, registered or certified, postage prepaid with return receipt requested. Mailed notices must be addressed to the parties at the addresses appearing in the introductory paragraph of this Agreement, but each party may change the address by giving written notice in accordance with this paragraph. Notices delivered personally will be deemed communicated as of actual receipt; mailed notices will be deemed communicated as of the day of receipt or the fifth day after mailing, whichever occurs first.

8.02. This Agreement supersedes any and all agreements, either oral or written, between the parties with respect to the rendering of services by Contractor for Client and contains all of the representations, covenants, and agreements between the parties with respect to the rendering of those services. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not contained in this Agreement, and that no other agreement, statement, or promise not contained in this Agreement will be valid or binding. Any modification of this Agreement will be effective only if it is in a writing signed by the party to be charged.

8.03. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will continue in full force and effect without being impaired or invalidated in any way.

8.04. If Contractor dies before completing the services under this Agreement, any moneys due Contractor from Client under this Agreement as of the date of death will be paid to the Contractor's executors, administrators, heirs, personal representatives, successors, and assigns.

8.05. Any controversy or claim arising out of or relating to this Agreement or the breach of this Agreement will be adjudicated in the State of California, Los Angeles County, if suit is brought in state court, and in the Central District of California, if suit is brought in federal court.

8.06. If any legal action including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, which may be set by the court in the same action or in a separate action brought for that purpose, in addition to any other relief to which that party may be entitled.

8.08. This Agreement will be governed by and construed in accordance with the laws of the State of California, without regard to conflict of law principles.

4

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

CLIENT:
VDC AT THE MET, LLC

By: _____
    Ryan Ogulnick,
    Authorized Signatory

CONTRACTOR:

BISNO DEVELOPMENT ENTERPRISES LLC

By: 
    Robert H. Bisno,
    CEO

5

EXHIBIT "A"

DESCRIPTION OF SERVICES

Bisno agrees to provide Client with all development and entitlement related services in connection with obtaining entitlements to construct approximately 280-305 rental units. Bisno agrees to provide Client with regular updates of his progress in connection with the engagement including all material developments, meetings, and/or discussions or communications. Bisno agrees to provide Client with any other services reasonably related to the entitlement of the above described project. Notwithstanding anything to the contrary in Section 3.03, should Client direct for Bisno to provide any of these additional services, Client shall be responsible for reimbursement for all out of pocket costs that are otherwise not incidental to the performance of this Agreement..

EXHIBIT "B"

**Robert H. Bisno**
9255 Sunset Blvd., Suite 920
Los Angeles, CA 90069
Phone (310) 277-3670  Fax (310) 277-3787

As of July 1, 2011

Mr. Ryan Ogulnick
ryan@vineyardsdevelopment.com

Re: Entitlement Representation: Geneva Commons/The Met, Santa Ana, CC

Dear Ryan:

This letter sets forth an agreement ("Agreement") between you and Vineyards Development, Incorporated (VDI), (Collectively,"You") and me and Bisno Development Enterprises, (Collectively, "BDE") This agreement is not binding upon VDC At The Met, LLC ("VDC"). VDC is not a party to this Agreement

This Agreement is for me and or BDE to provide entitlement and related consultancy and real estate advisory services, as set forth herein, for You. This Agreement is not an agreement to represent You or your Affiliates, or any of them, as an attorney or in any legal capacity. You and your Affiliates have independent legal counsel and it is not me or my offices.

1.    You, have agreed that BDE will represent You in the entitlement of certain real property, being that (approximately) 3 acre parcel at the intersection of MacArthur Blvd. and Pinnacle Lane, in the City of Santa Ana, CA (the "Property"). BDE will also consult with You in the design and other aspects of the development of improvements on the Property.

2.    The term of our Agreement shall be effective as of January 1, 2011, and will continue until either BDE completes the task of entitling the 2 acre parcel for 250 or more units, eighteen months herefrom, or BDE elects to terminate its representation, but the fees and other compensation provided for in paragraph 4 will survive any termination of this agreement. You may direct BDE and me to cease and desist representing You in the matters described herein but should so direct BDE.or me, the compensation provided herein will not be changed.  BDE MAY ONLY TERMINATE THIS AGREEMENT "FOR CAUSE" AS THE TERM IS SET FORTH IN SECTION 6 HEREIN. IF BDE is requested to entitle the (approximately) 1 acre parcel, the term of this Agreement will continue until BDE accomplishes that task.

3.    BDE will perform entitlement services and development and real estate consultancy services as necessary to entitle an (approximate) 2 acre portion of the Property for 250 or more residential units and to entitle the remaining (approximately) 1 acre portion of, the Property, at a later date based on then current market conditions.

Ryan Ogulnick
July 1, 2011

4.      BDE will bill at $750 per hour to a maximum of $26,000 in any month. You will
        pay the amount BDE bills within 15 days of the time BDE sends you a bill.
        Based on BDE's experience with other entitlement efforts, but for this $26,000
        monthly limitation, BDE's monthly invoices could easily exceed the monthly
        limitation as gaining entitlements are time consuming.

THE PARTIES ACKNOWLEDGE THAT THE PROPERTY IS OWNED BY VDC AT
THE MET LLC AND ANY OBLIGATION HEREINABOVE IS NOT THE RESPONSIBILITY
OF   VDC AT THE MET LLC BUT IS YOUR THE RESPONSIBILITY AND THE
RESPONSIBILITY OF THE ENTITY IN OR THROUGH WHICH YOU HAVE AN
INTEREST IN VDC AT THE MET LLC. IF BDE ENTERS INTO AN AGREEMENT WITH
VDC ANY AMOUNTS RECEIVED BY BDE UNDER THAT AGREEMENT WILL OFFSET
YOUR OBLIGATIONS UNDER THIS PARAGRAPH.

        In addition to the above described compensation You agree to provide, and hereby
assign to BDE, or it's assignee a profits interests of 40% which includes all proceeds, income
and other consideration (whether fixed, contingent, residual, deferred, percentages, royalties, and
other things of value), received by You and your affiliates, whether arising from contracts,
settlements, recoveries, litigation, or otherwise, from the sale or development, recapitalization,
refinancing, contribution to partnership or other entity, of any portion of the Property, after
payment of the minimum payments or yields of any secured lender on the Property or preferred
equity in the LLC that owns the property and return of your investment (up to a maximum of
$8,800,000 in the aggregate).

        Payment of the amounts of monthly compensation set forth above are subject to You
being able to raise additional capital to continue pursuing entitlements for the Property. You
agree to use your best efforts in attempting to raise that additional capital. You also agree to use
your best reasonable efforts to cause VDB to enter into an agreement to pay for or reimburse you
for some or all of the compensation set forth herein..

        To the extent that any provision of this Agreement creates an Event of Default under
the Second Amended And Restated Operating Agreement For VDC At The Met, LLC (the
"Second Amended Operating Agreement") it shall be tolled until the performance of the
provision or provisions herein can be implemented or effected without causing an Event of
Default (as described in the Second Amended Operating Agreement)

        BDE has advised you, and you hereby acknowledge that BDE's compensation is
negotiable between us. We have discussed and have agreed upon this compensation
arrangement.

2

Ryan Ogulnick
July 1, 2011

     5.    In general, BDE may incur various costs and expenses in performing services for you or your Affiliates under this Agreement. Standard charges for such office items as postage, photocopying, facsimile transmissions, computer usage or computer services will not be billed to you. You will be billed for out-of-pocket costs and amounts paid to third parties unrelated to my firm such as filing fees, messengers, and will be billed for travel costs including any transportation, parking, mileage, food, entertainment, and other incidental costs (out-of-Southern California travel will only be incurred with your approval). Any charges billed to You will be itemized on the monthly statements.

     6.    You do not have the right to terminate our relationship before 12 months from the time formal application to the City of Santa Ana is made for the entitlements we request. AS SET FORTH ABOVE YOU MAY DIRECT ME OR BDE TO DESIST WORKING ON THE PROJECT. As set forth herein, if you elect to terminate BDE, OR DIRECT BDE OR ME TO DESIST WORKING ON THE PROJECT such termination OR DIRECTION TO DESIST WORKING ON THE PROJECT will not change, alter or reduce BDE's compensation as set forth herein. BDE has the right to terminate our relationship for Good Cause. Good Cause includes, among other things, your breach of this Agreement, the arising of a conflict of interest, or any other fact or circumstance that would render our continuing relationship unlawful or unethical or your refusal to accept positions that BDE advocates in good faith are necessary of helpful to advance the entitlement effort of the Property. If our contractual relationship is terminated BDE's profit percentage as set forth hereinabove shall apply and all fees and expenses to date which are due or which may be billed hereunder shall remain due and payable.

     7.    The prevailing party in any action or proceeding arising out of or to enforce any provisions of this Agreement is entitled to all costs and reasonable legal fees.

     8.    All provisions of this agreement that are stated to survive this Agreement shall survive the termination or cancellation of this Agreement. The terms of this Agreement cannot be modified or altered except in a writing signed by the parties hereto. This Agreement is binding upon the heirs, successors and permitted assigns of the parties. This is the entire Agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties. This Agreement shall not be construed against any purported drafting party. Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, as may be reasonably necessary and requested by the other party to carry out the purposes and intent of this agreement.

     9.    If any provision of this Agreement is determined by a court of competent jurisdiction to be void, voidable, invalid or unenforceable, the remainder of this Agreement shall

Ryan Ogulnlok
July 1, 2011

nonetheless remain in full force and effect. And, should a Court so determine a provision or
provisions are void, voidable, invalid or unenforceable, BDE shall retain all rights to bring an
action for Quantum Merlut and or Unjust Enrichment, in addition to any and all other claims.

10.    This Agreement has been entered into in the State of California, and the validity,
interpretation and legal effect of this Agreement shall be governed by the laws of the State of
California without regard to any conflict of laws principles.

11.    Although BDE may from time to time offer an opinion about possible results
regarding your matter or matters, BDE has not and cannot guarantee any particular result. You
acknowledge that BDE has made no promises about the outcome of any matter that BDE is
involved with on your behalf, and that any opinion offered by BDE in the future will not
constitute a guarantee.

12.    You acknowledge that you have been advised to and have had the opportunity to
retain independent counsel to review this Agreement on your behalf, and that you are relying
upon such counsel's advice, or deliberately waiving your right to obtain such advice in
connection with the legal matters of this agreement.

13.    This Agreement may be executed by fax signatures and any faxed or photocopied
version of this agreement which bears a faxed or photocopied signature shall be binding, valid
and admissible in any proceeding, for all purposes, as though the same were an original.

14.    Liquidated Damages:  Because actual damages are difficult to estimate, we have
agreed that in the event you or your Affiliate terminate or breach this Agreement, the amount of
$4,000,000 is a reasonable estimate and we agree to that as liquidated damages.

I will, of course, be happy to discuss these matters with you in greater detail if you have
any questions. If the foregoing meets with your approval and acceptance, if you would be so
kind as to sign this agreement in the space provided for your signatures, I would be most
appreciative.

Sincerely,

ROBERT H. BISNO

AGREED AND ACCEPTED

4

Ryan Ogulnick
July 1, 2011

Ryan Ogulnick :

By _____

Date _____

5

Vineyards Mail - Re: FW: Proposed Resolution to Outstanding Issues



Ryan Ogulnick <ryan@vineyardsdc.com>

## Re: FW: Proposed Resolution to Outstanding Issues
1 message

**Ari Schottenstein** <aschottenstein@proteancap.com>                    Tue, Aug 16, 2011 at 2:34 PM
To: Ryan Ogulnick <ryan@vineyardsdc.com>
Cc: Alex Iscoe <aiscoe@ridgemountgroup.com>, Barry Levine <blevine@proteancap.com>, David Ulmer
<dulmer@ridgemountgroup.com>, Ryan Ogulnick <ryanogulnick@hotmail.com>

Guys, see below for current update on where things currently stand on each issue (my comments in orange
brackets). It appears we have addressed most of the issues and are on track to finish the balance in short
order.

Ari

On Tue, Aug 16, 2011 at 11:12 AM, Ryan Ogulnick <ryan@vineyardsdc.com> wrote:
Guys, Please see below in blue my comments/actions to Ari's pending or outstanding items list below.

**RYAN OGULNICK** CEO
Cell    310.508.4083
Office  310.571.8227
Ryan@VineyardsDC.com



Date: Thu, 11 Aug 2011 15:12:10 -0400
Subject: Proposed Resolution to Outstanding Issues
From: aschottenstein@proteancap.com
To: ryan@vineyardsdc.com
CC: blevine@proteancap.com; aiscoe@ridgemountgroup.com; dulmer@ridgemountgroup.com

Ryan:

We would like to move forward by addressing (hopefully once and for all) the remaining outstanding issues
related to your interest in VDC and the engagement of the Project's "Operating Team" (i.e., Bisno and
Glickman). To that end, here are our suggestions for how to move forward on what we see as the five
major outstanding issues:

1. Bisno's Engagement. Bob Bisno will be engaged by VDC pursuant to the agreement we have discussed.
You will provide to us your agreement with Bisno regarding any additional compensation he is to receive.

Vineyards Mail - Re: FW: Proposed Resolution to Outstanding Issues

*[ UNDERLINED COMMENTS WERE*
*IN BLUE IN ORIGINAL EMAIL ]*

RYAN TO SIGN AGREEMENT, NO FURTHER CHANGES. Bisno's IC agreement has been signed by Bob
and myself and emailed to the group. I emailed Bob's additional success fee agreement, there are no
changes to the agreement, this agreement will not be signed until after meetings with City Council. [Done
until council meetings take place, at which point Ryan to sign VDI's success fee agreement with Bisno if
Bisno demonstrates effectiveness in meetings and performs as intended.]

2. Graphic Designer Engagement. As soon as practicable, VDC will hire a graphic designer of your choice
who will liaise with MVE and other individuals and/or entities involved in the Project, as well as assisting
you in the performance of your duties. The Graphic Designer will be paid $5k per year. Prior to making
any hires, VDC shall obtain workman's compensation insurance to protect VDC against potential future
claims. RACHEL TO SEND W-9. Rachel sent the required W-9. [Done. Rachel to be engaged as graphic
designer for $5k per annum; workers compensation insurance policy for VDC has been bound.]

3. Glickman Engagement. Ilus recommends that VDC engage Leonard Glickman as a Capital Partner
Consultant & Representative (or such other title as you and Mr. Glickman mutually agree upon). Glickman
shall apprise you of all meetings, telephone calls and communications with City Council Members and/or
other individuals involved in the Project in advance of such interactions and such interactions will be subject
to your approval. You will communicate regularly with Glickman regarding the state of the Project, recent
developments and outstanding issues as they arise and shall respond timely to Glickman's questions
and/or information requests. Except in instances where you believe his involvement would be
counterproductive, Glickman shall be offered the opportunity to attend meetings with architects, engineers,
consultants and other Project service providers and Council Members (although in instances where you
believe his involvement would be counterproductive, Glickman should still be informed of such interactions
in advance of their occurrence and apprised of the contents of such interactions). For his services,
Glickman shall be paid $5k per month as an independent consultant. RYAN TO MODIFY CONTRACT TO
INDICATE HIS DUTIES. MUST NOT CONTACT COUNCIL OR STAFF WITHOUT LLC APPROVAL. We
sent Glickman's amended agreement yesterday and I am ready to sign, pending Ilus approval. I shall email
signed agreement this morning. [Done. Glickman has signed consulting agreement and has been
engaged for $5k per month.]

4. Weekly Operating Team Calls. We believe the weekly "Partners Calls" for Ilus and Ryan have been very
helpful, and believe it would behoove everyone to replicate that model with the Operating Team. To that
end, we would like you to coordinate with the Operating Team (i.e., Ryan, Bisno, Glickman) to set up
recurring / standing weekly or bi-weekly conference calls to discuss the state of the entitlements process
and any issues. The Ilus members should be allowed to dial in to the Operating Team Calls, but the calls
should be driven by you. RYAN TO WORK TO CREATE STANDARD TIME TO DISCUSS UPDATES WITH
BISNO AND GLICKMAN. Have spoken with Bisno and he is free for an early Thrusday morning call with
Glickman. [Done. Weekly Operating Team Calls for Ryan, Bisno and Glickman set for Thursday mornings
at 9am PT / 12 noon ET.]

5. VDI Assignment. Ilus approves of the assignment to VDB in principle, and just need to take care of a few
housekeeping items: (a) Assignor entity should be Vineyards Development, Inc. as opposed to VDI Corp.;
(b) Ryan and Vineyards Development, Inc. will execute indemnification and hold harmless agreement
(Appel and Henick can provide); (c) no further assignment of your VDB interest without explicit consent of
Ilus; and (d) David is not the Manager of VDB Santa Ana LLC, so the document should be modified
accordingly. RYAN TO SEND WORD VERSION TO BARRY OF ASSIGNMENT. Assignment sent to Barry
for his approval or modification. [In process. Ilus has sent Ryan comments to the Assignment agreement
and we are awaiting Ryan's signoff.]

It is our hope and belief that all of these issues can be agreed upon and resolved in short order (i.e., today
or tomorrow), and if you are in agreement with each of these points, please let us know so we can proceed
full steam ahead. If you have comments / thoughts about these points, please let us know so we can
address them ASAP.

Best,
Ari

--

Ari A. Schottenstein
Protean Capital Management LLC
646.918.7264 (main)
917.287.2774 (mobile)
aschottenstein@proteancap.com

--

Ari A. Schottenstein
Protean Capital Management LLC
646.918.7264 (main)
917.287.2774 (mobile)
aschottenstein@proteancap.com

EXHIBIT G

**FIRST AMENDED AND RESTATED
OPERATING AGREEMENT
FOR
VDC AT THE MET, LLC**

1.    <u>Parties</u>. This First Amended and Restated Operating Agreement for VDC at The Met, LLC (the "**Agreement**"), dated March 28, 2011 (the "**Effective Date**") is entered into by and among ILUS INVESTORS, LP, a California limited partnership ("**Managing Member**") and RYAN OGULNICK, an individual ("**Ogulnick**"). The Managing Member and Ogulnick are also referred to in this Agreement individually as a "**Member**" and collectively as the "**Members**". This Agreement completely amends, restates and supersedes that certain Operating Agreement for VDC at The Met, LLC dated March 22, 2011.

2.    <u>Definitions</u>. The terms used in this Agreement have the meanings set forth in the Glossary of Defined Terms attached as <u>Exhibit A</u> to this Agreement and in <u>Exhibit C</u> hereto.

3.    <u>Organization</u>.

    3.1    <u>Formation</u>. Pursuant to the Act, the Company was formed by filing the Articles with the California Secretary of State on March 22, 2011 as File No. 201108210173. The rights and obligations of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

    3.2    <u>Name of the Company</u>. The name of the Company is VDC at The Met, LLC. The Managing Member may, from time to time, in its discretion and in compliance with applicable laws, change the name of the Company. The Managing Member, in its discretion, from time to time, may adopt such trade or fictitious names as it deems appropriate for the conduct of the Company's business. The Managing Member shall file and publish any Fictitious Business Name Statements and shall effect other similar filings as are required by applicable laws or as the Managing Member shall consider appropriate or advisable.

    3.3    <u>Principal Executive Office</u>. The principal executive office of the Company shall be located at 51 Gibraltar Drive, Suite 2D, Morris Plains, New Jersey 07950, or such other place or places as the Managing Member may designate. The Company shall continuously maintain an office in California where it will keep the records required to be maintained pursuant to Section 17058 of the Act and Section 9.1 hereof.

    3.4    <u>Agent For Service of Process</u>. The Company shall continuously maintain in California an agent for service of process on the Company.

    3.5    <u>Purposes</u>. The purpose of this Company is to acquire, own, manage, maintain, operate, finance, refinance, lease, improve, develop, and dispose of the Property and to engage in any lawful act or activity related to the foregoing for which a limited liability company may be organized under the Act.

3.6    The Names and Addresses of the Members.  The name and business or residence address of each Member appears on the Schedule attached hereto as Exhibit B.

3.7    Term.  The Company will begin on the date set forth above and shall dissolve as provided in Section 10.1.

3.8    Expenses of Formation.  All expenses (including without limitation legal fees and costs, accounting fees and costs, filing fees, recording fees) incurred by the Managing Member in connection with the formation and organization of the Company, the negotiation, preparation, filing and recordation (as applicable) of this Agreement, the Articles, any statements to be filed or recorded in connection herewith, and any other documents or instruments negotiated, prepared or executed in connection herewith, shall be paid by the Company and shall be disbursed by the Managing Member from Company funds. The Company shall reimburse the Managing Member and its Affiliates for organizational expenses (including without limitation legal and accounting fees and costs) incurred to form the Company and to prepare and file the Articles and this Agreement.

4.    Members' Capital Contributions; Capital Accounts; and Loans.

4.1    Initial Contributions. Each Member shall contribute on the date hereof the amount set forth next to its name on the Schedule.

4.2    Additional Contributions.  No Member shall be obligated to make any additional Capital Contributions to the Company. Additional Capital Contributions may be made by one or more Members to the Company with the approval of, and on terms and conditions approved by, the Managing Member.

4.3    Treatment of Capital Contributions.  Except as otherwise specifically set forth in this Agreement, no Member shall:

a.    receive any interest on its Capital Contributions or on the balance in its Capital Account;

b.    have the right to withdraw or reduce its Capital Contributions or to receive any Distributions from the Company except for the Distributions to be made in accordance with this Agreement;

c.    have the right to demand or receive property other than cash in return for its Capital Contributions or as Distributions;

d.    be compelled to accept a Distribution of any asset in kind from the Company in lieu of a proportionate Distribution of cash being made to other Members; or

e.    have priority over any other Member with respect to a return of Capital Contributions or the allocations of Profits, Losses or Distributions of Distributable Cash.

4.4     Capital Accounts.  The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv).  If a Member transfers his or her Membership Interest in accordance with this Agreement, such Member's Capital Account shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

4.5     Loans.  Any Member may lend or advance money to or on behalf of the Company if the Managing Member determines that such funds are necessary for a Company purpose. Except as otherwise provided herein, any loans or advances by a Member shall be repaid on such terms and conditions and shall bear interest at such rates as shall be approved by the Managing Member.  The amount of any such loans or advances shall be treated as a Company debt, and not as a Capital Contribution.

5.     Members.

5.1     Limited Liability.  Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

5.2     Members Are Not Agents.  The Company shall be managed as set forth in Section 6 of this Agreement and no Member shall have any right or power to participate in the management of the Company except as expressly authorized by this Agreement or except as expressly required by the Act.  Accordingly, except as provided in Section 6 with respect to the Managing Member, no Member acting solely in the capacity of a Member is an agent of the Company nor can any Member in such capacity bind or execute any instrument on behalf of the Company.

5.3     Remuneration To Members.  Except as otherwise specifically provided in this Agreement, no Member (or Affiliate of a Member) is entitled to remuneration for acting in the Company business, subject to the entitlement of Members winding up the affairs of the Company to reasonable compensation pursuant to Section 10.3 below.

5.4     Transactions With The Company.  Subject to any limitations set forth in this Agreement and with the prior approval of the Managing Member after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

5.5     Competing Activities.  The Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation (a) being a general partner or limited partner of any partnership, being a member of any limited liability company (whether as a managing member or otherwise) or a shareholder, officer or director of any corporation; (b) rendering advice or services to other Persons; (c) investing their own capital and revenues or the capital and revenues of others in any fashion; (d) those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company; and (e) owning property in the vicinity of or that otherwise competes with the

Property. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Members shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account and to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. The Members hereby waive any and all rights and claims which they may otherwise have against the other Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any of such activities.

6.    Management and Control of the Company.

6.1    Management of the Company by the Managing Member.

a.    Exclusive Management by the Managing Member. The business, property and affairs of the Company shall be managed exclusively by the Managing Member, and the Managing Member shall have full, complete, exclusive and sole authority, power, and discretion to manage and control all aspects of the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

b.    Management of Funds and Obligations to Pay Money. The Managing Member is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company. All checks, drafts, and other instruments obligating the Company to pay money must be signed on behalf of the Company by the Managing Member.

6.2    Performance of Duties: Liability of Members.

a.    The Managing Member shall perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. With respect to all matters (including disputes with respect thereto) relating to the Company, its business, and all computations and determinations required to be made under this Agreement, the Members may rely on, and shall have no liability to the Company or any other Member if it relies on, the opinion or advice of accountants, lawyers or consultants retained by the Company or by the Members on behalf of the Company. A Member who so performs its duties shall not have any liability to non-Members of the Company by reason of being or having been a Member of the Company. The Members shall not be liable to the Company or any other Member for, and the Company shall indemnify, defend, protect and hold harmless the Members and its Affiliates from and against, any Liabilities incurred by reason of their acts or omissions in connection with the Company's business or in dealing with other Members or third parties on behalf of the Company if such acts or omissions are taken or not taken in good faith and are not finally

adjudicated by a court of competent jurisdiction to constitute fraud or gross negligence by a Member or its Affiliates, employees, delegates, agents, successors or assigns. The Members may require in all Company contracts that it will not be personally liable thereunder, and that the contracting entity must look solely to the Company and its assets to satisfy Liabilities. In any case where a Member or his Affiliates, employees, delegates, agents, successors or assigns are personally liable on Company obligations, all Liabilities incurred first must be satisfied from the assets of the Company (including any insurance).

        b.    Under no circumstances will any director, officer, shareholder, member, manager, partner, employee, agent or Affiliate of any Member have any personal responsibility for any liability or obligation of a Member (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member, and the Company against a Member will be limited to the assets of the Member as they may exist from time to time.

       6.3    Devotion of Time.  No Member is obligated to devote all of his time or business efforts to the affairs of the Company. Each Member shall devote whatever time, effort, and skill as may be reasonably necessary for the operation of the Company.

       6.4    Limited Liability.  No person who is a Member or officer or both a Member and officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member or officer or both a Member and officer of the Company.

       6.5    Compensation and Reimbursement.  The Company will pay, or reimburse, the Managing Member and its Affiliates for all Liabilities paid or incurred by the Managing Member and its Affiliates in connection with the performance of its duties under this Agreement and in connection with the Company's business, provided that such expenses are approved by the Managing Member. Reimbursable expenses include, without limitation, out-of-pocket fees and other amounts paid or incurred by the Managing Member for attorneys, accountants, bookkeepers, inspectors, engineers, contractors, project managers, brokers and consultants attributable to the conduct of the Company's business, but not the overhead of any Member.

7.    Allocation of Profits, Losses and Distributions.

       7.1    Allocations of Profits and Losses.  Profits and Losses shall be allocated to the Members in accordance with Exhibit "C" attached hereto.

       7.2    Distributions.

       a.    Timing of Distributions.  Distributions shall be made as determined by the Managing Member.

       b.    Form of Distribution.  A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any Distribution from the Company in any

form other than money. No Member may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon the dissolution and winding up of the Company, no Member may be compelled to accept a Distribution of any asset in kind.

        c.    Distributions of Distributable Cash. In each fiscal year of the Company, Distributions of Distributable Cash shall be made to the Members as follows:

        i    First, to the Members in proportion to and up to the amount of the Members' respective Unrepaid Capital Contributions;

        ii    next, to the Members in proportion to their respective Member Percentages.

        d.    Liquidating Distribution. Upon a dissolution of the Company, the Managing Member shall take or cause to be taken a full account of the Company's assets and liabilities as of the date of such dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and to terminate its business. The cash proceeds from the liquidation, as and when available therefor, shall be applied in the following order of priority:

        i    to the payment of all Liabilities of the Company and the necessary expenses of liquidation;

        ii    thereafter, to the Members in the amounts and in the priorities set forth in Sections 7.2(c) above.

        iii    Except as provided in Section 7.2(d)(i) above, the Managing Member shall use reasonable efforts to distribute the proceeds from a liquidation in the same calendar year in which the sale of Company assets occurs.

8.    Transfer and Assignment of Membership Interests. No Member shall be entitled to Transfer all or any part of such Member's Membership Interest without the consent of the Managing Member. Transfers in violation of this Article 8 shall be invalid and shall not be reflected on the Company's books.

9.    Accounting, Records, Reporting By Members.

    9.1    Books and Records. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes or such other method determined by the Managing Member. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all books and records as required by the Code.

    9.2    Filings. The Managing Member, at Company, expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The

Managing Member, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations.

9.3   Bank Accounts. The Managing Member shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.4   Accounting Decisions and Reliance on Others.   All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managing Member. The Managing Member may rely upon the advice of its accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.5   Tax Matters for the Company Handled by Managing Member.   The Managing Member shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members.   The Managing Member shall be the "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and to expend the Company funds for professional services and costs associated therewith.   In its capacity as "Tax Matters Partner", the Managing Member shall oversee the Company tax affairs in the overall best interests of the Company.

9.6   Tax Status and Returns.

a.   Accountants. The Company's accountant shall be selected by the Managing Member.

b.   Status as Partnership for Tax Purposes. Any provision hereof to the contrary notwithstanding, solely for United States federal income tax purposes, each of the Members hereby confirms that the Company will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.

9.7   Mandatory Section 754 Election. Upon a Transfer by a Member of an interest in the Company, which Transfer is permitted by the terms hereof, or upon the death of a Member or the distribution of any Company property to one or more Members, the Members, upon the request of one or more of the transferees or distributes, shall cause the Company's accountants to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Sections 734 or 743 of the Code, as the case may be.   The cost of preparing said election, and any additional accounting expenses of the Company occasioned by said election, shall be borne by said transferees or distributees.